# COLLECTIVE EXHIBIT 1

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

| | | |
|---|---|---|
| METROPOLITAN NASHVILLE AIRPORT AUTHORITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 22-0304-II |
| | ) | |
| AFFILIATED FM INSURANCE COMPANY, | ) | JURY DEMAND |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Metropolitan Nashville Airport Authority (the "Airport") files this Complaint against Defendant Affiliated FM Insurance Company ("Defendant") and states as follows:

### THE PARTIES

1.  The Airport is a Tennessee governmental entity with its principal place of business at One Terminal Drive Suite 501, Nashville, TN 37214. The Airport owns and manages the John C. Tune Airport ("Tune"), located at 110 Tune Airport Drive, Nashville, TN 37209. Tune is a general aviation airport located in West Nashville in the Cockrill Bend area, serving the needs of regional corporate and private aircraft.

2.  Defendant is an insurance company conducting business in the State of Tennessee. Defendant is a Rhode Island corporation with its principal place of business located at 270 Central Avenue, Johnston, Rhode Island 02919-4949. Defendant may be served with process through the Commissioner of the Tennessee Department of Commerce and Insurance, 500 James Robertson Parkway, Nashville, TN 37243-1131.

4861-9757-6462

1

3.    The Airport seeks *inter alia*, a declaration of its rights, status, and other legal relations with respect to Defendant, arising out of its contract of insurance with Defendant.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over this action under Tennessee Code Annotated sections 16-11-102, -103.

5.    Defendant is subject to the personal jurisdiction of this Court pursuant to Tennessee Code Annotated section 20-2-214(a)(4).

6.    Venue is proper in this Court under Tennessee Code Annotated section 16-11-114 because Davidson County is the county where the loss at issue occurred and where this cause of action arose.

## FACTS

7.    This insurance coverage dispute arises out of the devastating March 3, 2020 tornado that obliterated the hangars and caused catastrophic property damage at Tune (the "loss").

8.    Defendant issued to the Airport an insurance policy, Policy No. IA038, for the policy period March 1, 2019, to March 1, 2020 ("Policy"), which had been extended to July 1, 2020. A true and correct copy of the Policy and Policy extension is attached as **Exhibit 1**.

9.    The Policy covers the Airport's property at various locations, including at Tune, against "ALL RISKS OF PHYSICAL LOSS OR DAMAGE."

10.    The Airport timely notified Defendant of the loss.

11.    There is no dispute that tornado damage is a covered cause of loss under the Policy. Defendant has conceded that the Policy provides coverage for the loss.

12.    The primary dispute concerns the actual cash value or replacement value of various damaged and destroyed hangars, i.e., the amount that Defendant must pay the Airport for the loss.

13.     The Airport merely seeks to recover the amount that it would cost to rebuild the buildings as they existed immediately before the loss in a manner that complies with FAA rules and regulations and applicable codes.

14.     Section L (Valuation) states that "[a]djustment of the physical loss amount(s) under this Policy will be as of the date of loss at the place of loss, and for no more than the interest of the Insured." It additionally states:

> 1. Adjustment of physical loss to property will be determined based on the lesser of the following unless stated otherwise below or elsewhere in this Policy:
>
> a) The cost to repair.
> b) The cost to rebuild or replace on the same site with new materials of like size, kind and quality.
> c) The cost to rebuild, repair or replace on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.
> d) On real property or machinery and equipment, other than stock, offered for sale on the date of the loss, the selling price.

15.     Tune has obtained two independent replacement cost estimates from reputable, licensed general contractors in the area for an exact rebuild of the buildings without including any improvements or enhancements. Specifically, Faithful Gould ("FG") estimated that the total cost of construction for the scope of the project would be $10,458,421, and Connico estimated the construction cost to be $9,315,000.

16.     Additionally, FEMA provided a cost estimate for replacement based on the pre-approved scope, and FEMA's updated estimate is $10,182,116. FEMA, however, has taken the position that Tune does not qualify for any FEMA assistance, as the proceeds should all be recoverable from Defendant.

17.     The actual cost to replace the hangars is approximately $15,122,652.

18.     Defendant apparently obtained an estimate from ServiceMaster Recovery Management ("SRM") dated November 11, 2020, stating that the replacement cost for Tune's

hangers is approximately $6,799,625.66—much less than any of the above independent estimates from Tennessee contractors and the actual cost to replace. SRM clearly states that its work product is merely an estimate on the first page of its document.

19.     SRM is not a licensed Tennessee contractor, and its bid was invalid and unenforceable.

20.     Defendant did not obtain any estimates from Tennessee licensed contractors in determining the cost necessary to rebuild the damaged and destroyed hangars.

21.     In addition to being from an unlicensed contractor, the SRM estimate is flawed and was prepared solely for the benefit of Defendant. SRM's estimates of square footage for the various buildings differed from that provided by Tune and used by FG, Connico, and FEMA. Finally, SRM's bid states that the scope of work was provided by Solis & Parker Associates report dated 8/3/2020, but the SRM estimate ignored the report's statement: "Scope of replacement to include new foundations and anchors required to meet present day code." A true and correct copy of the Solis & Parker Associates report is attached as **Exhibit 2**.

22.     In other words, the SRM quote does not include new foundations, but proposes to reuse the existing, damaged, and structurally unsound building pads that do not meet the modern Building Codes--directly in contravention to the scope prepared by Solis & Parker Associates for Defendant. According to SRM, it would use the existing pads, cut out the former post and anchor bolts, and reattach new with epoxy and concrete adhesives. Two different Tennessee engineering firms have opined that this approach is unacceptable and both agree that the footings and concrete slabs must be replaced.

23.     Counsel for the Airport sent a demand letter to Defendant on May 5, 2021, demanding that Defendant agree to pay above and beyond SRM's flawed estimate. A true and

4861-9757-6462

4

correct copy of the demand letter is attached as **Exhibit 3**. On May 24, 2021, Defendant delivered a response. A true and correct copy of the May 24, 2021 response without its attachments is attached as **Exhibit 4**.

24.    On July 28, 2021, the Airport and Defendant met in person to discuss two primary areas for which Defendant asserted that it needed additional information: (1) the requirements of the Federal Aviation Administration ("FAA") for relocating slabs and necessitating certain redesign elements and (2) code requirements. The Airport provided all requested information at the in-person meeting.

25.    Defendant subsequently hired Envista Forensics purportedly to investigate "certain matters pertaining to [the Airport's] efforts to recover from the subject loss event." Instead of responding to any of the FAA or code items, in September 2021, Envista requested a litany of additional information, including multiple interviews, none of which relates to FAA or code requirements.

26.    Defendant's antics of requesting a veritable mountain of information without any intent to pay the full amount owing under the Policy further demonstrates that it has no intention to pay what it owes under the Policy and merely intends to avoid paying the Airport what is owed under the Policy.

27.    The Airport has complied with everything Defendant previously required and has given Defendant all relevant documentation. Despite the fact that Defendant has in its possession everything that it needs to adjust the claim, Defendant continues to delay resolution of the Airport's claim by either asking for documents it never previously requested nor required in a piecemeal fashion or by asking for documents and information already in Defendant's possession in a

different form or format. Defendant's delay tactics breach the implied covenant of good faith and fair dealing with its insured.

28.     As a result, on January 24, 2022, the Airport demanded an appraisal as provided under Section B (Appraisal) of the Loss Adjustment and Settlement part of the Policy and requested that the parties enter into a tolling agreement to work out their issues outside of court. A true and correct copy of the Airport's appraisal demand is attached as **Exhibit 5**.

29.     The Airport subsequently notified Defendant of the Airport's selected appraiser. A true and correct copy of the Airport's notice of its selected appraiser is attached as **Exhibit 6**.

30.     In response, Defendant ignored the Airport's request to enter into a tolling agreement and claims that appraisal is "premature" and "objects to moving forward with an Appraisal proceeding." According to Defendant, the Airport has not yet provided "a signed and sworn proof of loss" but that Defendant would give the Airport more time to submit a proof of loss. A true and correct copy of the Defendant's response to the Airport's appraisal demand is attached as **Exhibit 7**. Upon information and belief, this is the first time that Defendant has requested a proof of loss from the Airport. Defendant then provided the proof of loss form for the Airport to complete only after the Airport asked for the form.

31.     Defendant has also waived the obligation for the Airport to provide a proof of loss because Defendant has made payments to the Airport prior to receiving the proof of loss and has not previously conditioned payments on receipt of a proof of loss.

32.     As of the date of the filing of this Complaint, the Airport has timely completed and sent to Defendant a signed and sworn proof of loss form that provides the Airport's best estimate of damages, but which was made without the benefit of having a formal appraisal to determine the amount of appraised damages.

33. The Airport has also incurred significant business interruption and business income losses that are expressly covered by the Policy.

34. To date, Defendant has paid less than $5,500,000 to the Airport under the Policy for the damaged hangars and under $700,000 for business interruption.

35. With respect to business income losses, Defendant has inappropriately and inaccurately withheld funds; has applied extraneous, unsubstantiated post-loss conditions to the amount of loss; and has inappropriately limited the timeframe for recovery of business interruption loss.

36. Defendant has also refused to pay the depreciation portion of the loss even though Defendant is aware that the Airport has incurred the costs to restore the damaged property and had promised the Airport that it would release the depreciated funds.

37. These amounts have unequivocally been due and owing, and Defendant promised that it would pay those amounts. Despite Defendant's previous promises and legal obligation to pay the funds, Defendant still refuses to release the funds without any legal or valid basis for doing so.

38. Upon information and belief, Defendant applied depreciation on labor-related costs and has withheld payment of funds to the Airport for depreciation related to labor as prohibited by Tennessee law.

39. Defendant has also failed to pay and remit to the Airport other amounts due and owing under the Policy that have been specifically demanded by the Airport and that have been substantiated as being paid.

40. As of the date of the filing of this Complaint, the Airport has sent to Defendant everything requested by Defendant. At a minimum, Defendant already has in its possession the

information it needs to adjust the Airport's claim. Defendant's successive requests for information in piecemeal fashion, coupled with Defendant's refusal to enter into a tolling agreement for the parties to resolve this dispute without court involvement, shows that Defendant does not intend to adjust the Airport's claim in good faith. And for its part, Defendant has failed to perform under the Policy.

## CLAIMS FOR RELIEF

### I. DECLARATORY JUDGMENT UNDER TENNESSEE CODE ANNOTATED SECTIONS 29-14-101 TO -113

41. The Airport incorporates each of its previous averments as if set forth herein.

42. A dispute exists between the Airport and Defendant concerning their respective rights and obligations under the Policy.

43. This dispute is ripe for adjudication and is therefore justiciable by this Court.

44. The Airport seeks a declaratory judgment declaring that Defendant owes in excess of $15,122,652 under the Policy for the Building, which is well above and beyond what Defendant has paid in reliance on the flawed SRM estimate.

45. The Airport requests that the Court enforce the declaratory judgment through an order directing Defendant to fulfill all obligations to the Airport under the Policy.

### II. BREACH OF CONTRACT

46. The Airport incorporates each of its previous averments as if set forth herein.

47. The Policy between Defendant and the Airport was a valid contract.

48. The Airport satisfied its obligation under the Policy by paying the required premiums, reporting the loss to Defendant, sending any information requested by Defendant, demanding an appraisal, notifying Defendant of the Airport's selected appraiser, and otherwise cooperating with Defendant as it adjusts the loss.

49.     Defendant has refused to cooperate and has provided excuse after excuse to delay paying all amounts due and owing under the policy.

50.     Defendant's nonperformance of its agreement to provide full coverage under the Policy, including for the damaged hangars, for business interruption, and for other coverage provisions of the Policy, is a material breach of the contract.

51.     Defendant's nonperformance of its agreement to enter into an appraisal proceeding is a material breach of the contract.

52.     The Airport has complied with everything Defendant previously required and has given Defendant all relevant documentation. Despite the fact that Defendant has in its possession everything that it needs to adjust the claim, Defendant continues to delay resolution of the Airport's claim by either asking for documents it never previously requested nor required in a piecemeal fashion or by asking for documents and information already in Defendant's possession in a different form or format.  Defendant's delay tactics constitute a breach of the implied covenant of good faith and fair dealing with its insured.

53.     As a result of Defendant's breach of the Policy, the Airport has sustained damages.

## III.    STATUTORY BAD FAITH PENALTY UNDER TENNESSEE CODE ANNOTATED 56-7-105

54.     The Airport incorporates each of its previous averments as if set forth herein.

55.     The Airport satisfied its obligation under the Policy by paying the required premiums, reporting the loss to Defendant, sending any information requested by Defendant, and otherwise cooperating with Defendant as it adjusts the loss.

56.     The Policy has, by its terms, become due and payable.

57.     The Airport has made a demand for payment above and beyond the amount Defendant already paid in reliance on an unreliable, and void and unenforceable estimate from SRM.

58.     If the Airport were to have engaged SRM, the Airport would have been violating applicable law and would have committed a misdemeanor. Tenn. Code Ann. § 62-6-120. Yet despite clear statutory prohibitions against doing so, Defendant has attempted to compel the Airport to engage SRM to rebuild Tune and has relied exclusively on the SRM estimate in failing to pay the Airport what it is owed.

59.     Defendant owed the Airport the duty to use good faith and diligence in responding to and adjusting claims.

60.     The Airport is entitled to recover the depreciation expense that has been previously withheld by Defendant.

61.     Defendant promised to pay the depreciation expense to the Airport but has without justification or reason failed to pay that depreciation expense.

62.     Upon information and belief, Defendant applied depreciation to the labor costs to complete construction.

63.     Applying depreciation to labor costs is prohibited by Tennessee law and such conduct constitutes bad faith.

64.     Defendant's refusal to pay all amounts due and owing under the Policy was not in good faith. Defendant's reliance on an unlicensed contractor's estimate to determine the amount of loss was not done in good faith.

65.     Defendant's successive requests for documentation in piecemeal fashion (after the Airport has given Defendant everything it needs to adjust the Airport's claim), coupled with

Defendant's refusal to enter into a tolling agreement with the Airport, shows that it does not intend to adjust the Airport's claim in good faith.

66. The Airport has incurred significant costs because of Defendant's delays by successive requests for more information not necessary to adjust the Airport's claim, repeated delays, refusal to pay all amounts due and owing, and refusal to enter into an appraisal proceeding as provided by the Policy.

## PRAYER FOR RELIEF

WHEREFORE, the Airport respectfully requests that:

    a.  Defendant be compelled to adhere to the appraisal process in its Policy and be ordered to submit to the appraisal process;

    b.  Judgment be granted against Defendant in favor of the Airport;

    c.  The Court declare that Defendant is liable for all amounts due and owing under the Policy;

    d.  The Airport be awarded compensatory damages, extra-contractual damages for bad faith penalties, punitive damages, interest, costs, attorneys' fees, pre-judgment interest, and other relief as this Court deems just and proper.

    e.  The case be tried by a six-person jury in this action.

4861-9757-6462

11

WALLER LANSDEN DORTCH & DAVIS, LLP



Mark M. Bell (Tenn. BPR No. 029048)
Quynh-Anh D. Kibler (Tenn. BPR No. 035096)
511 Union Street, Suite 2700
Nashville, Tennessee 37219
(615) 244-6380
mark.bell@wallerlaw.com
qa.kibler@wallerlaw.com

*Counsel for Plaintiff,*
*Metropolitan Nashville Airport Authority*

4861-9757-6462

# Exhibit 1




Affiliated FM Insurance Company
P.O Box 7500
Johnston, RI 02919

## DECLARATIONS PAGE

| Policy No. | Previous Policy No. | DATE OF ISSUE |
|---|---|---|
| IA038 | GO524 | 01-Mar-2019 |
| Account No. | | |
| 1-32565 | | |

In consideration of this Policy's Provisions, Conditions, Stipulations, Exclusions and Limits of Liability, and the premium charged, Affiliated FM Insurance Company, hereinafter referred to as the "Company", does insure:



**INSURED:**

Metropolitan Nashville Airport Authority
1 Terminal Drive
Suite 501
Nashville, TN 37214-4110

(For Complete Title See Policy)

The term of this Policy is from the **1st day of March 2019 to the 1st day of March 2020** at 12:01a.m., Standard Time, at the Locations of property involved as provided in this Policy.

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

This Policy is made and accepted subject to the above provisions and those hereinafter stated, which are made a part of this Policy, together with such other provisions and agreements as may be added to this Policy.

In Witness, this Company has issued this Policy at its office in Alpharetta, Georgia this 1st day of March 2019.

Authorized Signature
SBR/jrs

Secretary

President

PRO DEC 4100 (04/15)
© 2017 AFM. All rights reserved.

# Loss Reporting and Contact Information
# Atlanta Operations



---

**Claims Manager:**

Michael J. Brugh, PE, CPCU
Affiliated FM Insurance Company
Preston Ridge III
3460 Preston Ridge Road, Suite 400, Alpharetta, GA 30005
Tel: 770-777-3670
Michael.Brugh@FMGlobal.com

**Property Loss Reporting Procedure:**

To ensure that you receive prompt claims service, be sure to report a loss immediately. This enables us to provide you a professional property adjuster to examine your loss. Your loss may give rise to a claim under your Affiliated FM Insurance Company policy.

**Notice of Loss:**

The notice and report of any loss under an Affiliated FM Insurance Company policy should be communicated by emailing: **newlossatlanta@affiliatedfm.com**, or by calling the 24-hour claims hotline: **1-877-NEW-LOSS (1-877-639-5677).**

If this first notice and report is made orally, it should be confirmed in writing including at least the same information as was provided in the oral first notice and report.

**Leaving a Message:**

When leaving a message, please include the following information:

- Name and phone number of person to contact
- A brief description of the loss

A claims adjuster will return your call promptly.

---

**Account Engineer:**

Israel Pagan
Affiliated FM Insurance Company
Preston Ridge III
3460 Preston Ridge Road, Suite 400, Alpharetta, GA 30005
Tel: 770-777-3668
Israel.Pagan@AffiliatedFM.com

**Jurisdictional Services:**

For more information on our jurisdictional inspections services, please contact the Account Engineer as listed above.

## NOTICE TO TENNESSEE POLICYHOLDERS

The Provisions of Chapter 0780-1-57 requires that certain information accompany all policies issued or renewed after January 1, 1989.

**Policyholder Service Office of:** Affiliated FM Insurance Company

**Address:**                    Preston Ridge III
                                3460 Preston Ridge Road, Suite 400
                                Alpharetta, GA 30005

**Telephone Number:**           770-777-3600



Member of the FM Global Group

270 Central Ave
Johnston, RI 02919
www.affiliatedfm.com

Thank you for placing your property insurance with AFM. We believe insurance should be straightforward and certain. That is why our proVision® 4100 policy is easy to read and navigate, while providing you broad coverage.

In addition to providing property insurance, AFM would like to help you protect your business and achieve your goals. In partnering with AFM, you have the strength of FM Global Group behind you, including a strong balance sheet and access to our market-leading loss prevention engineering products and services that are based on more than 180 years of experience as a property specialist. We are eager to work with you and your broker to choose how to best identify, prioritize and reduce future loss in a way that makes practical and affordable sense.

Our engineering services, combined with the comprehensive coverage of our proVision 4100, will give you peace of mind and allow you to focus on what matters most—making your business thrive. We are committed to maintaining a long-term, mutually beneficial relationship with you. And, it is our hope that you will take advantage of the many tools and resources we offer our clients, such as online training, onsite policy workshops and access to AFM Online, our powerful extranet that includes policy documents and data-driven risk management tools.

If you have any questions or concerns, please do not hesitate to contact your local account team.

Respectfully,

James R. Galloway
Senior Vice President, AFM

# Loss Reporting and Contact Information
# Atlanta Operations



**Claims Manager:**

Michael J. Brugh, PE, CPCU
Affiliated FM Insurance Company
Preston Ridge III
3460 Preston Ridge Road, Suite 400, Alpharetta, GA 30005
Tel: 770-777-3670
Michael.Brugh@FMGlobal.com

**Property Loss Reporting Procedure:**

To ensure that you receive prompt claims service, be sure to report a loss immediately. This enables us to provide you a professional property adjuster to examine your loss. Your loss may give rise to a claim under your Affiliated FM Insurance Company policy.

**Notice of Loss:**

The notice and report of any loss under an Affiliated FM Insurance Company policy should be communicated by emailing: newlossatlanta@affiliatedfm.com, or by calling the 24-hour claims hotline: 1-877-NEW-LOSS (1-877-639-5677).

If this first notice and report is made orally, it should be confirmed in writing including at least the same information as was provided in the oral first notice and report.

**Leaving a Message:**

When leaving a message, please include the following information:

- Name and phone number of person to contact
- A brief description of the loss

A claims adjuster will return your call promptly.

**Account Engineer:**

Israel Pagan
Affiliated FM Insurance Company
Preston Ridge III
3460 Preston Ridge Road, Suite 400, Alpharetta, GA 30005
Tel: 770-777-3668
Israel.Pagan@AffiliatedFM.com

**Jurisdictional Services:**

For more information on our jurisdictional inspections services, please contact the Account Engineer as listed above.

## NOTICE TO TENNESSEE POLICYHOLDERS

The Provisions of Chapter 0780-1-57 requires that certain information accompany all policies issued or renewed after January 1, 1989.

**Policyholder Service Office of:** Affiliated FM Insurance Company

**Address:**

Preston Ridge III
3460 Preston Ridge Road, Suite 400
Alpharetta, GA 30005

**Telephone Number:**

770-777-3600





Affiliated FM Insurance Company
P.O Box 7500
Johnston, RI 02919

## DECLARATIONS PAGE

| Policy No. | Previous Policy No. | DATE OF ISSUE |
|---|---|---|
| IA038 | GO524 | 01-Mar-2019 |
| Account No. | | |
| 1-32565 | | |

In consideration of this Policy's Provisions, Conditions, Stipulations, Exclusions and Limits of Liability, and the premium charged, Affiliated FM Insurance Company, hereinafter referred to as the "Company", does insure:

---

**INSURED:**

Metropolitan Nashville Airport Authority
1 Terminal Drive
Suite 501
Nashville, TN  37214-4110

(For Complete Title See Policy)

---

The term of this Policy is from the **1st day of March 2019 to the 1st day of March 2020 at 12:01a.m.,** Standard Time, at the Locations of property involved as provided in this Policy.

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

This Policy is made and accepted subject to the above provisions and those hereinafter stated, which are made a part of this Policy, together with such other provisions and agreements as may be added to this Policy.

In Witness, this Company has issued this Policy at its office in Alpharetta, Georgia this 1st day of March 2019.

_____
**Authorized Signature**
SBR/jrs

_____
Secretary

_____
President

PRO DEC 4100 (04/15)
© *2017 AFM. All rights reserved.*

# DECLARATIONS

## A. POLICY TERM:

01-March-2019 to 01-March-2020

## B. NAMED INSURED:

Metropolitan Nashville Airport Authority, Nashville International Airport, John C. Tune Airport, MNAA Properties Corporation, Arts at the Airport Foundation, MPC Holdings LLC, MPC Conrac, LLC and its wholly or majority owned subsidiaries and any interest which may now exist or hereinafter be created or acquired which are owned, controlled or operated by any one or more of those named insureds.

## C. POLICY LIMIT:

This Company's total limit of liability, including any insured Business Interruption loss, will not exceed the Policy Limit of $800,000,000 as a result of any one **occurrence** subject to the respective sub-limits of liability shown elsewhere in this Policy.

## D. POLICY TERRITORY:

Coverage provided by this Policy is limited to property while located within the United States of America except as follows:

### Cyber Coverage Territory

Coverage provided in Data, Programs or Software; Off-Premises Data Services Property Damage and Business Interruption and Computer Systems Non-Physical Damage is limited to anywhere in the world except Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

## E. INSURANCE PROVIDED:

1. This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as follows:

   As per the following schedules on file with the company:

   File Name: "2019 03 PROP EXP Statement of Values (NIA) 2.7.2019. xls" received via email dated 2.8.2019 (excluding project 2)
   File Name: "2019 03 PROP EXP Statement of Values Tune Airport updated 2.7.19.xls" received via email dated 2.8.2019
   File Name: "2019 03 PROP EXP Statement of values (boilers chillers) updated 2017-12.xls" received via email dated 2.8.2019
   File Name: "2019 03 Multi EXP Bridges Schedule updated 2018-12-14.xls" received via email dated 2.8.2019
   File Name: "Business Interruption Values FY19-FY20.pdf" received via email dated 2.6.2019
   File Name: "Extra Business Expense Worksheet With Support for review.pdf" received via email dated 2.6.219

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 22 of 133 PageID #: 25

# DECLARATIONS

2. This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, not to exceed the limits of liability specified for the coverages indicated, while located as follows:

| Location Schedule | Limits of Liability |
|---|---|

Bridge over Murfreesboro Pike, (R/W 2C) Bridge, 1 Terminal Drive, Nashville, TN, 37214, Index No. 084843.35

| | |
|---|---|
| Real Property | $27,298,767 |
| Personal Property | NOT COVERED |
| Business Interruption | NOT COVERED |

Bridge over Donelson Pike, (T/W Juliet) Bridge, Nashville, TN, 37214

| | |
|---|---|
| Real Property | $3,734,853 |
| Personal Property | NOT COVERED |
| Business Interruption | NOT COVERED |

Bridge over Donelson Pike, (T/W Lima) Bridge, Nashville, TN, 37214

| | |
|---|---|
| Real Property | $3,734,853 |
| Personal Property | NOT COVERED |
| Business Interruption | NOT COVERED |

Bridge 1 Terminal Drive, 1 Terminal Drive Bridge, Nashville, TN, 37214

| | |
|---|---|
| Real Property | $1,699,512 |
| Personal Property | NOT COVERED |
| Business Interruption | NOT COVERED |

## F. SUB-LIMITS:

Unless otherwise stated below or elsewhere in this Policy, the following sub-limits of liability, including any insured Business Interruption loss, will be the maximum payable and will apply on a per **occurrence** basis.

The sub-limits stated below or elsewhere in this Policy are part of and not in addition to the Policy Limit.

When a limit of liability applies to a **location** or property, such limit of liability will be the maximum amount payable for all loss or damage.

There shall be no liability under this Policy when "NOT COVERED" is shown as a sublimit.

| | | |
|---|---|---|
| 1. | $50,000,000 | Earth Movement **annual aggregate** for all coverages provided, and is the maximum amount payable for all loss or damage caused by or resulting from Earth Movement, not to exceed: |
| | $50,000 | Earth Movement **annual aggregate** as respects Errors and Omissions, Off-Premises Data Services, Off-Premises Service Interruption, Unnamed Property and Supply Chain combined. |
| 2. | $50,000,000 | Flood **annual aggregate** for all coverages provided, and is the maximum amount payable for all loss or damage caused by or resulting from Flood, not to exceed: |
| | $50,000 | Flood **annual aggregate** as respects Errors and Omissions, Off-Premises Data Services, Off-Premises Service Interruption, Unnamed Property and Supply Chain combined. |
| 3. | $1,000,000 | Pavements and Roadways |

Affiliated FM Policy No. IA038
© 2017 AFM. All rights reserved.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 23 of 133 PageID #: 26

# DECLARATIONS

## Additional Coverages

| | |
|---|---|
| $1,000,000 | Accounts Receivable |
| $100,000 | Arson or Theft Reward |
| Policy Limit | Brand Protection |
| $100,000 | Change of Temperature |
| $100,000 | Communicable Disease - Property Damage **annual aggregate** |
| $500,000 | Data, Programs or Software **annual aggregate** |
| Policy Limit | Debris Removal |
| Policy Limit | Decontamination Costs |
| $100,000 | Deferred Payment |
| Policy Limit | Demolition and Increased Cost of Construction |
| $2,500,000 | Errors and Omissions |
| $2,500,000 | Expediting Expenses |
| $50,000 | Fine Arts not to exceed $10,000 per item for **irreplaceable Fine Arts** |
| $50,000 | Green Coverage not to exceed 25% of the amount of the property damage loss |
| $100,000 | Land and Water Clean Up Expense **annual aggregate** |
| $100,000 | Locks and Keys |
| $100,000 | Money and Securities |
| $5,000,000 | Newly Acquired Property |
| $50,000 | Off-Premises Data Services - Property Damage **annual aggregate** |
| $2,500,000 | Off-Premises Service Interruption - Property Damage |
| $250,000 | Professional Fees |
| Policy Limit | Property Removed from a Location |
| Policy Limit | Protection and Preservation of Property - Property Damage not to exceed $250,000 for security costs |
| $100,000 | Tax Treatment |
| $100,000 | Tenants Legal Liability |
| | Terrorism Coverage and the Supplemental United States Certified Act of Terrorism Endorsement |
| $800,000,000 | A. United States Certified Act of Terrorism coverage |
| $100,000 | B. Terrorism Coverage for Locations Outside of the United States **annual aggregate** not to exceed $100,000 **annual aggregate** for Property Removed from a Location, Unnamed Property and Flood |
| $1,000,000 | Transit not to exceed $50,000 for Business Interruption |
| $2,500,000 | Unnamed Property |
| $1,000,000 | **Valuable Papers and Records** not to exceed $10,000 per item for **irreplaceable Valuable Papers and Records** |

## Business Interruption Coverage

| | |
|---|---|
| Policy Limit | Gross Earnings excluding **ordinary payroll** |
| Policy Limit | Gross Profits for 12 months Period of Liability excluding **ordinary payroll** |
| Policy Limit | Rental Income |
| $10,000,000 | Extra Expense |

# DECLARATIONS

**Business Interruption Coverage Extensions**

| | |
|---|---|
| $250,000 | Attraction Property |
| 30 Days | Civil or Military Authority |
| $100,000 | Communicable Disease - Business Interruption **annual aggregate** for a 12 Month Period of Liability |
| Included in Data, Programs or Software | Computer Systems Non-Physical Damage **annual aggregate** |
| $100,000 | Contractual Penalties |
| $100,000 | Crisis Management not to exceed 30 Days |
| 90 Days | Extended Period of Liability |
| $1,000,000 | Ingress/Egress |
| $250,000 | Leasehold Interest |
| $100,000 | Logistics Extra Cost |
| $50,000 | Off-Premises Data Services - Business Interruption **annual aggregate** |
| Included in OPSI-PD Limit | Off-Premises Service Interruption - Business Interruption |
| Policy Limit | Protection and Preservation of Property - Business Interruption |
| $250,000 | Research and Development |
| $1,500,000 | Soft Costs |
| $500,000 | Supply Chain |

## G. DEDUCTIBLE AMOUNT:

This Company will not be liable for loss or damage, including any insured Business Interruption loss, in any one **occurrence** until the amount of loss or damage exceeds the deductible amount shown below and then this Company will only be liable for its share of the loss or damage in excess of the deductible amount. If two or more deductibles apply to a single **occurrence**, then no more than the largest deductible amount will apply. However, this Policy allows for the application of separate and distinct deductibles and deductibles for specific loss or damage as shown below.

The following deductible amounts shall apply per **occurrence**, unless otherwise stated, for insured loss or damage under this Policy:

1.   $100,000   Earthquake (per **location** for all coverages provided).

2.   $100,000   Flood (per **location** for all coverages provided).

3.   $50,000   Wind and/or Hail (per **occurrence** for all coverages provided).

4.   Boiler and Machinery:

   A.   Property Damage:  $25,000

   B.   Business Interruption Average Daily Value:

   The business interruption deductible will be determined by multiplying the one hundred percent average daily value (ADV) by 1.

   The ADV will be calculated by dividing the sum of the 100% actual annual business interruption values that would have been earned had no loss occurred at the **location** where the physical damage happened plus that proportion of the 100% annual business interruption value at all other **locations** where Business Interruption loss ensues by the number of annual working days.

PRO S-1 4100 (01/17)                                                                 Page 4 of 10
Affiliated FM Policy No. IA038
© *2017 AFM. All rights reserved.*

# DECLARATIONS

5. Communicable Disease Property Damage and Business Interruption:

   Qualifying Period: This Company will not be liable for loss or damage unless access is limited, restricted or prohibited in excess of 48 hours.

   Should this time be exceeded, the insured costs will be calculated beginning from the time access is limited, restricted or prohibited subject to a deductible of $25,000

6. Computer Systems Non-Physical Damage:

   Qualifying Period: This Company will not be liable for loss resulting from the failure of the Insured's electronic data processing or media to operate as a direct result of a malicious act directed at the Named Insured, unless the Period of Liability exceeds 48 hours.

   The Qualifying Period for the cost to temporarily protect under Item 4. b) shall be waived.

   Should this time be exceeded, the insured loss will be calculated beginning from the time of loss subject to a Business Interruption Day Equivalent Deductible:

   The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 2.

   The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the **location** where the loss happened plus that proportion of the 100% annual business interruption value at all other **locations** where business interruption loss ensues, divided by the number of annual working days.

7. Data, Programs, or Software:

   Qualifying Period: This Company will not be liable for loss or damage caused by the malicious introduction of a machine code or instruction, unless the time to recreate or restore physically damaged property exceeds 48 hours.

   Should this time be exceeded, the insured loss or damage will be calculated beginning from the time of loss subject to a deductible of:

   A. Property Damage: $25,000

   B. Business Interruption Day Equivalent Deductible:

      The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 2.

      The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the **location** where the physical damage happened plus that proportion of the 100% annual business interruption value at all other **locations** where business interruption loss ensues, divided by the number of annual working days.

Affiliated FM Policy No. IA038
© 2017 AFM. All rights reserved.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 26 of 133 PageID #: 29

# DECLARATIONS

8. Off-Premises Data Services Property Damage and Business Interruption:

   Qualifying Period: This Company will not be liable for loss or damage unless the Period of Liability exceeds 48 hours.

   Should this time be exceeded, the insured loss or damage will be calculated beginning from the time of loss subject to a deductible of:

   A. Property Damage: $25,000

   B. Business Interruption Day Equivalent Deductible:

      The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 2.

      The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the **location** where the physical damage happened plus that proportion of the 100% annual business interruption value at all other **locations** where business interruption loss ensues, divided by the number of annual working days.

9. Off Premises Service Interruption Property Damage and Business Interruption:

   Qualifying Period: This Company will not be liable for loss or damage unless the Period of Liability exceeds 24 hours.

   Should this time be exceeded, the insured loss or damage will be calculated beginning from the time of loss subject to the deductible(s) that would have applied to the cause of the interruption of services, but not less than:

   A. Property Damage: $25,000

   B. Business Interruption Day Equivalent Deductible:

      The business interruption deductible will be determined by multiplying the one hundred percent day equivalent (DEQ) by 1.

      The day equivalent is the 100% actual annual business interruption value that would have been earned had no loss occurred at the **location** where the physical damage happened plus that proportion of the 100% annual business interruption value at all other **locations** where business interruption loss ensues, divided by the number of annual working days.

10. $250,000    Bridges.

11. Terminal D Builders Risk Project at 1 Terminal Drive, Nashville, TN, 37214

    A. Property Damage: $25,000

    B. Business Interruption Waiting Period:

       In the event of loss or damage insured by this policy, no coverage is provided for business interruption unless and until the period of interruption exceeds 15 days beginning from the time of loss. The company's liability commences only after, and does not include, the waiting period.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 27 of 133 PageID #: 30

# DECLARATIONS

12.     $10,000     All Other Losses Contractors' Equipment.

13.     $25,000     All Other Losses.

## H. SPECIAL TERMS AND CONDITIONS:

### 1. Contractors' Equipment – PRO 202 (4/15)

This Policy covers Contractors' Equipment consisting of the following:

| Description | Manufacturer | Serial Number | Limit of liability |
|---|---|---|---|
| Per Contractors' Equipment Schedule received via e-mail dated 02/12/2019 on file with this Company, named "2019- 2020 Equipment Schedule updated 2.12.2019.xls | | | Per "Value" listed on the Contractors' Equipment Schedule on file with this Company dated 2/12/2019. |
| Rented or Leased Equipment | | | $500,000 per item/ $1,000,000 maximum per occurrence |

Except this policy excludes contractors' equipment consisting of cranes.

The company's maximum liability for any one loss under this Policy for each piece of Contractors' Equipment will not exceed their respective limit(s) shown above per occurrence.

Contractors Equipment Valuation: On property insured under this coverage, the loss amount will not exceed the **actual cash value.**

### 2. Tarmac, Runways, and Taxiways Exclusion

PROPERTY EXCLUDED, is amended to include:

Paved surfaces used for aircraft traffic including but not limited to tarmac, runways, and taxiways.

ADDITIONAL COVERAGES, is amended to include:

Pavements and Roadways - This policy is extended to include direct physical damage to pavements and roadways caused by **named perils** only.

Pavements and roadways do not include tarmacs, runways, and taxiways.

Pavements and roadways do include aprons, which are defined as pavements used by airplanes and other vehicles within 250 ft of the terminal buildings.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 28 of 133 PageID #: 31

# DECLARATIONS

### 3. Bridge Coverage

PROPERTY EXCLUDED, Item 3. is amended to:

**3.** Bridges and tunnels intended for use by motor vehicles licensed for highway use except this exclusion does not apply to the following bridges for direct physical loss caused by **Named Perils:**

Bridge over Murfreesboro Road, (R/W 2C) Bridge, 1 Terminal Drive, Nashville, TN, 37214
Bridge over Donelson Pike, (T/W Juliet) Bridge, Nashville, TN, 37214
Bridge over Donelson Pike, (T/W Lima) Bridge, Nashville, TN, 37214
Bridge 1 Terminal Drive, 1 Terminal Drive Bridge, Nashville, TN, 37214

### 4. Fuel Products and Storage Tank Exclusion

The following applies only to the Fuel Tank Farm located approximately 1,000 ft Southeast of C Concourse near the Multi-Purpose Building:

PROPERTY EXCLUDED is amended to include:

Fuel, including but not limited to gasoline, oil, diesel, kerosene, bio-diesel and natural gas, except in containers of less than five (5) U.S. gallons.

Aboveground and underground storage tanks, contents of tanks, and underground equipment.

### 5. Notice of Cancellation/ Non-Renewal - PRO 337 (4/15)

The time required by the Company for mailing or delivering notice of cancellation or non-renewal of this Policy to:

   a. The First Named Insured, as shown in GENERAL CONDITIONS, CANCELLATION/NON-RENEWAL, and

   b. The Lender or Mortgagee, as shown in GENERAL CONDITIONS, MORTGAGEE/LENDERS LOSS PAYABLE,

is extended from 60 days to 90 days, except the notice for non-payment of premium remains at ten (10) days

### 6. United States Certified Act of Terrorism 2015 - PRO 207 (4/15)

As respects the United States, its territories and possessions and the Commonwealth of Puerto Rico, the definition of terrorism contained in DEFINITIONS is declared null and void and it is agreed that an event defined as a Certified Act of Terrorism under the terms of the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT attached to this Policy shall be considered terrorism within the terms of this policy. Notwithstanding anything contained in this Policy to the contrary, this Policy provides coverage for direct physical loss or damage to insured property and any resulting Business Interruption loss, as provided in the Policy, caused by or resulting from a Certified Act of Terrorism only to the extent coverage is provided under the terms and conditions of the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT attached to this policy. Any difference in limit between loss recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT and this Policy is not recoverable under this Policy.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 29 of 133 PageID #: 32

# DECLARATIONS

### 7. Combined Off-Premises Service Interruption Limit (OPSI) – PRO 614 (1/17)

The Company's total liability for Off-Premises Service Interruption - Property Damage and Off-Premises Service Interruption - Business Interruption combined will not exceed $2,500,000 as a result of one occurrence and replaces the corresponding limits of liability shown in the sublimit section.

### 8. Additional Named Insured – PRO 65 (04/15)

The following is (are) added as Additional Named Insured(s) on property described below, as their interest may appear:

| Additional Named Insured and Address | Location/ Interest |
|---|---|
| Hensel Phelps Construction Co.<br>420 Sixth Avenue<br>Greeley, Colorado 80631 | As respects Real Property only for Terminal D Demolition and Rebuild/Expansion (6 gates with passenger boarding bridges and support ramp space), and expansion to the north and south of existing ticketing and baggage claim areas in the Terminal Wing |

### 9. Data, Programs or Software Split Sublimit for Malicious Introduction of Machine Code and Computer Systems Non-Physical Damage - PRO 847 (12/17)

The Data, Programs or Software SUB-LIMIT in the ADDITIONAL COVERAGES and Computer Systems Non-Physical Damage in the BUSINESS INTERRUPTION COVERAGE EXTENSIONS are amended to:

$1,000,000     Data, Programs or Software for physical loss or damage not caused by the malicious introduction of a machine code or instruction

$500,000     Data, Programs or Software for physical loss or damage caused by the malicious introduction of a machine code or instruction and Computer Systems Non-Physical Damage combined annual aggregate.

### 10. Property Exclusion

The following is added to the PROPERTY EXCLUDED section of the policy;

PROPERTY EXCLUDED is amended to include:

The following builder risk project(s) at 1 Terminal Drive Nashville, TN 37217:

Project 3 including but not limited to: reconfiguration of the ticketing counters, the security check points, new roof canopy, lobby area/market place (all at the Main Terminal), and the new International Affairs Facility (Separate Building).

Project 2: Parking C, Office Plaza, the Transit Station, Parking B and the Hotel.

for the duration of the existing and future builder risk project(s).

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 30 of 133 PageID #: 33

# DECLARATIONS

11. **Debris Removal Coverage Only**

The following wording is added to the INURANCE PROVIDED section of the S-1:

This policy is extended to cover Debris Removal only at the following Insured location:

| Location | Limit of Liability |
|---|---|
| Short Term Parking Garage at:<br>1 Terminal Drive, Nashville, TN 37217 | $5,000,000 |

Resulting from direct physical loss or damage to Real Property only at the above location

## I. INDEX OF FORMS:

The following forms are made part of this Policy:

| Title | Form No. | Edition |
|---|---|---|
| Declarations Page | PRO DEC 4100 | (04/15) |
| Declarations | PRO S-1 4100 | (01/17) |
| All Risk Coverage | PRO AR 4100 | (01/17) |
| Supplemental United States Certified Act of Terrorism Endorsement | 7312 | (1/15) |
| Tennessee Amendatory Endorsement | AFM 6409 | (04/15) |

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 31 of 133 PageID #: 34




# ALL RISK COVERAGE

## Table of Contents

**PROPERTY INSURED** ........................................................................................................ 1

    Real Property ........................................................................................................... 1

    Personal Property ...................................................................................................... 1

**PROPERTY EXCLUDED** .................................................................................................... 1

**EXCLUSIONS** ....................................................................................................................... 2

    Group I .................................................................................................................... 2

    Group II ................................................................................................................... 3

    Group III .................................................................................................................. 4

**ADDITIONAL COVERAGES** ........................................................................................... 5

    Accounts Receivable ................................................................................................. 5

    Arson or Theft Reward .............................................................................................. 5

    Brand Protection ....................................................................................................... 6

    Change of Temperature ............................................................................................. 6

    Communicable Disease – Property Damage ............................................................... 6

    Data, Programs or Software ....................................................................................... 7

    Debris Removal ........................................................................................................ 8

    Decontamination Costs ............................................................................................. 8

    Deferred Payment ..................................................................................................... 8

    Demolition and Increased Cost of Construction .......................................................... 9

    Earth Movement ....................................................................................................... 10

    Errors and Omissions ................................................................................................ 10

    Expediting Expenses ................................................................................................. 10

    Fine Arts and Valuable Papers and Records ............................................................... 11

    Flood ....................................................................................................................... 11

    Green Coverage ........................................................................................................ 11

    Land and Water Clean Up Expense ............................................................................ 12

    Locks and Keys ........................................................................................................ 12

    Money and Securities ............................................................................................... 12

    Newly Acquired Property .......................................................................................... 12

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 32 of 133 PageID #: 35




Off-Premises Data Services – Property Damage.................................................................13

Off-Premises Service Interruption – Property Damage.........................................................13

Professional Fees.............................................................................................................13

Property Removed from a Location ....................................................................................14

Protection and Preservation of Property – Property Damage ...............................................14

Tax Treatment .................................................................................................................14

Tenants Legal Liability .....................................................................................................15

Terrorism........................................................................................................................15

Transit ...........................................................................................................................16

Unnamed Property...........................................................................................................18

**BUSINESS INTERRUPTION** .............................................................................................19

Loss Insured ...................................................................................................................19

Business Interruption Coverage ........................................................................................20

    Gross Earnings ......................................................................................................20

    Gross Profits..........................................................................................................20

    Rental Income .......................................................................................................21

    Extra Expense........................................................................................................22

    BI Select................................................................................................................22

Period of Liability ............................................................................................................22

Business Interruption Exclusions ......................................................................................23

**BUSINESS INTERRUPTION COVERAGE EXTENSIONS** ....................................................24

Attraction Property...........................................................................................................24

Civil or Military Authority ..................................................................................................24

Communicable Disease – Business Interruption..................................................................24

Computer Systems Non-Physical Damage..........................................................................25

Contractual Penalties.......................................................................................................25

Crisis Management...........................................................................................................26

Extended Period of Liability ..............................................................................................26

Ingress/Egress.................................................................................................................27

Leasehold Interest ...........................................................................................................27

Logistics Extra Cost .........................................................................................................27

Off-Premises Data Services – Business Interruption............................................................28

Off-Premises Service Interruption – Business Interruption....................................................29

Protection and Preservation of Property – Business Interruption ...........................................30

Research and Development ...............................................................................................30





Soft Costs ....................................................................................................................................................... 30

Supply Chain ................................................................................................................................................ 30

**LOSS ADJUSTMENT AND SETTLEMENT** ........................................................................................... 32

Abandonment ............................................................................................................................................... 32

Appraisal ...................................................................................................................................................... 32

Collection From Others ............................................................................................................................... 32

Company Option .......................................................................................................................................... 32

Currency for Loss Payment .......................................................................................................................... 32

Legal Action Against this Company ............................................................................................................ 33

Loss Adjustment and Payable ..................................................................................................................... 33

Other Insurance ........................................................................................................................................... 33

Requirements in Case of Loss ..................................................................................................................... 33

Settlement of Claims .................................................................................................................................... 34

Subrogation .................................................................................................................................................. 35

Valuation ...................................................................................................................................................... 35

**GENERAL CONDITIONS** ..................................................................................................................... 37

Application of Policy to Date or Time Recognition ..................................................................................... 37

Cancellation/Non-Renewal ......................................................................................................................... 37

Conformity to Statute .................................................................................................................................. 37

First Named Insured ..................................................................................................................................... 37

Increase in Hazard ....................................................................................................................................... 38

Inspections ................................................................................................................................................... 38

Liberalization Clause .................................................................................................................................... 38

Misrepresentation and Fraud ...................................................................................................................... 38

Mortgagee/Lenders Loss Payable ............................................................................................................... 38

Policy Modification ...................................................................................................................................... 40

Reinstatement of Limits after a Loss ........................................................................................................... 40

Suspension ................................................................................................................................................... 40

Transfer or Rights and Duties under this Policy .......................................................................................... 40

**DEFINITIONS** ....................................................................................................................................... 41

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 34 of 133 PageID #: 37

 

# ALL RISK COVERAGE

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

## A. PROPERTY INSURED

This Policy insures the following property, unless otherwise excluded elsewhere in this Policy, at or within 1,000 feet of a **described location**, to the extent of the interest of the Insured in such property.

1. Real Property in which the Insured has an insurable interest.

2. Personal Property:

   a) Owned by the Insured.

   b) Consisting of improvements and betterments in which the Insured has an insurable interest.

   c) Of directors, officers and employees of the Insured.

   d) Of others in the Insured's custody to the extent the Insured is under obligation to keep insured for physical loss or damage insured by this Policy.

   e) Of others in the Insured's custody to the extent of the Insured's legal liability for insured physical loss or damage to such Personal Property.

   This Company may defend that portion of any suit against the Insured that alleges such liability and seeks damages for such insured physical loss or damage to such Personal Property. This Company may, without prejudice, investigate, negotiate and settle any claim or suit as this Company deems expedient.

This Policy also insures the interest of contractors and subcontractors in insured property during construction, while at or within 1,000 feet of a **described location**, to the extent that the Insured has agreed, prior to loss, to keep such interest insured for insured physical loss or damage to such property. Such interest of contractors and subcontractors is limited to the property for which they have been hired to perform work and will not extend to any Business Interruption coverage provided in this Policy.

## B. PROPERTY EXCLUDED

This Policy excludes the following except as otherwise stated in this Policy:

1. Land, water or any substance in or on land.

2. Growing crops, standing timber or animals.

3. Bridges and tunnels intended for use by motor vehicles licensed for highway use.

4. Reservoirs, canals, dikes or dams.

5. Docks, piers or wharves which are not a structural part of a building.

6. Currency, money, notes or securities, except as provided by the Money and Securities coverage in this Policy.

7. Motor vehicles licensed for highway use or owned by directors, officers or employees of the Insured.

**PRO AR 4100 (01/17)**
© *2017 AFM. All rights reserved.*

Page 1 of 44

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 35 of 133 PageID #: 38



8. Satellites, aircraft or watercraft, except if on land, unfueled and manufactured by the Insured.

9. Property sold by the Insured under conditional sale, trust agreement, installment payment or other deferred payment plan after delivery to the customer, except as provided by the Deferred Payment coverage in this Policy.

10. Underground mines or mine shafts or any property within such mine or shaft.

11. Property while in transit, except as otherwise provided in this Policy.

12. Electronic data, programs or software, except when they are stock in process, finished goods manufactured by the Insured, raw materials, supplies or other merchandise not manufactured by the Insured or as provided by the Data, Programs or Software coverage in this Policy.

13. Property while located **offshore**, except as provided by the Transit coverage in this Policy.

## C. <u>EXCLUSIONS</u>

In addition to the exclusions elsewhere in this Policy, the following exclusions apply unless otherwise stated:

**GROUP I:** This Policy excludes loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss or damage:

1. Nuclear reaction or nuclear radiation or radioactive contamination. However:

    a) If physical damage by fire or sprinkler leakage results, then only that resulting damage is insured; but not including any loss or damage due to nuclear reaction, radiation or radioactive contamination.

    b) This Policy does insure physical damage directly caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the **location**, provided that on the date of loss, there is neither a nuclear reactor nor any new or used nuclear fuel on the **location**. This coverage does not apply to any act, loss or damage excluded in Group I 2f of this Exclusions clause.

    This exclusion Group I Item 1 and the exceptions in Group I Item 1a and Group I Item 1b above do not apply to any act, loss or damage which also comes within the terms of exclusion Group I Item 2b of this Exclusions clause.

2. a) Hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by any:

    i) Government or sovereign power (de jure or de facto);

    ii) Military, naval or air forces; or

    iii) Agent or authority of any party specified in i) or ii) above.

    b) Discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

    c) Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an event.

    d) Seizure or destruction under quarantine or custom regulation, or confiscation by order of any governmental or public authority.

    e) Risks of contraband, or illegal transportation or trade.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 36 of 133 PageID #: 39



**f)** **Terrorism,** including action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism,** except to the extent provided in the Terrorism coverage of this Policy. However, if direct loss or damage by fire results from any of these acts (unless committed by or on behalf of the Insured), then this Policy covers only to the extent of the **actual cash value** of the resulting direct loss or damage by fire to insured property. This coverage exception for such resulting fire loss or damage does not apply to:

    **i)** Direct loss or damage by fire which results from any other applicable exclusion in the Policy, including the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

    **ii)** Any coverage provided in the Business Interruption section of this Policy or to any other coverages provided by this Policy.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion or any other risk of physical loss or damage covered elsewhere in this Policy.

If any act which satisfies the definition of **terrorism** also comes within the terms of Group I Item 2a of this Exclusions clause then Group I Item 2a applies in place of this Group I Item 2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of Group I Item 2b of this Exclusions clause then Group I Item 2b applies in place of this Group I Item 2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of Group I Item 2c of this Exclusions clause then Group I Item 2c applies in place of this Group I Item 2f exclusion.

If any act excluded herein involves nuclear reaction, nuclear radiation or radioactive contamination, this Group I Item 2f exclusion applies in place of Group I Item 1 of this Exclusions clause.

**3.** Any dishonest act, including but not limited to theft, committed alone or in collusion with others, at any time by:

    **a)** An Insured or any proprietor, partner, director, trustee, officer or employee of an Insured; or

    **b)** Any proprietor, partner, director, trustee, or officer of any business or entity (other than a common carrier) engaged by an Insured to do anything in connection with property insured under this Policy.

This Policy does insure acts of direct insured physical damage intentionally caused by an employee of an Insured or any individual specified in b above, and done without the knowledge of the Insured. This coverage does not apply to any act excluded in Group I Item 2f of this Exclusions clause. In no event does this Policy cover loss by theft by any individual specified in a or b above.

**4.** Lack of incoming electricity, fuel, water, gas, steam or refrigerant; outgoing sewerage; or incoming or outgoing voice, data or video; all when caused by an event off the **location,** except as provided by the Off-Premises Data Services and Off-Premises Service Interruption coverages in this Policy. If the lack of such a service directly causes insured physical damage at the **location,** then only that resulting damage is insured.

**5.** **Earth movement,** except as otherwise provided in this Policy.

**6.** **Flood,** except as otherwise provided in this Policy.

**7.** Seepage or influx of water from natural underground sources.

**GROUP II:** This Policy excludes the following, however, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

© 2017 AFM. All rights reserved.

 

Member of the FM Global Group

1. Wear and tear, deterioration, depletion, rust, corrosion, erosion, inherent vice or latent defect.

2. Faulty workmanship, material, construction or design.

3. Loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested or otherwise worked on.

4. Loss or damage caused by or resulting from:

   a) Changes of temperature, except damage to machinery or equipment including fire protective equipment;

   b) Changes in relative humidity,

   All whether atmospheric or not, except as provided by the Change of Temperature and Off-Premises Service Interruption coverages in this Policy.

5. Settling, cracking, shrinking, bulging or expansion of:

   a) Foundations.

   b) Walls.

   c) Floors.

   d) Pavements or roadways.

   e) Roofs.

   f) Ceilings.

6. Loss or damage to personal property in the open from rain, sleet, snow, sand or dust.

7. Theft of precious metal or stones, except when such property is used by the Insured for industrial purposes.

8. Insect, animal or vermin damage.

**GROUP III:** This Policy excludes:

1. Indirect or remote loss or damage.

2. Interruption of business, except to the extent provided in this Policy.

3. Loss of market or loss of use.

4. Loss or damage or deterioration arising from any delay.

5. Mysterious disappearance, loss or shortage disclosed on taking inventory, or any unexplained loss.

6. Loss from enforcement of any law or ordinance:

   a) Regulating the construction, repair, replacement, use or removal, including debris removal, of any property; or

   b) Requiring the demolition of any property, including the cost in removing its debris;

© 2017 AFM. All rights reserved.



Except as provided by the Decontamination Costs and Demolition and Increased Cost of Construction coverages in this Policy.

7. Loss or damage resulting from the voluntary parting with title or possession of property if induced by any fraudulent act or by false pretense.

8. **Contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured. This exclusion does not apply to radioactive contamination which is excluded elsewhere in this Policy.

9. Shrinkage, evaporation or loss of weight, unless directly resulting from other physical damage not excluded by this Policy.

10. Changes in color, flavor, texture or finish, unless directly resulting from other physical damage not excluded by this Policy.

## D. <u>ADDITIONAL COVERAGES</u>

The Additional Coverages below are subject to all the terms and conditions of this Policy including, but not limited to, the limits of liability, deductibles and exclusions shown in the Declarations section.

### 1. Accounts Receivable

This Policy covers amounts which the Insured is unable to collect as a direct result of insured physical loss or damage to accounts receivable records at a **location**.

Coverage includes:

a) Interest charges on any loan to offset impaired collections pending repayment of sums that cannot be collected. Unearned interest charges and service charges on deferred payment accounts and normal credit losses on bad debts will be deducted.

b) Collection expenses in excess of normal collection costs.

c) Other reasonable expenses incurred by the Insured in recreating records of accounts receivable.

After payment of loss by this Company, all amounts recovered by the Insured on accounts receivable for which the Insured has been indemnified will belong to and be paid to this Company by the Insured up to the total amount of loss paid by this Company. All recoveries in excess of such amounts will belong to the Insured.

Accounts Receivable Exclusions: As respects Accounts Receivable, the following additional exclusions apply:

This Policy does not cover shortage resulting from:

a) Bookkeeping, accounting, or billing error or omission.

b) Alteration, falsification, manipulation, concealment, destruction or disposal of records of accounts receivable committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property.





## 2. Arson or Theft Reward

This Policy covers payment of any reward offered by the Insured or on the Insured's behalf for information that leads to conviction of the perpetrator(s) of insured:

**a)** Arson to; or

**b)** Theft of;

Insured property.

## 3. Brand Protection

This Policy gives control of physically damaged property consisting of finished goods or merchandise manufactured by or for the Insured as follows:

**a)** The Insured will have full rights to the possession and control of damaged property in the event of insured physical loss or damage to such property provided proper testing is done to show which property is physically damaged.

**b)** The Insured using reasonable judgment will decide if the physically damaged property can be reprocessed or sold.

Physically damaged property judged by the Insured to be:

**i)** Unfit for reprocessing or selling will not be sold or disposed of except by the Insured, or with the Insured's consent.

**ii)** Fit for reprocessing or selling and this Company elects to take all or any part of physically damaged branded and labeled property, the Insured may at this Company's expense:

    **(a)** Stamp "salvage" on the property or its containers; or

    **(b)** Remove or obliterate the brands or labels,

If doing so will not damage the property.

The Insured must relabel the property or containers in compliance with the applicable requirements of law.

**c)** Any salvage proceeds received will go to the:

**i)** Company at the time of loss settlement; or

**ii)** Insured if received prior to loss settlement and such proceeds will reduce the amount of loss payable accordingly.

## 4. Change of Temperature

This Policy covers spoilage of insured stock and supplies due to:

**a)** Changes of temperature or changes in relative humidity,

Directly resulting from the interruption, in whole or part, of services consisting of electricity, gas, fuel, steam, water or refrigeration by reason of any accidental event, other than insured physical loss or damage, at a **location**.

© 2017 AFM. All rights reserved.



## 5. Communicable Disease – Property Damage

If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:

a) An order of an authorized governmental agency regulating or as result of such presence of **communicable disease;** or

b) A decision of an Officer of the Insured as a result of such presence of **communicable disease,**

This Policy covers the reasonable and necessary costs incurred by the Insured at such **described location** for the:

a) Cleanup, removal and disposal of such presence of **communicable disease** from insured property; and

b) Actual costs or fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from such presence of **communicable disease** on insured property.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to such presence of **communicable disease.**

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Communicable Disease - Property Damage Exclusions: As respects Communicable Disease – Property Damage, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

## 6. Data, Programs or Software

This Policy covers insured **physical loss or damage to electronic data, programs or software,** including physical loss or damage caused by the malicious introduction of a machine code or instruction, while anywhere within this Policy's Territory, including while in transit.

This coverage includes:

a) The cost of the following reasonable and necessary actions taken by the Insured due to actual insured **physical loss or damage to electronic data, programs or software:**

  i) To temporarily protect and preserve insured electronic data, programs or software.

  ii) For the temporary repair of insured **physical loss or damage to electronic data, programs or software.**

  iii) To expedite the permanent repair or replacement of such damaged property.

b) The reasonable and necessary costs incurred by the Insured to temporarily protect or preserve insured electronic data, programs or software against immediately impending insured **physical loss or damage to electronic data, programs or software.** In the event that there is no physical loss or damage, the costs covered under this item will be subject to the deductible that would have applied had there been such physical loss or damage.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

This Additional Coverage excludes loss or damage to data, programs or software when they are **stock in process,** finished goods manufactured by the Insured, **raw materials,** supplies or other merchandise not manufactured by the Insured.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 41 of 133 PageID #: 44



Data, Programs or Software Exclusions: As respects Data, Programs or Software, the following additional exclusion applies:

This Policy excludes the following but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

**a)** Errors or omissions in processing or copying.

**b)** Loss or damage to data, programs or software from errors or omissions in programming or machine instructions.

Data, Programs or Software Valuation: On property insured under this coverage, the loss amount will not exceed:

**a)** The cost to repair, replace or restore data, programs or software including the costs to recreate, research and engineer; or

**b)** The blank value of the media if not repaired, replaced or restored within two years from the date of loss.

## 7. Debris Removal

This Policy covers the reasonable and necessary costs incurred to remove debris from a **location** that remains as the direct result of insured physical loss or damage.

This coverage does not cover the costs of removing:

**a)** Contaminated uninsured property; or

**b)** The **contaminant** in or on uninsured property;

Whether or not the **contamination** results from insured physical loss or damage.

This coverage includes the costs of removal of contaminated insured property or the **contaminant** in or on insured property only if the **contamination**, due to the actual not suspected presence of **contaminant(s)**, of the debris resulted directly from other physical damage not excluded by the Policy.

## 8. Decontamination Costs

If insured property is contaminated as a direct result of insured physical damage and there is in force at the time of the loss any law or ordinance regulating **contamination** due to the actual not suspected presence of **contaminant(s)**, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance. This coverage applies only to that part of insured property so contaminated due to such presence of **contaminant(s)** as a direct result of insured physical damage.

The Company is not liable for the costs required for removing:

**a)** Contaminated uninsured property; or

**b)** The **contaminant** in or on uninsured property;

Whether or not the **contamination** results from insured physical loss or damage.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 42 of 133 PageID #: 45



### 9. Deferred Payment

This Policy covers the Insured's interest in personal property of the type insured that has been sold by the Insured under a conditional sale or trust agreement or any installment or deferred payment plan, if such property sustains physical loss or damage insured by this Policy and only to the extent the Insured is unable to collect the unpaid balance of such interest.

This coverage applies from the time the property is delivered to the buyer until the Insured's interest in it has ceased or the policy terminates or expires, whichever is first.

Deferred Payment Exclusion: As respects Deferred Payment, the following additional exclusion applies:

This Policy excludes:

**a)** Theft or conversion by the buyer of the property after the buyer has taken possession of such property.

**b)** Property not within this Policy's Territory.

Deferred Payment Valuation: On property insured under this coverage, the loss amount will not exceed the lesser of the following:

**a)** The total amount of unpaid installments less finance charges.

**b)** The **actual cash value** of the property on the date of loss or damage.

**c)** The cost to repair or replace with material of like size, kind and quality.

### 10. Demolition and Increased Cost of Construction

This Policy covers the costs as described herein resulting from the Insured's obligation to comply with a law or ordinance, provided that:

**a)** Such law or ordinance is enforced as a direct result of insured physical loss or damage at a **location;**

**b)** Such law or ordinance is in force at the time of such loss or damage; and

**c)** Such **location** was not required to be in compliance with such law or ordinance prior to the happening of the insured physical loss or damage.

Coverage A:

The reasonable and necessary costs incurred by the Insured to comply with the enforcement of the minimum requirements of any law or ordinance that Regulates the demolition, construction, repair, replacement or use of buildings, structures, machinery or equipment.

As respects insured property, this Coverage A covers the reasonable and necessary costs to:

**a)** Demolish any physically damaged and undamaged portions of the insured buildings, structures, machinery or equipment.

**b)** Repair or rebuild the physically damaged and undamaged portions, whether or not demolition is required, of such insured buildings, structures, machinery or equipment.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 43 of 133 PageID #: 46



The Company's maximum liability for this Coverage A at each location in any occurrence will not exceed the actual costs incurred in demolishing the physically damaged and undamaged portions of the insured property plus the lesser of:

**a)** The reasonable and necessary cost, excluding the cost of land, to rebuild on another site; or

**b)** The cost to rebuild on the same site.

Coverage B:

The reasonable estimated cost to repair, replace or rebuild insured property consisting of buildings, structures, machinery or equipment that the Insured is legally prohibited from repairing, replacing or rebuilding to the same height, floor area, number of units, configuration, occupancy or operating capacity, because of the enforcement of any law or ordinance that regulates the construction, repair, replacement or use of buildings, structures, machinery or equipment.

Demolition and Increased Cost of Construction Coverage B Valuation: On property covered under this Coverage B that cannot legally be repaired or replaced, the loss amount will be the difference between: .

**a)** The actual cash value; and

**b)** The cost that would have been incurred to repair, replace or rebuild such lost or damaged property had such law or ordinance not been enforced at the time of loss.

Demolition and Increased Cost of Construction Exclusions: As respects Demolition and Increased Cost of Construction, the following additional exclusions apply:

This Policy does not cover:

**a)** Any cost incurred as a direct or indirect result of enforcement of any law or ordinance regulating any form of **contamination**.

**b)** Any machinery or equipment manufactured by or for the Insured, unless used by the Insured in its operation at the **location** suffering the physical loss or damage.

## 11. Earth Movement

This Policy covers physical loss or damage caused by or resulting from **earth movement.**

## 12. Errors and Omissions

If physical loss or damage is not payable under this Policy solely due to an error or unintentional omission:

**a)** In the address of a property insured by this Policy which existed at the inception date of this Policy or in any subsequent amendments to this Policy;

**b)** That fails to include any **location:**

    **i)** Owned; or

    **ii)** Occupied by the Insured; or

**c)** That results in cancellation of insured property under this Policy;

Then coverage applies to the extent this Policy would have provided coverage had the error or unintentional omission not been made.

PRO AR 4100 (01/17)                                                                Page 10 of 44
© 2017 AFM. All rights reserved.



It is a condition of this Additional Coverage that any error or unintentional omission be reported by the Insured to the Company when discovered and corrected.

## 13. Expediting Expenses

This Policy covers the reasonable and necessary costs incurred to:

a) Temporarily repair or replace; and

b) Expedite the permanent repair or replacement of;

Insured property that has sustained insured physical loss or damage.

This coverage does not include expenses payable elsewhere in this Policy including the cost of permanent repair or replacement of damaged property.

## 14. Fine Arts and Valuable Papers and Records

This Policy covers **fine arts** and **valuable papers and records** while anywhere within this Policy's Territory including while in transit.

Fine Arts and Valuable Papers and Records Exclusion: As respects Fine Arts and Valuable Papers and Records, the following additional exclusion applies:

This Policy excludes:

a) Loss or damage to any **fine arts** as a result of restoring, repairing or retouching processes.

b) Errors or omissions in the processing or copying of **valuable papers and records.**

Fine Arts and Valuable Papers and Records Valuation: On property insured under this coverage, the loss amount will not exceed the lesser of the following:

a) The cost to repair or restore the article to the condition that existed immediately prior to the loss;

b) The cost to replace the article; or

c) The value designated for the article as shown in the Declarations section of this Policy or on a schedule on file with this Company.

In case of physical loss or damage to a **fine arts** or **valuable papers and records** article that is part of a pair or a set, this Company will pay the lesser of the full value or the amount scheduled, if any, of the value of such pair or set only if the damaged article cannot be repaired or restored to its condition before the loss and the Insured surrenders the remaining article or articles of the pair or set to this Company.

## 15. Flood

This Policy covers physical loss or damage caused by or resulting from **flood.**

## 16. Green Coverage

This Policy covers the reasonable and necessary additional costs incurred by the Insured, as a direct result of insured physical loss or damage:

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 45 of 133 PageID #: 48



a) To repair or replace physically damaged insured property with material of like kind and quality which qualifies as **Green.**

b) To replace the insured physically damaged portions of insured roofing systems with vegetative roof(s), including but not limited to the addition of trees, shrubs, plants and lawns to those roof(s), which qualify as **Green,** if this Policy covers Real Property.

c) As part of **Green** reconstruction, to flush out the air in the area of the physically damaged insured property with 100 percent outside air and to provide replacement filtration media for the building's ventilation system that controls the damaged area.

d) For an accredited professional certified by a **Green Authority** to participate in the design and construction for repairing or rebuilding the physically damaged insured property as **Green.**

e) For the process of certification or recertification of the repaired or replaced insured property as **Green.**

f) For **Green** removal, disposal or recycling of the damaged insured property.

Notwithstanding any other provision in this Policy, the Insured must repair or replace the insured real and/or personal property lost, damaged or destroyed as a condition of this coverage.

Green Coverage Exclusions: As respects Green Coverage, the following additional exclusions apply:

This Policy excludes:

a) Stock, **raw materials,** work in process, finished goods, merchandise, **production machinery and equipment,** electronic data processing equipment not used in the functional support of the real property, molds and dies, property in the open, property of others for which the insured is legally liable, personal property of directors, officers or employees of the Insured.

b) Any property adjusted on other than repair or replacement per the Valuation clauses of this Policy.

c) Any loss recoverable elsewhere in this Policy.

## 17. Land and Water Clean Up Expense

This Policy covers the reasonable and necessary costs to remove, dispose of or clean up the actual but not the suspected presence of **contaminant(s)** from uninsured land or water or any substance in or on land, at a **location,** when such property is contaminated as a direct result of insured physical loss or damage to insured property.

This Policy does not cover the cost to clean up, remove and dispose of **contamination** from such property:

a) At any **location** insured for Personal Property only.

b) When the Insured fails to give written notice of loss to this Company within 180 days after the inception of the loss.

## 18. Locks and Keys

This Policy covers the reasonable and necessary cost incurred by the Insured to replace undamaged keys and to replace, adjust or reprogram undamaged locks to accept new keys or entry codes as a result of insured physical loss or damage.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 46 of 133 PageID #: 49



## 19. Money and Securities

This Policy covers physical loss or damage to money and securities at a **location** resulting from:

a) Fire, explosion or sprinkler leakage.

## 20. Newly Acquired Property

This Policy covers property of the type insured that is newly acquired while located anywhere within this Policy's Territory, excluding while in transit.

This coverage terminates:

a) When the newly acquired property is bound by this Company; or

b) When agreement is reached that the property will not be insured under this Policy; or

c) 120 days after the date of acquisition of the property; or

d) At the termination or expiration of this Policy;

Whichever occurs first.

## 21. Off-Premises Data Services - Property Damage

This Policy covers insured physical loss or damage to insured property at a **location** when such physical loss or damage results from the interruption of **off-premises data processing or data transmission services** by reason of any accidental event at the facilities of the provider of such services, while anywhere within this Policy's Territory, that immediately prevents in whole or in part the delivery of such provided services.
For the purposes of this Additional Coverage an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Additional General Conditions:

1) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Off-Premises Data Services - Property Damage Exclusions: As respects Off-Premises Data Services - Property Damage , the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

## 22. Off-Premises Service Interruption - Property Damage

This Policy covers insured physical loss or damage at a **location** caused by or resulting from the interruption, in whole or part, of incoming electric, gas, fuel, steam, water, refrigeration, or outgoing sewerage.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 47 of 133 PageID #: 50



The interruption of such services must be by reason of an accidental event, not otherwise excluded by this Policy, at the facilities of the service provider(s) while anywhere within this Policy's Territory.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Additional Conditions:

This Company will not be liable for deliberate act(s) by the service provider to shed load to maintain system integrity.

Off-Premises Service Interruption - Property Damage Exclusion: As respects Off-Premises Service Interruption - Property Damage the following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

### 23. Professional Fees

This Policy covers the reasonable and necessary expenses incurred by the Insured of:

a) Auditors;

b) Accountants;

c) Architects;

d) Engineers; or

e) Other professionals; and

f) The Insured's own employees,

For producing and certifying particulars or details to determine the amount of loss payable under this Policy for which this Company has accepted liability.

This coverage does not include the fees and expenses of attorneys, public adjusters, loss appraisers, loss consultants or any of their subsidiaries or related or associated entities.

### 24. Property Removed from a Location

This Policy covers insured property when removed from a **location** to avoid or prevent immediately impending insured physical loss or damage to such property. This Policy covers such property for physical loss or damage as provided at the **location** from which the property was removed.

This coverage applies for a period:

a) Of 120 days from the date of removal; but

b) Not beyond the termination or expiration date of this Policy.

### 25. Protection and Preservation of Property - Property Damage

This Policy covers the reasonable and necessary costs incurred for:

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 48 of 133 PageID #: 51



a) Actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

b) Fire department firefighting charges imposed as a result of responding to a fire in, on or exposing the insured property.

c) Restoring and recharging fire protection systems following an insured loss.

d) The water used for fighting a fire in, on or exposing the insured property.

e) Temporary security for a period of time not to exceed 30 consecutive days due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

This coverage does not cover costs incurred for actions to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by the Terrorism coverage of this Policy.

This coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## 26. Tax Treatment

This Policy covers the increased tax liability as a direct result of insured physical loss or damage to insured property. When such tax liability is greater than the tax liability that would have been incurred had there been no such loss or damage, then this Policy will cover only the increased tax liability for the profit portion of a loss payment under this Policy involving finished stock manufactured by the Insured and/or the profit portion of the Business Interruption loss payment.

## 27. Tenants Legal Liability

This Policy covers direct physical loss or damage, caused by or resulting from **named perils**, to that part of buildings of others, including permanently attached building fixtures, leased to and occupied by the Insured at a **described location** to the extent of the Insured's legal liability for such loss or damage.

This coverage also includes the following:

a) The reasonable expenses of defending the Insured against only that part of any suit alleging the Insured's legal liability for such physical loss or damage;

b) The reasonable expenses incurred by this Company, this Company's proportionate share of costs taxed against the Insured in any such suit, and this Company's proportionate share of interest accruing after entry of judgment until this Company has paid, tendered or deposited into court its proportionate share of such judgment; and

c) The reasonable expenses, other than loss of earnings, incurred at this Company's request.

This coverage does not include:

a) That part of any settlement by the Insured to which this Company has not given its prior written consent; or

b) Any legal liability for loss or damage assumed by the Insured under any contract or agreement, whether oral or written, expressed or implied.

Additional Provisions: This Company may:

a) Investigate, negotiate and settle any claim or suit as this Company deems expedient and will not be prejudiced under this coverage for failure to settle for any amount within the Company's applicable limit of liability.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 49 of 133 PageID #: 52



b) Pay, tender or deposit into court the Company's applicable limit of liability, less any expenses incurred by the Company, in full satisfaction of its liability under this coverage, and thereby terminate any further liability for any expense amount described in paragraphs a, b or c above.

Tenants Legal Liability Exclusion: As respects Tenants Legal Liability, the following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

## 28. Terrorism

This Policy covers physical loss or damage caused by or resulting from **terrorism** only at a **described location**.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion or any other risk of physical loss or damage covered elsewhere in this Policy.

Amounts recoverable under this coverage are excluded from coverage elsewhere in this Policy.

This coverage does not cover loss or damage which also comes within the terms of either Group I Item 2a or Group I Item 2c of the Exclusions clause of this Policy.

This coverage does not in any event cover loss or damage directly or indirectly caused by or resulting from any of the following, regardless of any other cause or event, whether or not insured under this Policy contributing concurrently or in any other sequence to the loss:

a) That involves the use, release or escape of nuclear materials or that directly or indirectly results in nuclear reaction or radiation or radioactive contamination or that involves the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act; or

b) That is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

c) In which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials; or

d) That involves action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**.

## 29. Transit

This Policy covers the following insured personal property:

a) Owned by the Insured;

b) Of others to the extent of the Insured's interest or legal liability while in the actual or constructive custody of the Insured;

c) Shipped to others on Free on Board (FOB), Cost and Freight (C&F) or similar terms. The Insured's contingent interest in such shipments is admitted,

d) Of others sold by the Insured, that the Insured has agreed prior to the loss to insure during course of delivery including:

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 50 of 133 PageID #: 53





    i)    When shipped by the Insured's direct contract service provider or by the Insured's direct contract manufacturer to the Insured or to the Insured's customer;

    ii)    When shipped by the Insured's customer to the Insured or to the Insured's contract service provider or to the Insured's contract manufacturer,

While in transit within the Policy's Territory:

a)    From the time the property leaves the original point of shipment for transit; and

b)    Continuously in the due course of transit until delivered at the destination.

c)    Coverage on export shipments not insured under ocean cargo policies does not extend beyond the time when the property is loaded on board overseas vessels or aircraft. Coverage on import shipments not insured under ocean cargo policies does not attach until after discharge from overseas vessels or aircraft.

This coverage:

a)    Insures physical loss or damage caused by or resulting from:

    i)    Unintentional acceptance of fraudulent bills of lading, shipping or messenger receipts by the Insured or the Insured's agent, customer or consignee.

    ii)    Any unauthorized person(s) representing themselves to be the proper party(ies) to receive the property for shipment or to accept it for delivery.

b)    Covers general average and salvage charges on shipments covered while waterborne.

Additional Conditions:

a)    Permission is granted to the Insured, without prejudice to this insurance, to accept ordinary bills of lading used by carriers, including:

    i)    Released and/or undervalued bills of lading; or

    ii)    Shipping or messenger receipts.

b)    The Insured may waive subrogation against railroads under sidetrack agreements.

c)    The Insured may not enter into any special agreement with carriers releasing them from their common law or statutory liability.

d)    This coverage shall not inure directly or indirectly to the benefit of any carrier or bailee.

Transit Exclusions: As respects Transit, the following additional exclusions apply:

This Policy excludes:

a)    Property shipped by mail.

b)    Shipments by air unless made by regularly scheduled airlines.

c)    Waterborne shipments via the Panama Canal or waterborne shipments to and from:

    i)    Alaska.

© *2017 AFM. All rights reserved.*



      **ii)** Hawaii.

      **iii)** Commonwealth of Puerto Rico.

      **iv)** Virgin Islands.

**d)** Any transporting vehicle.

**e)** Property of others, including the Insured's legal liability, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

**f)** Property insured under any import or export ocean marine insurance.

Transit Valuation: On property insured under this coverage, the loss amount will not exceed the following:

**a)** For property shipped to or for the account of the Insured: the actual invoice to the Insured, including such costs and charges (including the commission of the Insured as selling agent) as may have accrued and become legally due on such property.

**b)** For property that has been sold by the Insured and shipped to or for the account of the purchaser (if covered by this Policy), the amount of the Insured's selling invoice, including prepaid or advanced freight.

**c)** For property not under invoice:

      **i)** For property of the Insured, at the valuation provisions of the Policy applying at the place from which the property is being transported; or

      **ii)** For other property, the **actual cash value** at point of destination on the date of loss,

      Less any charges saved which would have become due and payable upon arrival at destination.

## 30. Unnamed Property

This Policy covers insured property anywhere within this Policy's Territory, excluding property while in transit.

Unnamed Property Exclusion: As respects Unnamed Property, the following additional exclusion applies:

This Policy excludes:

**a)** **Transmission and distribution systems**, except at a premises owned, leased or rented by the Insured.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 52 of 133 PageID #: 55



# BUSINESS INTERRUPTION

The Business Interruption loss, as provided in the Business Interruption Coverage and Business Interruption Coverage Extensions of this section, is subject to all the terms and conditions of this Policy including, but not limited to, the limits of liability, deductibles and exclusions shown in the Declarations section.

## A. LOSS INSURED

This Policy insures Business Interruption loss, as provided in the Business Interruption Coverage, as a direct result of physical loss or damage of the type insured:

1.  To property as described elsewhere in this Policy and not otherwise excluded by this Policy;

2.  Used by the Insured;

3.  While at a **location** or while in transit as provided by this Policy; and

4.  During the Period of Liability as described elsewhere in this Policy.

This Policy insures Business Interruption loss only to the extent it cannot be reduced through:

1.  The use of any property or service owned or controlled by the Insured;

2.  The use of any property or service obtainable from other sources;

3.  Working extra time or overtime; or

4.  The use of inventory;

All whether at a **location** or at any other premises. This Company reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the amount of loss.

In determining the amount of loss payable, this Company will consider:

1.  Any amount recovered elsewhere under this Policy for loss or damage to finished goods or merchandise at selling price as having been sold to the Insured's regular customers and credited against net sales.

2.  The experience of the business before and after and the probable experience during the Period of Liability. The probable experience will also consider any increase or decrease in demand for the Insured's goods or services during the Period of Liability, even if such increase or decrease is from the same event that caused physical loss or damage starting the Period of Liability.

3.  The continuation of only those normal charges and expenses that would have been earned had there been no interruption of production or business operations or services.

This Policy also covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this Policy. The amount of such recoverable expenses will not exceed the amount by which the loss is reduced.

© 2017 AFM. All rights reserved.



# B. BUSINESS INTERRUPTION COVERAGE

### 1. Gross Earnings

The recoverable Gross Earnings loss is the actual loss sustained by the Insured of **Gross Earnings**, less all charges and expenses that do not necessarily continue, plus all other earnings derived from the operations of the business, excluding loss covered under Rental Income, during the Period of Liability.

**Gross Earnings** means:

The net sales value of production or business operations or services less the cost of:

**a)** Raw stock;

**b)** Materials and supplies; and

**c)** Merchandise sold;

Used in production or business operations or services rendered by the Insured

The recoverable Gross Earnings loss payable is limited to the extent the Insured is:

**a)** Wholly or partially prevented from producing goods or continuing business operations or services;

**b)** Unable to make up lost production within a reasonable amount of time, not limited to the period during which production is interrupted;

**c)** Unable to continue such operations or services during the Period of Liability; and

**d)** Able to demonstrate a loss of sales for the production or business operations or services prevented.

### 2. Gross Profits

The recoverable Gross Profits loss is the actual loss sustained by the Insured of the:

**a)** **Reduction in Sales;** and the

**b)** **Increased Cost of Doing Business,**

Resulting from the necessary interruption of business during the Period of Liability.

As respects Gross Profits, Business Interruption Exclusion Items 2a, 2c and 3 do not apply.

For purposes of measuring the loss:

**Gross Profits** means:

The sum produced by adding the **Net Profit** to the **Insured Fixed Charges.** If there is no **Net Profit** the amount of all **Insured Fixed Charges** less that proportion of any loss from business operations as the amount of the **Insured Fixed Charges** bears to all fixed charges.

**Increased Cost of Doing Business** means:

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 54 of 133 PageID #: 57



The reasonable and necessary costs incurred to avoid or diminish a reduction in sales but not to exceed the sum produced by applying the **Rate of Gross Profit** to the amount of the reduction avoided; all less any sums saved as may cease or be reduced during the Period of Liability.

**Insured Fixed Charges** means:

All fixed charges unless specifically excluded in the Declarations section.

**Net Profit** means:

The net operating profit excluding:

a) Capital receipts and accruals; and

b) Outlay properly chargeable to capital;

Resulting from the business of the Insured after due provision has been made for all fixed charges and any other expenses, including depreciation, but before deduction of any taxes on profits.

**Rate of Gross Profit** means:

The rate of **Gross Profit** earned on **Sales** during the twelve (12) full months immediately before the date of the loss or damage to the insured property.

**Reduction in Sales** means:

The amount produced by applying the **Rate of Gross Profit** to the amount by which the **Sales** during the Period of Liability fall short of the **Standard Sales**.

**Sales** means:

The money, excluding loss covered under Rental Income, paid or payable to the Insured for:

a) Goods sold and delivered; and

b) Services rendered;

In the conduct of the Insured's business.

**Standard Sales** means:

The **Sales** during the period of the twelve (12) months immediately before the date of the loss or damage to the insured property which corresponds with the Period of Liability.

3. **Rental Income**

The recoverable Rental Income loss is the actual loss sustained by the Insured of the following during the Period of Liability:

a) The fair rental value of any portion of the property occupied by the Insured;

b) Income reasonably expected from the rentals of unoccupied or unrented portions of such property;

c) The rental income from the rented portions of such property, according to bona fide leases, contracts or agreements, in force at the time of loss;

 

All less charges and expenses that do not continue.

Rental Income Exclusion: As respects Rental Income, the following additional exclusion applies:

This Policy does not insure:

a) Any loss of rental income during any period in which the insured property would not have been rented for any reason other than an insured loss.

## 4. Extra Expense

The recoverable Extra Expense loss is the reasonable and necessary extra expense incurred by the Insured of the following during the Period of Liability to:

a) Temporarily continue as close to normal the conduct of the Insured's business; and

b) Temporarily use the property or facilities of the Insured or others;

All less any value remaining at the end of the Period of Liability for property obtained in connection with the above.

If the Insured makes claim in accordance with the terms and conditions of the BI Select clause, the Period of Liability for Extra Expense coverage will be the Period of Liability applicable to the Business Interruption Coverage option selected.

Extra Expense Exclusions: As respects Extra Expense, the following additional exclusions apply:

This Policy does not insure:

a) Any loss of income.

b) Expenses that usually would have been incurred in conducting the business during the same period had no physical loss or damage happened.

c) The cost of permanent repair or replacement of property that has been damaged or destroyed.

d) Any expense recoverable elsewhere in this Policy.

## 5. BI Select™

If this Policy insures Gross Earnings and Gross Profit the Insured has the option to make claim based on either:

a) Gross Earnings; or

b) Gross Profit.

If such claim involves more than one location, including interdependency at one or more locations, all such claims will be adjusted using the coverage option chosen above.

This option may be exercised any time prior to meeting the conditions set forth in the Settlement of Claims provisions in the Loss Adjustment and Settlement section of this Policy.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 56 of 133 PageID #: 59



## C. **PERIOD OF LIABILITY**

The Period of Liability for Business Interruption Coverage and Business Interruption Coverage Extensions, unless otherwise stated elsewhere in this Policy, is as follows:

The Gross Earnings, Rental Income or Extra Expense Period of Liability is:

1. The period starting from the time of physical loss or damage of the type insured; and

2. Ending when, with due diligence and dispatch,

   a) The lost or damaged property could be repaired or replaced and made ready for production or business operations or services under the same or equivalent physical operating conditions that existed prior to the loss or damage; or

   b) The lost or damaged property under the course of construction or renovation could be repaired or replaced to the same or equivalent degree of completion that existed prior to the loss or damage. This period of time will be applied to the level of business that would have been reasonably achieved after construction and startup would have been completed had no physical damage happened.

3. For **raw materials** or supplies, the period of time:

   a) Resulting from the inability to procure suitable **raw materials** or supplies to replace those physically lost or damaged, but

   b) For no more than the period of time for which such physically lost or damaged **raw materials** or supplies would have supplied production or business operating or servicing needs.

The Gross Profit Period of Liability is:

The period starting from the time of physical loss or damage of the type insured and ending no later than the period of time shown in the Declarations section during which the results of the business shall be directly affected by such damage.

Period of Liability Conditions:

The Period of Liability will not include any additional time:

1. Due to the Insured's inability to resume production or business operations or services regardless of the reason, including but not limited to:

   a) Making change(s) to the buildings, structures or equipment, for any reason except as provided by the Demolition and Increased Cost of Construction coverage in this Policy; or

   b) Restaffing or retraining employees. However, this item does not apply to additional time needed to train staff to use new machinery or equipment which replaces machinery or equipment that suffered insured physical loss or damage, provided that such training is completed within 90 days after the new machinery or equipment has been installed.

If two or more Periods of Liability apply such periods will not be cumulative and will not be limited by the expiration of this Policy.

## D. **BUSINESS INTERRUPTION EXCLUSIONS**

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to Business Interruption loss:

This Policy does not insure:

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 57 of 133 PageID #: 60





1. Any loss during any idle period, including but not limited to when production, operations or services or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

   a) Physical loss or damage not insured by this Policy.

   b) Planned or rescheduled shutdown.

   c) Strike or other work stoppage.

   d) Any other reason other than physical loss or damage insured under this Policy.

2. Any increase in loss due to:

   a) The suspension, cancellation, or lapse of any lease, contract, license or order.

   b) Damages for breach of contract, or for late or non-completion of orders.

   c) Fines or penalties of any nature, except as provided by the Contractual Penalties coverage in this Policy.

   d) Any other consequential or remote loss.

3. Any loss resulting from physical loss or damage to merchandise or finished goods valued at the regular cash selling price or the time required for their reproduction.

4. Any loss resulting from the actual cash value portion of direct physical loss or damage by fire caused by or resulting from terrorism.

## E. BUSINESS INTERRUPTION COVERAGE EXTENSIONS

### 1. Attraction Property

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to a **described location** and is within one (1) statute mile of the **described location.**

Attraction Property Exclusion: As respects Attraction Property, the following additional exclusion applies:

This Policy does not insure loss resulting from:

   a) Physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to loss.

### 2. Civil or Military Authority

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a **location** provided such order is the direct result of physical damage of the type insured at a **location** or within five (5) statute miles of it.

Item B. 3. of Property Excluded does not apply to this Business Interruption Coverage Extension.

The Period of Liability for this Business Interruption Coverage Extension will be:

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 58 of 133 PageID #: 61



    a)   The period of time starting at the time of such order of civil or military authority, but not to exceed the number of consecutive days shown in the Declarations section of this Policy.

## 3.  Communicable Disease - Business Interruption

If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:

    a)   An order of an authorized governmental agency regulating such presence of **communicable disease**; or

    b)   A decision of an Officer of the Insured as a result of such presence of **communicable disease**,

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at such **described location** with such presence of **communicable disease**.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Communicable Disease - Business Interruption Exclusions: As respects Communicable Disease - Business Interruption, the following additional exclusions apply:

This Policy does not insure loss resulting from:

    a)   The enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.

    b)   Loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any sequence of loss.

The Period of Liability for this Business Interruption Coverage Extension will be:

The period of time:

    a)   Starting at the time of the order of the authorized governmental agency or the Officer of the Insured; but

    b)   Not to exceed the time limit shown in the Limits of Liability clause in the Declarations section,

This period of time is part of and not in addition to any Period of Liability applying to any coverage provided in the Business Interruption section.

## 4.  Computer Systems Non-Physical Damage

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from:

    a)   The failure of the Insured's **electronic data processing equipment or media** to operate provided that such failure is the direct result of a malicious act directed at the Named Insured; or

    b)   The Insured's reasonable action to temporarily protect the Insured's **electronic data processing equipment or media** against an actual or immediately impending malicious act directed at the Named Insured, provided such action is necessary to prevent failure of the Insured's **electronic data processing equipment or media** to operate.

While anywhere within this Policy's Territory.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 59 of 133 PageID #: 62



The Period of Liability for this Business Interruption Coverage Extension will be:

a) The period of time starting when the Insured's **electronic data processing equipment or media** fails to operate and ending when, with due diligence and dispatch, the Insured's **electronic data processing equipment or media** could be restored to the same or equivalent operating condition that existed prior to the failure; and

b) Does not include the additional time to make changes to the Insured's **electronic data processing equipment or media.**

### 5. Contractual Penalties

This Policy covers contractual penalties incurred by the Insured during the Period of Liability due to late or non-completion of orders as a direct result of insured physical loss or damage to property of the type insured.

This extension of coverage applies provided that such contractual penalties:

a) Are written in the provisions of a contract prior to the time of such direct physical loss or damage, and

b) Will be limited to the contractual sales value of such late or non-completed orders.

### 6. Crisis Management

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a **described location,** provided such order is a direct result of:

a) A violent crime, suicide, attempted suicide or armed robbery; or

b) A death or bodily injury caused by a **workplace accident;**

At that **described location.**

For the purpose of this Business Interruption Coverage Extension only, a violent crime, suicide, attempted suicide or armed robbery at a **described location** will be considered direct physical loss or damage insured by this Policy.

Crisis Management Exclusion: As respects Crisis Management, the following additional exclusion applies:

This Policy does not insure loss resulting from:

a) Physical loss or damage caused by or resulting from **terrorism,** regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to the loss.

The Period of Liability for this Business Interruption Coverage Extension will be:

a) The period of time starting at the time of such order of civil or military authority, but not to exceed the number of consecutive days shown in the Declarations section of this Policy.

### 7. Extended Period of Liability

The Gross Earnings and Rental Income coverage is extended to cover the reduction in sales resulting from:

a) The interruption of business as covered by Gross Earnings or Rental Income;

b) For such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss happened; and

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 60 of 133 PageID #: 63



e) Commencing with the date on which the liability of the Company for loss resulting from interruption of business would terminate if this Business Interruption Coverage Extension had not been included in this Policy.

However, this Business Interruption Coverage Extension does not apply to Gross Earnings or Rental Income loss resulting from physical loss or damage caused by or resulting from **terrorism.**

As respects Extended Period of Liability, Business Interruption Exclusion Item 2a does not apply.

Coverage under this Business Interruption Coverage Extension for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the extended period of liability.

Coverage under this Business Interruption Coverage Extension does not apply for more than the number of consecutive days shown in the Limits of Liability clause of the Declarations section of this Policy.

## 8. Ingress/Egress

This Policy covers the Business Interruption Coverage loss incurred by the Insured due to the necessary interruption of the Insured's business when ingress to or egress from a **described location(s)** is physically prevented, either partially or totally, as a direct result of physical loss or damage of the type insured to property of the type insured whether or not at a **described location.**

Item B. 3. of Property Excluded does not apply to this Business Interruption Coverage Extension.

Ingress/Egress Exclusion: As respects Ingress/Egress, the following additional exclusion applies:

This Policy does not insure loss resulting from:

a) Physical loss or damage caused by or resulting from **terrorism,** regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to the loss.

## 9. Leasehold Interest

This Policy covers the loss incurred by the Insured of Leasehold Interest as follows:

If the lease agreement requires continuation of rent; and if the property is wholly untenantable or unusable, the actual rent payable for the unexpired term of the lease; or if the property is partially untenantable or unusable, the proportion of the rent payable for the unexpired term of the lease.

If the lease is cancelled by the lessor pursuant to the lease agreement or by the operation of law; the **Lease Interest** for the first three months following the loss; and the **Net Lease Interest** for the remaining unexpired term of the lease. Leasehold Interests Exclusions: As respects Leasehold Interest, the following applies:

a) Business Interruption Exclusions 1, 2 and 3 do not apply and the following applies instead:

This Policy does not insure any increase in loss resulting from the suspension, lapse or cancellation of any license, or from the Insured exercising an option to cancel the lease; or from any act or omission of the Insured that constitutes a default under the lease.

b) This Policy does not insure loss directly resulting from physical loss or damage to Personal Property.

As used above, the following terms mean:

**Net Lease Interest:**

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 61 of 133 PageID #: 64



That sum which placed at 6 percent interest rate compounded annually would equal the Lease Interest (less any amounts otherwise payable hereunder).

**Lease Interest:**

The excess rent paid for the same or similar replacement property over actual rent payable plus cash bonuses or advance rent paid (including maintenance or operating charges) for each month during the unexpired term of the Insured's lease.

## 10. Logistics Extra Cost

This Policy covers the extra cost incurred by the Insured during the Period of Liability due to disruption of the normal movement of goods or materials:

a) Directly between **described locations;** or

b) Directly between a **location** and the premises of a direct supplier, direct customer or direct contract service provider to the Insured;

Provided that such disruption is a direct result of physical loss or damage of the type insured to property of the type insured within the Policy's Territory.

Item B. 3. of Property Excluded does not apply to this Business Interruption Coverage Extension.

The recoverable extra cost loss will be the reasonable and necessary extra costs incurred by the Insured of the following:

a) Extra costs to temporarily continue as close to normal the movement of goods or materials.

Logistics Extra Cost Exclusions: As respects Logistics Extra Cost, the following shall apply:

This Policy does not insure any loss resulting from:

a) Disruption of incoming or outgoing services consisting of electricity, gas, fuel, steam, water, refrigeration, sewerage and voice, data or video.

b) Disruption caused by or resulting from **terrorism,** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

c) Disruption caused by physical loss or damage to personal property of the Insured while in transit.

d) Disruption in the movement of goods or materials between the premises of a supplier, customer or contract service provider to the Insured and the premises of another supplier, customer or contract service provider to the Insured.

e) Costs that usually would have been incurred in conducting the business during the same period had there been no disruption of normal movement of goods or materials; or

f) Loss of income

g) Costs of permanent repair or replacement of property that has been damaged or destroyed.

The Period of Liability for this Business Interruption Coverage Extension will be:

The period of time:

a) Starting at the time of physical loss or damage causing the disruption of the normal movement of goods or materials; and

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 62 of 133 PageID #: 65



b) Ending not later than when with due diligence and dispatch the normal movement of goods or materials could be resumed.

## 11. Off-Premises Data Services – Business Interruption

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at a **location of off-premises data processing or data transmission services**, when the interruption is caused by any accidental event at the facilities of the provider of such services, while anywhere within this Policy's Territory, that immediately prevents in whole or in part the delivery of such provided services. For the purposes of this Additional Coverage an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Additional General Conditions:

a) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

b) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Coverage provided in this Extension is excluded from coverage elsewhere in this Policy.

This Extension does not cover the Business Interruption Coverage loss incurred by the Insured covered by Computer Systems Non-Physical Damage coverage as provided in this section of this Policy.

Off-Premises Data Services – Business Interruption Exclusions: As respects Off- Premises Data Services – Business Interruption, the following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

As used above, Period of Liability of **off-premises data processing or data transmission services:**

a) Is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the Period of Liability clause in this section.

b) Is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

c) Does not extend to include the interruption of operations caused by any reason other than interruption of the provided service(s).

## 12. Off-Premises Service Interruption – Business Interruption

This Policy covers Business Interruption Coverage loss incurred by the Insured during the Period of Liability caused by the interruption, in whole or part, of incoming electric, gas, fuel, steam, water, refrigeration, and outgoing sewerage services at a **location.**

The interruption of such services must be by reason of any accidental event, not otherwise excluded by this Policy, at the facilities of the service provider(s) while anywhere within this Policy's Territory.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 63 of 133 PageID #: 66

 

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Additional Conditions:

This Company will not be liable for deliberate act(s) by the supplying utility to shed load to maintain system integrity.

Off-Premises Service Interruption - Business Interruption Exclusion: As respects Off-Premises Service Interruption - Business Interruption the following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The Period of Liability for this Business Interruption Coverage Extension will be:

a) The period starting with the time when an interruption of specified services happens; and

b) Ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations under the same or equivalent physical and operating conditions. Resultant and concurrent interruptions are considered as one event.

## 13. Protection and Preservation of Property - Business Interruption

This Policy covers the Business Interruption Coverage loss incurred by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending insured physical loss or damage to such insured property.

This Business Interruption Coverage Extension does not cover loss sustained by the Insured to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by Terrorism coverage as provided in this Policy.

This Business Interruption Coverage Extension is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## 14. Research and Development

Gross Earnings and Gross Profits coverages are extended to cover the actual loss sustained by the Insured of continuing fixed charges and **ordinary payroll** directly attributable to the interruption of research and development activities that in themselves would not have produced income during the Period of Liability.

The Period of Liability for this Business Interruption Coverage Extension will be:

The period of time:

a) Starting at the time of physical loss or damage of the type insured; and

b) Ending when the property could be repaired or replaced and made ready for operations.

## 15. Soft Costs

This Policy covers **soft costs** incurred by the Insured during the Period of Liability arising out of the delay in the completion of buildings and additions under construction directly resulting from physical loss or damage of the type insured to insured property under construction at **locations**.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 64 of 133 PageID #: 67



### 16. Supply Chain

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from physical loss or damage of the type insured to property of the type insured at the premises of any of the following within the Policy's Territory:

a) Direct suppliers, direct customers or direct contract service providers to the Insured;

b) Any company under any royalty, licensing fee or commission agreement with the Insured; or

c) Any company that is a direct or indirect supplier, customer or contract service provider of those described in a) above,

But not at the premises of entities directly or indirectly supplying to or receiving from a **location** electricity, fuel, water, steam, refrigeration, sewerage, voice, data or video.

Business Interruption Coverage loss recoverable under this Business Interruption Coverage Extension is extended to include the following Business Interruption Coverage Extensions:

a) Civil or Military Authority

b) Crisis Management

c) Extended Period of Liability

d) Ingress/Egress

e) Off-Premises Service Interruption - Business Interruption

f) Supply Chain

Supply Chain Exclusions: As respects Supply Chain coverage, the following additional exclusion applies:

This Policy does not insure loss resulting from:

a) Physical loss or damage caused by or resulting from **terrorism,** regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to the loss.

© 2017 AFM. All rights reserved.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 65 of 133 PageID #: 68





# LOSS ADJUSTMENT AND SETTLEMENT

## A. ABANDONMENT

There shall be no abandonment to this Company of any property.

## B. APPRAISAL

If the Insured and this Company fail to agree on the amount of loss, each will, on the written demand of either, select a competent and disinterested appraiser after:

1. The Insured has fully complied with all provisions of this Policy.

2. This Company has received a signed and sworn Proof of Loss from the Insured.

Each will notify the other of the appraiser selected within 20 days of such demand.

The appraisers will first select a competent and disinterested umpire. If the appraisers fail to agree upon an umpire within 30 days then, on the request of the Insured or this Company, the umpire will be selected by a judge of a court of record in the jurisdiction in which the appraisal is pending. The appraisers will then appraise the amount of loss, stating separately the **actual cash value** and replacement cost value as of the date of loss and the amount of loss, for each item of physical loss or damage or if, for Business Interruption loss, the amount of loss for each Business Interruption coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire. An award agreed to in writing by any two will determine the amount of loss.

The Insured and this Company will each:

1. Pay its chosen appraiser; and

2. Bear equally the other expenses of the appraisal and umpire.

A demand for Appraisal shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this Policy, including as provided under Requirements in Case of Loss.

This Company will not be held to have waived any of its rights by any act relating to appraisal.

## C. COLLECTION FROM OTHERS

This Company will not be liable for any loss to the extent that the Insured has collected for such loss from others.

## D. COMPANY OPTION

This Company has the option to take all or any part of damaged property at the agreed or appraised value. This Company must give notice to the Insured of its intention to do so within 30 days after receipt of Proof of Loss.

## E. CURRENCY FOR LOSS PAYMENT

Losses will be adjusted and paid in the currency of the United States of America, except in Canada where losses will be paid in Canadian currency, unless directed otherwise by the First Named Insured.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 66 of 133 PageID #: 69



## F. LEGAL ACTION AGAINST THIS COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless:

1. The Insured has fully complied with all the provisions of this Policy; and

2. Legal action is started within two years after inception of the loss.

If under the insurance laws of the jurisdiction in which the property is located, such two-year limitation is invalid, then any such legal action must be started within the shortest limit of time permitted by such laws.

## G. LOSS ADJUSTMENT AND PAYABLE

Loss or damage will be adjusted with the First Named Insured and payable to or as the First Named Insured directs subject to the Mortgagee/Lenders Loss Payable clause in the General Conditions section of this Policy.

Additional insured interests will also be included in loss payment as their interests may appear when named as additional named insured, lender, mortgagee and/or loss payee on a Certificate of Insurance issued by this Company prior to the loss.

When named on a Certificate of Insurance issued by the Insured's broker with this Company's permission, such additional interests are added to this Policy as their interests may appear when such Certificate of Insurance is issued prior to the loss and on file with this Company. The effective date of any such interest will be the issue date of the certificate unless a later date is specified on the Certificate of Insurance. The Certificate of Insurance will not amend, extend or alter the terms, conditions, provisions and limits of this Policy.

## H. OTHER INSURANCE

1. If there is any other insurance that would apply in the absence of this Policy, this Policy will apply only after such insurance whether collectible or not.

2. In no event will this Policy apply as contributing insurance.

3. The Insured is permitted to have other insurance over any limits or sublimits of liability specified elsewhere in this Policy without prejudice to this Policy. The existence of any such insurance will not reduce any limit or sublimit of liability in this Policy. Any other insurance that would have provided primary coverage in the absence of this Policy will not be considered excess.

4. The Insured is permitted to have other insurance for all, or any part, of any deductible in this Policy. The existence of such other insurance will not prejudice recovery under this Policy. If the limits of liability of such other insurance are greater than this Policy's applicable deductible, this Policy's insurance will apply only after such other insurance has been exhausted.

5. If this Policy is deemed to contribute with other insurance, the limit of liability applicable at each **location**, for the purposes of such contribution with other insurers, will be the latest amount described in this Policy or the latest **location** value on file with this Company.

## I. REQUIREMENTS IN CASE OF LOSS

The Insured will:

1. Give immediate written notice to this Company of any loss.

2. Protect the property from further loss or damage.

© 2017 AFM. All rights reserved.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 67 of 133 PageID #: 70



3. Promptly separate the damaged and undamaged property; put it in the best possible order; and furnish a complete inventory of the lost, destroyed, damaged and undamaged property showing in detail the quantities, costs, **actual cash value**, replacement value and amount of loss claimed.

4. Give a signed and sworn proof of loss to the Company within 90 days after the loss, unless that time is extended in writing by this Company. The proof of loss must state the knowledge and belief of the Insured as to:

   a) The time and origin of the loss.

   b) The Insured's interest and that of all others in the property.

   c) The **actual cash value** and replacement value of each item and the amount of loss to each item; all encumbrances; and all other contracts of insurance, whether valid or not, covering any of the property.

   d) Any changes in the title, use, occupation, location, possession or exposures of the property since the effective date of this Policy.

   e) By whom and for what purpose any **location** insured by this Policy was occupied on the date of loss, and whether or not it then stood on leased ground.

5. Include a copy of all the descriptions and schedules in all policies and, if required, provide verified plans and specifications of any buildings, fixtures, machinery or equipment destroyed or damaged.

6. Further, the Insured, will as often as may be reasonably required:

   a) Exhibit to any person designated by the Company all that remains of any property;

   b) Submit to examination under oath by any person designated by the Company and sign the written records of examinations; and

   c) Produce for examination at the request of the Company:

      i) All books of accounts, business records, bills, invoices and other vouchers; or

      ii) Certified copies if originals are lost,

   At such reasonable times and places that may be designated by the Company or its representative and permit extracts and machine copies to be made.

## J. <u>SETTLEMENT OF CLAIMS</u>

The amount of loss for which this Company may be liable will be paid within 30 days after:

1. Proof of loss as described in this Policy is received by this Company; and

2. When a resolution of the amount of loss is made either by:

   a) Written agreement between the Insured and this Company; or

   b) The filing with this Company of an award as provided in the Appraisal clause of this section.

In the event of insured physical loss or damage determined by this Company's representatives to be in excess of the applicable policy deductible, this Company will advance mutually agreed-upon partial payment(s), subject to the Policy's

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 68 of 133 PageID #: 71



provisions. To obtain such partial payments, the Insured will submit a signed and sworn proof of loss as described in this Policy, with adequate supporting documentation.

## K. SUBROGATION

The Insured shall cooperate in any subrogation proceedings. This Company may require from the Insured an assignment or other transfer of all rights of recovery against any party for loss to the extent of this Company's payment.

This Company will not acquire any rights of recovery that the Insured has expressly waived prior to a loss. No such waiver will affect the Insured's rights under this Policy.

Any recovery from subrogation proceedings, less costs incurred by this Company in such proceedings, will be payable to the Insured in the proportion that the amount of:

1.  Any applicable deductible; and/or

2.  Any provable uninsured loss,

Bears to the entire provable loss amount.

## L. VALUATION

Adjustment of the physical loss amount(s) under this Policy will be as of the date of loss at the place of loss, and for no more than the interest of the Insured.

1.  Adjustment of physical loss to property will be determined based on the lesser of the following unless stated otherwise below or elsewhere in this Policy:

    a)  The cost to repair.

    b)  The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

    c)  The cost to rebuild, repair or replace on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

    d)  On real property or machinery and equipment, other than stock, offered for sale on the date of the loss, the selling price.

2.  On **raw materials,** supplies and merchandise not manufactured by the Insured, the replacement cost.

3.  On **stock in process,** the value of **raw materials** and labor expended plus the proper proportion of overhead charges.

4.  On finished goods manufactured by the Insured, the regular cash selling price, less all discounts and charges to which such finished goods would have been subject had no loss happened.

5.  On exposed films, records, manuscripts and drawings that are not **valuable papers and records,** the value blank plus the cost of copying information from backup or from originals of a previous generation. These costs will not include research, engineering or any costs of restoring or recreating lost information.

6.  On property that is damaged by fire and such fire is the result of **terrorism,** the **actual cash value** of the fire damage loss. Any remaining fire damage loss shall be adjusted according to the terms and conditions of the Valuation clause(s) of the Policy and shall be subject to the limit(s) of liability for Terrorism, and if stated the limit of liability for SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S), as shown in the Limits of Liability clause in the Declarations section.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 69 of 133 PageID #: 72





7. On personal property that is part of a pair or set, and the physically damaged personal property cannot be replaced or repaired, the reduction in value of the undamaged portion of insured personal property. If settlement is based on a constructive total loss, the Insured will surrender the undamaged parts of such property to this Company.

8. On unrepairable electrical or mechanical equipment, including computer equipment, the cost to replace such equipment with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

9. On property scheduled for demolition, the increased cost of demolition, if any, directly resulting from insured loss.

10. On improvements and betterments, the unamortized value of improvements and betterments, if such property is not repaired or replaced at the Insured's expense.

11. On property that is useless to the Insured, the **actual cash value.**

12. On property if not repaired, replaced or rebuilt on the same or another site within two years from the date of loss, unless such time is extended by the Company, the **actual cash value.**

The Insured may elect not to repair or replace the insured real or personal property under Item 1 above that is lost, damaged or destroyed. Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss. As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at a **described location** under this Policy. This item does not extend to Demolition and Increased Cost of Construction.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 70 of 133 PageID #: 73



# GENERAL CONDITIONS

## A. APPLICATION OF POLICY TO DATE OR TIME RECOGNITION

With respect to situations caused by any **date or time recognition** problem by **electronic data processing equipment or media** (such as the so-called Year 2000 problem), this Policy applies as follows:

1. This Policy does not pay for remediation, change, correction, repair or assessment of any **date or time recognition** problem, including the Year 2000 problem, in any **electronic data processing equipment or media**, whether preventative or remedial, and whether before or after a loss, including temporary protection and preservation of property. This Policy does not pay for any business interruption loss resulting from the foregoing remediation, change, correction, repair or assessment.

2. Failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000, is not insured physical loss or damage. This Policy does not pay for any such incident or for any business interruption loss resulting from any such incident.

Subject to all of its terms and conditions, this Policy does pay for physical loss or damage not excluded by this Policy that results from a failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000. Such covered resulting physical loss or damage does not include any loss, cost or expense described in a) or b) above. If such covered resulting physical loss or damage happens, and if this Policy provides business interruption coverage, then, subject to all of its terms and conditions, this Policy also covers any insured business interruption loss directly resulting therefrom.

## B. CANCELLATION/NON-RENEWAL

This Policy may be:

1. Cancelled at any time at the request of the First Named Insured by surrendering this Policy to this Company or by giving written notice to this Company stating when such cancellation will take effect; or

2. Cancelled by this Company by giving the First Named Insured not less than:

    a) 60 days written notice of cancellation; or

    b) 10 days written notice of cancellation if the First Named Insured fails to remit, when due, payment of premium for this Policy; or

3. Non-renewed by this Company by giving the First Named Insured not less than 60 days written notice of non-renewal.

Return of any unearned premium will be calculated on the customary short rate basis if the First Named Insured cancels and on a pro-rata basis if the Company cancels this Policy. Return of any unearned premium will be made by the Company as soon as practicable.

## C. CONFORMITY TO STATUTE

Terms of this Policy that conflict with the statutes of the jurisdiction where the insured property is located, are amended to conform to such statutes.

## D. FIRST NAMED INSURED

The First Named Insured shown in the Declarations section:

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 71 of 133 PageID #: 74

 

1. Is responsible for the payment of all premiums.

2. Will be the payee for any return premiums.

3. May authorize changes in the terms and conditions of this Policy with the consent of this Company.

## E. INCREASE IN HAZARD

This Policy will not apply to any **location** where there is an increase in hazard over which the Insured has control and knowledge. Any increase in hazard at one or more **locations** will not affect coverage at other **locations** where, at the time of loss or damage, the increase in hazard does not exist.

## F. INSPECTIONS

This Company, at all reasonable times, will be permitted, but will not have the duty, to inspect insured property. This Company does not address life, safety or health issues.

This Company's:

1. Right to make inspections; or

2. Making of inspections; or

3. Providing recommendations or other information in connection with any inspections,

Will not constitute an undertaking, on behalf of or for the benefit of the Insured or others.

This Company will have no liability to the Insured or any other person because of any inspection or failure to inspect.

When this Company is not providing jurisdictional inspections, the Owner/Operator has the responsibility to assure that jurisdictional inspections are performed as required, and to assure that required jurisdictional Operating Certificates are current for their pressure equipment.

## G. LIBERALIZATION CLAUSE

If during the period that insurance is in force under this Policy, any filed rules or regulations affecting the same are revised by statute so as to broaden the insurance without additional premium charge, such extended or broadened insurance will inure to the benefit of the Insured within such jurisdiction, effective the date of the change specified in such statute.

## H. MISREPRESENTATION AND FRAUD

This entire Policy will be void if, whether before or after a loss, an Insured has:

1. Willfully concealed or misrepresented any material fact or circumstance concerning this insurance, the subject thereof, any insurance claim, or the interest of an Insured.

2. Made any attempt to defraud this Company.

3. Made any false swearing.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 72 of 133 PageID #: 75




## I. MORTGAGEE/LENDERS LOSS PAYABLE

Loss or damage, if any, to specified property insured under this Policy shall be payable to each specified Lenders Loss Payable (hereinafter referred to as Lender) and specified Mortgagee as its interest may appear.

This insurance as to the interest of the Lender or Mortgagee shall not be invalidated by:

1. Any act or neglect of the debtor, mortgagor or owner (as the case may be) of the property.

2. Foreclosure, notice of sale or similar proceedings with respect to the property.

3. Change in the title or ownership of the property.

4. Change to a more hazardous occupancy.

The Lender or Mortgagee will notify this Company of any known change in ownership, occupancy or hazard and, within 10 days of written request by this Company, may pay the increased premium associated with such known change. If the Lender or Mortgagee fails to pay the increased premium, all coverage under this Policy will cease.

If the Insured fails to render proof of loss within the time provided in this Policy, the Lender or Mortgagee shall render proof of loss within sixty days after having knowledge of the Insured's failure in the form and manner provided by this Policy, and, further, shall be subject to the provisions of this Policy relating to Appraisal, Legal Action Against this Company, and Settlement of Claims.

If this Policy is cancelled at the request of the First Named Insured or its agent, the coverage for the interest of the Lender or Mortgagee will terminate 10 days after the Company sends to the Lender or Mortgagee written notice of cancellation, unless:

1. Sooner terminated by authorization, consent, approval, acceptance or ratification of the Insured's action by the Lender or Mortgagee, or its agent.

2. This Policy is replaced by the Insured, with a policy providing coverage for the interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest will terminate as of the effective date of the replacement policy, notwithstanding any other provision of this Policy.

This Company may cancel this Policy and/or the interest of the Lender or Mortgagee under this Policy, by giving the Lender or Mortgagee written notice 60 days prior to the effective date of cancellation, if cancellation is for any reason other than non-payment. If the debtor, mortgagor or owner has failed to pay any premium due under this Policy, this Company may cancel this Policy for such non-payment, but will give the Lender or Mortgagee written notice 10 days prior to the effective date of cancellation. If the Lender or Mortgagee fails to pay the premium due by the specified cancellation date, all coverage under this Policy will cease.

Whenever this Company shall pay the Lender or Mortgagee for loss or damage under this Policy and shall deny payment to the debtor, mortgagor or owner, this Company shall, to the extent of such payment, be subrogated to the rights of the Lender or Mortgagee under all collateral held to secure the debt or mortgage. No subrogation shall impair the right of the Lender or Mortgagee to recover the full amount due. At its option, this Company may pay to the Lender or Mortgagee the whole principal due on the debt or mortgage plus any accrued interest. In this event, all rights and securities will be assigned and transferred from the Lender or Mortgagee to this Company, and the remaining debt or mortgage will be paid to this Company.

This Company may invoke this Policy's Suspension clause. The suspension of insurance will apply to the interest of the Lender or Mortgagee in any machine, vessel, or part of any machine or vessel subject to the suspension. This Company will provide the Lender or Mortgagee at the last reported address a copy of the suspension notice.

All notices sent to the Lender shall be sent to its last reported address.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 73 of 133 PageID #: 76



Other provision relating to the interests and obligations of the Lender or Mortgagee may be added to this Policy by agreement in writing.

## J. POLICY MODIFICATION

This Policy contains all of the agreements between the Insured and the Company concerning this insurance. The Insured and the Company may request changes to this Policy. This Policy can be changed only by endorsements issued by the Company and made a part of this Policy.

Notice to any agent or knowledge possessed by any agent or by any other person will not:

1. Create a waiver, or change any part of this Policy; or

2. Prevent the Company from asserting any rights under the provisions of this Policy.

## K. REINSTATEMENT OF LIMITS AFTER A LOSS

Except for an **annual aggregate** limit of liability, any loss or payment of any claim will not reduce the amount payable under this Policy.

## L. SUSPENSION

Upon discovery of a dangerous condition, this Company may immediately suspend the **boiler and machinery** insurance with respect to any machine, vessel or part thereof by giving written notice to the Insured. The insurance that is suspended may be reinstated by this Company. The Insured will be allowed the return of the unearned portion of the premium resulting from the suspension of insurance.

## M. TRANSFER OF RIGHTS AND DUTIES UNDER THIS POLICY

The Insured's rights, interests and duties under this Policy may not be transferred or assigned without this Company's written consent.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 74 of 133 PageID #: 77

 

# DEFINITIONS

**actual cash value** means the cost to repair or replace the property, on the date of the loss or damage, with material of like kind and quality, less proper deduction for obsolescence and physical depreciation.

**annual aggregate** means the Company's maximum amount payable during any policy year.

**boiler and machinery** means:

1.  Direct physical loss or damage originating within:

    a)  Boilers, fired or unfired pressure vessels, vacuum vessels and pressure piping, all normally subject to vacuum or internal pressure other than static pressure of contents, excluding:

        i)   Waste disposal piping;

        ii)  Any piping forming part of a fire protective system;

        iii) Furnaces; and

        iv)  Any water piping other than:

            (a)  Boiler feed water piping between the feed pump or injector and the boiler;

            (b)  Boiler condensate return piping; or

            (c)  Water piping forming part of a refrigerating or air conditioning system used for cooling, humidifying or space heating purposes.

    b)  All mechanical, electrical, electronic or fiber optic equipment;

2.  And caused by, resulting from or consisting of:

    a)  Mechanical breakdown; or

    b)  Electrical or electronic breakdown; or

    c)  Extremes or changes of temperature; or

    d)  Rupture, bursting, bulging, implosion or steam explosion.

3.  **boiler and machinery** as used in this Policy does not mean:

    Physical loss or damage caused by or resulting from any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss:

    a)  Combustion explosions, except from within combustion gas turbines; or

    b)  Explosions from liquids coming in contact with molten materials; or

    c)  Accidental discharge, escape, leakage, backup or overflow to the open of any material from confinement within piping, plumbing systems or tanks except from property described in Item 1a above; or

    d)  Fire, or from the use of water or other means to extinguish a fire.

© 2017 AFM. All rights reserved.



**communicable disease** means disease which is:

1.  Transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or

2.  Legionellosis.

**contaminant** means anything that causes contamination.

**contamination** means any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

**date or time recognition** means the recognition, interpretation, calculation, comparison, differentiation, sequencing, accessing or processing of data involving one or more dates or times, including the Year 2000.

**described location(s)** means the locations described in the Insurance Provided clause of the Declarations section of this Policy.

**earth movement** means any natural or man-made earth movement, including but not limited to earthquake or landslide regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, physical loss or damage by fire, explosion, sprinkler leakage or **flood** resulting from **earth movement** will not be considered to be loss by **earth movement** within the terms and conditions of this Policy.

**electronic data processing equipment or media** means any computer, computer system or component, hardware, network, microprocessor, microchip, integrated circuit or similar devices or components in computer or non-computer equipment, operating systems, data, programs or other software stored on electronic, electro-mechanical, electro-magnetic data processing or production equipment, whether the property of the Insured or not.

**fine arts** means paintings; etchings; pictures; tapestries; rare or art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit, excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft, money and securities.

**flood** means flood; surface waters; rising waters; storm surge, sea surge, wave wash; waves; tsunami; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; all whether driven by wind or not; or sewer backup resulting from any of the foregoing; regardless of any other cause or event, whether natural or man-made, contributing concurrently or in any other sequence of loss. Physical loss or damage from **flood** associated with a storm or weather disturbance whether or not identified by name by any meteorological authority, is considered to be **flood** within the terms of this Policy. However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **flood** is not considered to be loss by **flood** within the terms and conditions of this Policy.

**Green** means products, materials, methods and processes certified by a **Green Authority** that conserve natural resources, reduce energy or water consumption, avoid toxic or other polluting emissions or otherwise minimize environmental impact.

**Green Authority** means an authority on **Green** buildings, products, materials, methods or processes that are certified and accepted by Leadership in Energy and Environmental Design (LEED®), Green Building Initiative Green Globes®, Energy Star Rating System or any other recognized **Green** rating system.

**irreplaceable** means an item which cannot be replaced with other of like kind and quality.

**location** means a location described in the Insurance Provided clause of the Declarations section or included as Newly Acquired Property or Unnamed Property coverages.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 76 of 133 PageID #: 79

 
**named perils** means: fire, lightning, **wind**, hail, explosion, smoke, impact from aircraft and vehicles, objects falling from aircraft, strike, riot, civil commotion, vandalism, theft, attempted theft, sprinkler leakage or collapse of buildings.

**occurrence** means the sum total of all loss or damage of the type insured, including any insured Business Interruption loss, arising out of or caused by one discrete event of physical loss or damage, except as respects the following:

1. **terrorism: occurrence** will mean the sum total of all loss or damage of the type insured, including any insured Business Interruption loss, arising out of or caused by all acts of **terrorism** during a continuous period of seventy-two (72) hours.

2. **earth movement: occurrence** will mean the sum total of all loss or damage of the type insured, including any insured Business Interruption loss, arising out of or caused by all **earth movement(s)** during a continuous period of seventy-two (72) hours.

**off-premises data processing or data transmission services** means the storage or processing of data performed off-premises of the Insured's property, including the transmission of voice, data or video over a single, or combination of, computer or communication networks.

**offshore** means away from the shore but not connected to the shore by docks, piers or any other physical connection other than pipelines.

**ordinary payroll** means:

1. Wages of all employees except officers, executives, department managers, and employees under contract or similar key employees; and

2. Includes taxes and charges dependent on the payment of those wages.

**physical loss or damage to electronic data, programs or software** means the destruction, distortion or corruption of electronic data, programs or software.

**production machinery and equipment** means any production or process machine(s) or apparatus that processes, forms, cuts, shapes, grinds or conveys **raw materials**, materials in process or finished goods and any associated equipment utilized in production including but not limited to electrical cabling, transformers, HVAC and any equipment or apparatus that is mounted upon or used exclusively with any one or more production or process machine(s) or apparatus.

**raw materials** mean materials and supplies in the state in which the Insured receives them for conversion by the Insured into finished goods.

**soft costs** means the expenses over and above normal expenses at **locations** undergoing alterations or additions to existing property and property in the course of construction limited to the following:

1. Construction loan fees - the additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction including the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, and charges by the lenders for the extension or renewal of loans necessary.

2. Commitment fees, leasing and marketing expenses - the cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of releasing and marketing of the Insured Project due to loss of tenant(s) or purchaser(s).

3. Additional fees - for architects, engineers, consultants, attorneys and accountants needed for the completion of construction, repairs or reconstruction.

4. Carrying costs - building permits, additional interest on loans, insurance premiums and property and realty taxes.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 77 of 133 PageID #: 80

 

**stock in process** means raw materials or stock, which has undergone any aging, seasoning, mechanical or other process or manufacture, but which is not finished goods.

**terrorism** means:

1. Any act, involving the use or threat of: force, violence, dangerous conduct, interference with the operations of any business, government or other organization or institution, or any similar act,

2. When the effect or apparent purpose is:

   To influence or instill fear in any government (de jure or de facto) or the public, or any segment of either; or to further, or to express support for, or opposition to, any political, religious, social, ideological or similar type of objective or position.

**transmission and distribution systems** means transmission and distribution systems including but not limited to electricity, gas, fuel, steam, water, refrigeration, sewerage, voice, data and video. Such systems shall include poles, towers and fixtures, overhead conductors and devices, underground and underwater conduit, underground and underwater conductors and devices, line transformers, service meters, street lighting and signal systems.

**valuable papers and records** means inscribed, printed or written: documents; manuscripts or records including abstracts; and, books, deeds, drawings, films, maps or mortgages, all of which must be of value to the Insured. **Valuable papers and records** are not: money, securities and stamps; converted data programs or instructions used in the Insured's data processing operations; or, materials on which data is recorded.

**wind** means direct action of wind including substance driven by wind. **Wind** does not mean or include anything defined as **flood** in this Policy.

**workplace accident** means a sudden, fortuitous event that happens during working hours and arises out of work performed in the course and the scope of employment.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 78 of 133 PageID #: 81

# SUPPLEMENTAL UNITED STATES
# CERTIFIED ACT OF TERRORISM ENDORSEMENT

**This Endorsement is applicable to all insured locations in the United States, its territories and possessions and the Commonwealth of Puerto Rico.**

**Coverage for "Certified Act of Terrorism" Under The Terrorism Risk Insurance Act of 2002, as amended.**

In consideration of a premium charged of $100,000, this Policy, subject to the terms and conditions therein and in this Endorsement, covers direct physical loss or damage to insured property and any resulting Business Interruption loss, as provided in the Policy, caused by or resulting from a Certified Act of Terrorism as defined herein.

Notwithstanding anything contained elsewhere in this Policy, any exclusion or limitation of terrorism in this Policy and any endorsement attached to and made a part of this Policy, is hereby amended to the effect that such exclusion or limitation does not apply to a "Certified Act of Terrorism" as defined herein.
This amendment does not apply to any limit of liability for a Certified Act of Terrorism, if any, stated under any Sub-Limits clause in the Declarations section of this Policy.

With respect to any one or more Certified Act(s) of Terrorism, this Company will not pay any amounts for which the Company is not responsible under the terms of the Terrorism Risk Insurance Act of 2002 (including subsequent action of Congress pursuant to the Act) which includes a provision stating that if the aggregate insured losses exceed $100,000,000,000 during any calendar year, neither the United States Government nor any insurer that has met its insurer deductible shall be liable for the payment of any portion of the amount of such losses that exceed $100,000,000,000. If the aggregate insured losses for all insurers exceed $100,000,000,000, your coverage may be reduced.

The coverage provided under this Endorsement for "Certified" losses caused by acts of terrorism will be partially reimbursed by the United States Government under a formula established by Federal Law. Under this formula, the United States pays 85% (and beginning on January 1, 2016, shall then decrease by 1 percentage point per calendar year until equal to 80 percent) of covered terrorism losses exceeding a statutorily established retention by the insurer referenced in this Policy. The premium charged for this coverage is provided above.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Endorsement or the Policy.

The coverage provided by this Endorsement only applies to a Certified Act of Terrorism.

Reference and Application: The following term(s) means:

Certified Act of Terrorism:

A "Certified Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002 as amended and extended in 2005, 2007 and in 2015. The criteria contained in that Act for a "Certified Act of Terrorism" include the following:

  a. The act resulted in aggregate losses in excess of $5,000,000; and

  b. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 79 of 133 PageID #: 82

 

# TENNESSEE

# AMENDATORY ENDORSEMENT

With respect to any insured location in the State Tennessee of this policy is amended:

**CANCELLATION**-- The Insured may cancel this policy by returning the policy to the Company or by giving the Company written notice stating at what future date the coverage is to cease. If the policy has been in effect less than 60 days the company may cancel for any reason and must give the Named Insured at least 10 days written notice at the address shown in the policy before cancellation is effective and state the reason for cancellation.

If this policy has been in effect 60 days or more or if it is a renewal of a policy issued by the Company effective immediately, it may cancel this policy only on its annual anniversary date unless one or more of the following reasons apply:

1. Nonpayment of premium, including nonpayment of any additional premiums, calculated in accordance with the current rating manual of the insurer, justified by a physical change in the insured property or a change in its occupancy or use.

2. Conviction of the Named Insured by a crime having as one of its necessary elements an act increasing any hazard insured against.

3. Discovery of fraud or material misrepresentation on the part of either of the following:

    a. The Named Insured or his representative in obtaining the insurance; or

    b. The Named Insured in pursuing a claim under the policy.

4. Failure to comply with written loss control recommendations.

5. Material change in the risk which increases the risk of loss after insurance coverage has been issued or renewed.

6. Determination by the commissioner that the continuation of the policy would jeopardize the company solvency or would place it in violation of the insurance laws of this state or any other state.

7. Violation or breach by the insured of any policy terms or conditions.

8. Such other reasons that are approved by the commissioner.

The Company will give the Named Insured at the address shown in the policy, written notice of cancellation at least 10 days before cancellation is to take effect. The Company notice will state the reason for cancellation.

**NONRENEWAL** - If the Company decides not to renew this policy, it will mail or deliver to the Named Insured at the address shown in the policy, and their agent, its notice of nonrenewal at least 60 days before the end of the policy period or anniversary date. Notice of nonrenewal is not required if the Company has offered to issue a renewal policy, or the Named Insured has obtained replacement coverage or have agreed in writing to obtain replacement coverage.

If the Company decides to renew this policy subject to:

1. An increase in premium rates or factors in excess of 25%; OR

2. Reduction of limits or elimination of coverages;

The Company will give notice stating the new terms at least 60 days prior to the expiration date. The notice will be mailed or delivered to the Named Insured at the address on the policy and to the agent.

AFM 6409 (04/15)                                                                                    Page 1 of 1

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 80 of 133 PageID #: 83



## General Change Endorsement

This endorsement is attached to and forms part of the following designated policy:

**Account Number: 1-32565**
**Policy Number: IA038**

**Endorsement Number: 01**
**Effective Date of Change: Mar 01, 2020**

## Insured: Metropolitan Nashville Airport Authority

All terms and conditions remain unchanged except:

Additional Premium due now: $242,300 US (pro-rata of $730,900 US)

The following changes are made to Form No. S-1, Declarations:

The Expiration Date of this Policy is amended to read 30-June-2020.

BY: _____
**Authorized Representative**
**Stacey B. Rothbard**
**Office: Atlanta Operations  SBR/lmp**
**Date:  Feb. 27, 2020**

*© 2019 AFM. All rights reserved.*

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 81 of 133 PageID #: 84

# Exhibit 2

# Solis Parker & Associates, Inc.

2935 Horizon Park Drive
Suite D
Suwanee, GA. 30024

Phone: (770) 441-9901
Fax: (770) 441-9902

August 3, 2020

Ms. Deanna Gajdik
Adjuster, Atlanta Operations/Claims
3460 Preston Ridge Road, Suite 400
Alpharetta, GA 30005

Ref.:   John C. Tune Airport; Rev. (2)
        110 Tune Airport Drive
        Nashville, TN

Claim ID: 500245
DOL: Wind, 3-3-2020

Dear Ms. Gajdik:

As requested by FM Global; Solis Parker & Associates is providing this report on the scope of damages to the various hangar buildings located at the John C Tune airport in Nashville, TN. Our goal was to assess the building damages due to wind storms and tornados reported on March 3, 2020; evaluate the repairs or demolition and replacement limits to provide an estimated cost for in kind repairs or replacement:

GENERAL CONDITIONS:

The buildings are located in rows along the East side of the airport runway and generally oriented in an east to west longitudinal direction. The buildings have been built in stages at various dates; reportedly the latest hangar building was built in 2018, with some of the earlier T-hangar buildings dating back to early 1990's or before.

The majority of the buildings are pre-engineered metal building nested "T hangers" consisting of 6 to 8 stalls each with either 40'0 x 14'0 nominal bi-fold doors or 14'0 tall track mounted push/pull sectional doors for the older buildings. Buildings width, height and length varies depending on the date of construction of the individual buildings.

The T-hangar buildings are constructed with transverse braced post frames consisting of 2" x 2" ST type tubes, and welded tube trusses supporting cold formed Z or C purlins at 4'0 or 5'0 centers. Purlins observed are simple span bolted to the trusses by welded clip plates; the walls are 26 gage single sided sheet metal panels supported with tube girts welded to the frame posts at mid height and a base tube or base angle serving as floor trim and panel base support. The roof is a 26 gage fasten through sheet metal panels with most of the buildings also having a few translucent panels over each hangar bay.

In the longitudinal and transverse directions, the building walls are X braced with ½" diameter rods anchored from posts to truss and tensed by a clevis to treaded rod ends at mid length of the X. Bracing is also provided along the roof plane in the same manner for two or three bays at each building. Anchoring to foundations is limited and consisted of 1 or 2 each, ½" diameter anchor bolts into the ground at the frames.

The T-hangars do not have insulation with the exception of ½" thick spray-on polyurethane to the underside of the roof panels and purlins on some of the buildings. No wall insulation.

- 1 -

Buildings floor are a nominal 4" concrete slab or for some of the earlier buildings, an asphaltic 4" paving mix serves as floor. Electrical service to each hangar bay is limited to single bay light and a few outlets, one exterior flood light plus the bi-fold motor where applicable. There are no mechanical/HVAC, water or sanitary services, with the exception of one "box" hangar which did have some offices built-in to "housing grade" standards; wood framing and gypsum board walls, otherwise most hangars are bare, un-improved.



1- John C Tune Airport - Hangar orientation View.




**2- Asphaltic paving floor (Typical)**     **3- Track supported push/pull segmental doors.**




**4- Typical base anchor bolts and tube post.**     **5- Minimal electrical, metal panels and slab.**

## SCOPE OF DAMAGES:

**Note:** The northern most five buildings have been designated as buildings "A" to "E" for this report as the actual building number information was requested, but was not available at the time of this report.
See photo 1 above for location and orientation of all buildings.

1. Building "A" - Is a nested (9,240 s.f.) T-hangar with 8 stalls, nominally 55'0 wide by 168'0 long and 14'0 eave, ridge building with a 1:12 roof slope. Z inset both end walls. Hangar doors are segmental track supported push/pull doors nominally 40'0 x 14'0 each.

    i. **Building was completely destroyed** and will require rebuild in kind.

- 3 -

    ii.  Scope of replacement to include new foundations and anchors required to meet present day code.

    iii.  Building is 26 gage fasten-through sheet metal panels on the roof, partitions, doors and walls with 12 translucent roof panels per each slope, 24 total. 7 ridge gravity ventilators and Z inset end walls both ends.

    iv.  Replace minimal electrical as defined under "general conditions" above.

Scope to rebuild building A:

- General Contractor bids to include all labor, materials and tools to provide a complete hangar building. The contractor will follow restricted access procedures and follow owner's safety protocols; but at a minimum it shall follow OSHA construction site safety and provide safety PPE as required.

- Contractor shall include engineering design and drawings for foundations based on the pre-engineered metal building (PEMB) vendor design and loads required for the Nashville, TN area.

- Provide engineering soils evaluation and recommendation report to support the foundations design. Report shall be for the area affected by the tornados and need not be specific to a single building.

- Excavate and construct foundations as required to meet foundation's design and PEMB documents. All concrete and reinforcing shall meet the foundations documents, the documents shall be signed and sealed by a registered professional engineer registered in the state of TN. Foundations to be complete including anchor bolts and piers as required. Estimated foundations are 2'6 by 2'6 by 1'0 each; with 2 each ½" A-307 anchor bolts. All concrete to be 4000 psi and 50 grade steel. Epoxy anchors are acceptable and are to be installed per vendor's instructions.

- Contractor to procure and erect a new PEMB to match existing building A, including framing, roof purlins, wall and partition girts, X bracing and door track system in like kind to existing. All steel to be primed only. Roof and wall cladding to be fasten through 26 gage sheet metal panels attached to the girts or purlins including a base angle as required; all panels to be galvanized or aluminized, one side push painted. The track doors are to be push/pull manual segmental system, each door to be supported by a wheel and guide system or track system as provided by the PEMB vendor. Include segmental doors interlocking mechanism and hardware sets to complete the enclosures for each stall.

- Provide translucent roof panels and ridge ventilators; ridge ventilators to be 4'0 long and gravity type, fixed open with quantity as defined under item iii above.

- Provide one exterior roof mounted, single flood light 60 watts wall LED centered at each door; provide 2 each, interior 2'0 x 4'0, 50 watts LED lights and 2 each interior outlets on a 15 amp rated circuit for each stall. Provide a meter and distribution panel for the building as a whole and serve each stall from individual circuits. Include all wiring, anchoring and miscellaneous to complete the minimal electrical service to each stall.

- Complete the work by including a 1/2" spray on foam insulation under the roof panels.

- Clean site and legally dispose of all construction debris as required.

- 4 -

2. Building "**B**" – Is a box hangar building (9,360 s.f.) with two stalls, building is a PEMB nominally 120'0 wide by 78'0 deep, 3-25'0 bays plus hangar door overhang and 20'0 eave height; with two 55'0 x 18'0 bi-fold doors facing south and personnel doors. The building is a gable ridge at the middle with a ½":12 slope.

Within the interior northwest corner, this building had a "residential grade" offices two stories about 20'0 by 50'0, (2,000.0 s.f. offices), the roof above inclusive of an RTU for office HVAC. Offices are batt insulated with two sides Masonite boards cladding. Exterior to the building at the north-west corner had a 10' x 12' observation wood deck.

      i. **Building was completely destroyed** and will require rebuild in kind.

     ii. Scope of replacement to include new foundations and anchors required to meet present day code.

    iii. Building is 26 gage fasten-through sheet metal panels on the roof, doors and walls with 8 translucent roof panels per each slope, 16 total. 8 ridge gravity ventilators.

Scope to rebuild building **B**:

- General Contractor bids to include all labor, materials and tools to provide a complete hangar building. The contractor will follow restricted access procedures and follow owner's safety protocols; but at a minimum it shall follow OSHA construction site safety and provide safety PPE as required.

- Contractor shall include engineering design and drawings for foundations based on the pre-engineered metal building (PEMB) vendor design and loads required for the Nashville, TN area.

- Provide engineering soils evaluation and recommendation report to support the foundations design. Report shall be for the area affected by the tornados and need not be specific to a single building.

- Excavate and construct foundations as required to meet foundation's design and PEMB documents. All concrete and reinforcing shall meet the foundations documents, the documents shall be signed and sealed by a registered professional engineer registered in the state of TN. Foundations to be complete including anchor bolts and piers as required. All concrete to be 4000 psi and 50 grade steel. Epoxy anchors are acceptable and are to be installed per vendor's instructions.

- Contractor to procure and erect a new PEMB to match existing building **B**, including framing, roof purlins, wall and girts, X bracing and door hangar system in like kind to existing. All steel to be primed only. Roof and wall cladding to be fasten through 26 gage sheet metal panels attached to the girts or purlins including a base angle as required; all panels to be galvanized or aluminized, one side painted. The doors are to be motorized type system, each door to be supported from the roof and side beams system as provided by the door and PEMB vendor. Include doors locking mechanism and hardware sets to complete the enclosures for each stall.

- Provide translucent roof panels and ridge ventilators; ridge ventilators to be 6'0 long and gravity type, fixed open with quantity as defined under item iii above.

- Provide two exterior roof mounted, single flood light 60 watts wall LED at each door; provide 6 each, interior 2'0 x 4'0, 50 watts LED lights and 4 each interior for each stall. Provide a meter and distribution panel for the building as a whole. Include all wiring, anchoring and miscellaneous to complete the electrical service.

- Complete the work by including a 4" blanket type insulation under the PEMB roof panels.

- Construction to include "residential grade" offices; all wood framing construction with load bearing walls supporting the 2nd floor and the interior ceiling. Offices are two stories about 20'0 by 50'0 each level, (2,000.0 s.f. offices for both levels), provide ½" gypsum board wall interior construction on 2x4 stud. Provide ½" gypsum board ceiling and blanket insulation, flooring to be VTC tile and hollow doors at rooms. All interior painting to be good quality latex paint, colors by owner. Provide offices complete to include all hardware, lock sets and finishes in like kind.

- The PEMB roof above the offices is inclusive of an RTU for office HVAC; include a complete HVAC system including heating and cooling electrical unit with controls and supply/return ducts. Offices are batt insulated with two exterior sides Masonite boards cladding. Exterior to the building at the north-west corner had a 10' x 12' observation wood construction deck to be included in like kind with the work.

- Clean site and legally dispose of all construction debris as required.

3. Building "C" – Is a box type hangar building (9,360 s.f.) with two stalls, building is a PEMB nominally 120'0 wide by 78'0 deep, 3-25'0 bays plus hangar door overhang and 24'0 eave height; with two 55'0 x 20'0 bi-fold doors facing south and personnel doors. The building is a gable ridge at the middle with a 1:12 slope.

    i. **Building was completely destroyed** and will require rebuild in kind.

    ii. Scope of replacement to include new foundations and anchors required to meet present day code.

    iii. Building is 26 gage fasten-through sheet metal panels on the roof, doors and walls with 8 translucent roof panels per each slope, 16 total. 8 ridge gravity ventilators.

    iv. Electrical service is limited w/ fluorescent lights and outlets.

Scope to rebuild building **C**:

- General Contractor bids to include all labor, materials and tools to provide a complete hangar building. The contractor will follow restricted access procedures and follow owner's safety protocols; but at a minimum it shall follow OSHA construction site safety and provide safety PPE as required.

- Contractor shall include engineering design and drawings for foundations based on the pre-engineered metal building (PEMB) vendor design and loads required for the Nashville, TN area.

- Provide engineering soils evaluation and recommendation report to support the foundations design. Report shall be for the area affected by the tornados and need not be specific to a single building.

- Excavate and construct foundations as required to meet design and PEMB documents. All concrete and reinforcing shall meet the foundations documents, the documents shall be signed and sealed by a registered professional engineer registered in the state of TN. Foundations to be complete including anchor bolts and piers as required. All concrete to be 4000 psi and 50 grade steel. Epoxy anchors are acceptable and are to be installed per vendor's instructions.

- Contractor to procure and erect a new PEMB to match existing building **C**, including framing, roof purlins, wall and partition girts, X bracing and door hangar system in like kind to existing. All steel to be primed only.

- Roof and wall cladding to be fasten through 26 gage sheet metal panels attached to the girts or purlins including a base angle as required; all panels to be galvanized or aluminized, one side painted. The doors are to be motorized type system, each door to be supported from the roof and side beams system as provided by the door and PEMB vendor. Include doors locking mechanism and hardware sets to complete the enclosures for each stall.

- Provide translucent roof panels and ridge ventilators; ridge ventilators to be 6'0 long and gravity type, fixed open with quantity as defined under item iii above.

- Provide two exterior roof mounted, single flood light 60 watts wall LED at each door; provide 8 each, interior 2'0 x 4'0, 50 watts LED lights and 4 each interior for each stall. Provide a meter and distribution panel for the building as a whole and serve each stall from individual circuits. Include all wiring, anchoring and miscellaneous to complete the electrical service.

- Complete the work by including a 4" blanket type insulation under the roof panels.

- Clean site and legally dispose of all construction debris as required.

4. Building **"D"** - Is a nested (9,240 s.f.) T-hangar with 8 stalls, nominally 55'0 wide by 168'0 long and 14'0 eave, ridge building with a 1:12 roof slope. Z inset both end walls. Hangar doors are segmental track supported push/pull doors nominally 40'0 x 14'0 each.

    i. **Building was completely destroyed** and will require rebuild in kind.

    ii. Scope of replacement to include new foundations and anchors required to meet present day code.

    iii. Building is 26 gage fasten-through sheet metal panels on the roof, partitions, doors and walls with 12 translucent roof panels per each slope, 24 total. 8 ridge gravity ventilators and Z inset end walls both ends.

    iv. Replace minimal electrical as defined under "general conditions" above.

Scope to rebuild building **D**:

- General Contractor bids to include all labor, materials and tools to provide a complete hangar building. The contractor will follow restricted access procedures and follow owner's safety protocols; but at a minimum it shall follow OSHA construction site safety and provide safety PPE as required.

- Contractor shall include engineering design and drawings for foundations based on the pre-engineered metal building (PEMB) vendor design and loads required for the Nashville, TN area.

- Provide engineering soils evaluation and recommendation report to support the foundations design. Report shall be for the area affected by the tornados and need not be specific to a single building.

- Excavate and construct foundations as required to meet foundation's design and PEMB documents. All concrete and reinforcing shall meet the foundations documents, the documents shall be signed and sealed by a registered professional engineer registered in the state of TN. Foundations to be complete including anchor bolts and piers as required. Estimated foundations are 2'6 by 2'6 by 1'0 each; with 2 each ½" A-307 anchor bolts. All concrete to be 4000 psi and 50 grade steel. Epoxy anchors are acceptable and are to be installed per vendor's instructions.

- Contractor to procure and erect a new PEMB to match existing building **D**, including framing, roof purlins, wall and partition girts, X bracing and door track system in like kind to existing. All steel to be primed only. Roof and wall cladding to be fasten through 26 gage sheet metal panels attached to the girts or purlins including a base angle as required; all panels to be galvanized or aluminized, one side painted. The track doors are to be push/pull manual segmental system, each door to be supported by a wheel and guide system or track system as provided by the PEMB vendor. Include segmental doors interlocking mechanism and hardware sets to complete the enclosures for each stall.

- Provide translucent roof panels and ridge ventilators; ridge ventilators to be 4'0 long and gravity type, fixed open with quantity as defined under item iii above.

- Provide one exterior roof mounted, single flood light 60 watts wall LED centered at each door; provide 2 each, interior 2'0 x 4'0, 50 watts LED lights and 2 each interior outlets on a 15 amp rated circuit for each stall. Provide a meter and distribution panel for the building as a whole and serve each stall from individual circuits. Include all wiring, anchoring and miscellaneous to complete the minimal electrical service to each stall.

- Complete the work by including a 1/2" spray on foam insulation under the roof panels.

- Clean site and legally dispose of all construction debris as required.

5. Building "E" - Is a nested (9,300 s.f.) T-hangar with 7 stalls, nominally 62'0 wide by 150'0 long and 14'0 eave, ridge building with a ½":12 roof slope. Z inset eastern end wall, square west end wall. Hangar doors are segmental track supported push/pull doors nominally 45'0 x 14'0 each.

   i. **Building was completely destroyed** and will require rebuild in kind.

   ii. Scope of replacement to include new foundations and anchors required to meet present day code.

   iii. Building is 26 gage fasten-through sheet metal panels on the roof, partitions, doors and walls with 12 translucent roof panels per each slope, 24 total. 6 ridge gravity ventilators.

   iv. Replace minimal electrical as defined under "general conditions".

- 8 -

Scope to rebuild building **E**:

- General Contractor bids to include all labor, materials and tools to provide a complete hangar building. The contractor will follow restricted access procedures and follow owner's safety protocols; but at a minimum it shall follow OSHA construction site safety and provide safety PPE as required.

- Contractor shall include engineering design and drawings for foundations based on the pre-engineered metal building (PEMB) vendor design and loads required for the Nashville, TN area.

- Provide engineering soils evaluation and recommendation report to support the foundations design. Report shall be for the area affected by the tornados and need not be specific to a single building.

- Excavate and construct foundations as required to meet foundation's design and PEMB documents. All concrete and reinforcing shall meet the foundations documents, the documents shall be signed and sealed by a registered professional engineer registered in the state of TN. Foundations to be complete including anchor bolts and piers as required. Estimated foundations are 2'6 by 2'6 by 1'0 each; with 2 each ½" A-307 anchor bolts. All concrete to be 4000 psi and 50 grade steel. Epoxy anchors are acceptable and are to be installed per vendor's instructions.

- Contractor to procure and erect a new PEMB to match existing building **E**, including framing, roof purlins, wall and partition girts, X bracing and door track system in like kind to existing. All steel to be primed only. Roof and wall cladding to be fasten through 26 gage sheet metal panels attached to the girts or purlins including a base angle as required; all panels to be galvanized or aluminized, one side painted. The track doors are to be push/pull manual segmental system, each door to be supported by a wheel and guide system or track system as provided by the PEMB vendor. Include segmental doors interlocking mechanism and hardware sets to complete the enclosures for each stall.

- Provide translucent roof panels and ridge ventilators; ridge ventilators to be 4'0 long and gravity type, fixed open with quantity as defined under item iii above.

- Provide one exterior roof mounted, single flood light 60 watts wall LED centered at each door; provide 2 each, interior 2'0 x 4'0, 50 watts LED lights and 2 each interior outlets on a 15 amp rated circuit for each stall. Provide a meter and distribution panel for the building as a whole and serve each stall from individual circuits. Include all wiring, anchoring and miscellaneous to complete the minimal electrical service to each stall.

- Complete the work by including a 1/2" spray on foam insulation under the roof panels.

- Clean site and legally dispose of all construction debris as required.

6. Building No. 4250 – Two hangar stalls; #250 and #252; a box hangar nominally 160'0 wide by 60'0 deep and 20'0 eave height; with two 50'0 x 18'0 bi-fold doors facing north and access doors. The building is a gable ridge at the middle with a ½":12 slope.

      i. Damages are primarily a few strikes by debris to wall panels, no structural damages noted.

      ii. Repair by replacing the damaged panels.

7. **Building No. 4260** – Is a nested (8,740 s.f.) T-hangar with 8 stalls, nominally 52'0 wide by 168'0 long and 14'0 eave, ridge building with a 1:12 roof slope. Hangar doors are segmental track supported push/pull doors nominally 40'0 x 14'0.

    i. **Building was damaged** but can be **repaired in place**.

- 4 four each, south facing doors and track are damaged and will need replacement in like kind. Remove damaged parts and components, replace with similar track and doors.

- Debris strikes to the Eastern wall damaged panels; selectively replace panels with new 26 gage to match pattern and color. Replace damaged wall girt (1) one girt that needs to be removed and replaced. Repair corner trim and flashing as required.

- One interior post to foundation damaged, chip affected concrete and repair by casting a new foundation and anchor bolts; epoxy anchors to be installed as per vendor instructions.

- Roof along the eastern most bay and first interior partition are damaged, repair by replacing affected simple span purlins, estimated to be 8" deep, Z 14 gage and interior partition girts, estimated to be 8" Z 16 gage; provide engineering support to confirm repairs meet load requirements. Remove 26 gage fasten through sheet metal roof panels and re-roof entire building, including ridge to wall trim and roof to walls flashing.

- Repair and replace roof vents and affected electrical fixtures.



**4- Door Track, Tube truss, purlin and X brace.**    **5- Segmental push doors, roof panel & ridge vents.**

8. **Building No. 4300** – Is a nested (9,240 s.f.) T-hangar with 8 stalls, nominally 55'0 wide by 168'0 long and 14'0 eave, ridge building with a 1:12 roof slope. Hangar doors are segmental track supported push/pull doors nominally 40'0 x 14'0 each.

    i. **Building was completely destroyed** and will require rebuild in kind.

  ii. Scope of replacement to include new foundations and anchors required to meet present day code.

  iii. Building is 26 gage fasten-through sheet metal panels on the roof, partitions, doors and walls with 18 translucent roof panels per each slope, 36 total. 10 ridge gravity ventilators and Z inset end walls both ends.

  iv. Replace minimal electrical as defined under "general conditions".

Scope to rebuild building **4300**:

- General Contractor bids to include all labor, materials and tools to provide a complete hangar building. The contractor will follow restricted access procedures and follow owner's safety protocols; but at a minimum it shall follow OSHA construction site safety and provide safety PPE as required.

- Contractor shall include engineering design and drawings for foundations based on the pre-engineered metal building (PEMB) vendor design and loads required for the Nashville, TN area.

- Provide engineering soils evaluation and recommendation report to support the foundations design. Report shall be for the area affected by the tornados and need not be specific to a single building.

- Excavate and construct foundations as required to meet design and PEMB documents. All concrete and reinforcing shall meet the foundations documents, the documents shall be signed and sealed by a registered professional engineer registered in the state of TN. Foundations to be complete including anchor bolts and piers as required. Estimated foundations are 2'6 by 2'6 by 1'0 each; with 2 each ½" A-307 anchor bolts. All concrete to be 4000 psi and 50 grade steel. Epoxy anchors are acceptable and are to be installed per vendor's instructions.

- Contractor to procure and erect a new PEMB to match existing building **4300**, including framing, roof purlins, wall and partition girts, X bracing and door track system in like kind to existing. All steel to be primed only. Roof and wall cladding to be fasten through 26 gage sheet metal panels attached to the girts or purlins including a base angle as required; all panels to be galvanized or aluminized, one side painted. The track doors are to be push/pull manual segmental system, each door to be supported by a wheel and guide system or track system as provided by the PEMB vendor. Include segmental doors interlocking mechanism and hardware sets to complete the enclosures for each stall.

- Provide translucent roof panels and ridge ventilators; ridge ventilators to be 4'0 long and gravity type, fixed open with quantity as defined under item iii above.

- Provide one exterior roof mounted, single flood light 60 watts wall LED centered at each door; provide 2 each, interior 2'0 x 4'0, 50 watts LED lights and 2 each interior outlets on a 15 amp rated circuit for each stall. Provide a meter and distribution panel for the building as a whole and serve each stall from individual circuits. Include all wiring, anchoring and miscellaneous to complete the minimal electrical service to each stall.

- Complete the work by including a 1/2" spray on foam insulation under the roof panels.

- Clean site and legally dispose of all construction debris as required.

9. Building **No. 4310** – Is a nested (9,070 s.f.) T-hangar with 8 stalls, nominally 54'0 wide by 168'0 long and 14'0 eave, ridge building with a 1:12 roof slope. Hangar doors are segmental track supported push/pull doors nominally 40'0 x 14'0 each.

     i. **Building was completely destroyed** and will require rebuild in kind.

     ii. Scope of replacement to include new foundations and anchors required to meet present day code.

     iii. Building is 26 gage fasten-through sheet metal panels on the roof, partitions, doors and walls with 18 translucent roof panels per each slope, 36 total. 10 ridge gravity ventilators and Z inset end walls both ends.

     iv. Replace minimal electrical as defined under "general conditions".

Scope to rebuild building 4310:

- General Contractor bids to include all labor, materials and tools to provide a complete hangar building. The contractor will follow restricted access procedures and follow owner's safety protocols; but at a minimum it shall follow OSHA construction site safety and provide safety PPE as required.

- Contractor shall include engineering design and drawings for foundations based on the pre-engineered metal building (PEMB) vendor design and loads required for the Nashville, TN area.

- Provide engineering soils evaluation and recommendation report to support the foundations design. Report shall be for the area affected by the tornados and need not be specific to a single building.

- Excavate and construct foundations as required to meet foundation's design and PEMB documents. All concrete and reinforcing shall meet the foundations documents, the documents shall be signed and sealed by a registered professional engineer registered in the state of TN. Foundations to be complete including anchor bolts and piers as required. Estimated foundations are 2'6 by 2'6 by 1'0 each; with 2 each ½" A-307 anchor bolts. All concrete to be 4000 psi and 50 grade steel. Epoxy anchors are acceptable and are to be installed per vendor's instructions.

- Contractor to procure and erect a new PEMB to match existing building **4310**, including framing, roof purlins, wall and partition girts, X bracing and door track system in like kind to existing. All steel to be primed only. Roof and wall cladding to be fasten through 26 gage sheet metal panels attached to the girts or purlins including a base angle as required; all panels to be galvanized or aluminized, one side painted. The track doors are to be push/pull manual segmental system, each door to be supported by a wheel and guide system or track system as provided by the PEMB vendor. Include segmental doors interlocking mechanism and hardware sets to complete the enclosures for each stall.

- Provide translucent roof panels and ridge ventilators; ridge ventilators to be 4'0 long and gravity type, fixed open with quantity as defined under item iii above.

- Provide one exterior roof mounted, single flood light 60 watts wall LED centered at each door; provide 2 each, interior 2'0 x 4'0, 50 watts LED lights and 2 each interior outlets on a 15 amp rated circuit for each stall. Provide a meter and distribution panel for the building as a

whole and serve each stall from individual circuits. Include all wiring, anchoring and miscellaneous to complete the minimal electrical service to each stall.

- Complete the work by including a 1/2" spray on foam insulation under the roof panels.

- Clean site and legally dispose of all construction debris as required.

10. **Building No. 4320** – Is a nested (10,000 s.f.) T-hangar with 10 stalls, nominally 50'0 wide by 200'0 long and 14'0 eave, ridge building with a 1:12 roof slope. Hangar doors are segmental track supported push/pull doors nominally 40'0 x 14'0 each.

    i. **Building was severely damaged** and will require **demolition** and **rebuild** in kind.

    ii. Scope of replacement to include new foundations and anchors required to meet present day code.

    iii. Building is 26 gage fasten-through sheet metal panels on the roof, partitions, doors and walls with 20 translucent roof panels per each slope, 40 total. 10 ridge gravity ventilators and Z inset end walls both ends.

    iv. Replace structural and electrical as defined under "general conditions".

Scope to rebuild building **4320**:

- General Contractor bids to include all labor, materials and tools to provide a complete hangar building. The contractor will follow restricted access procedures and follow owner's safety protocols; but at a minimum it shall follow OSHA construction site safety and provide safety PPE as required.

- Contractor shall include engineering design and drawings for foundations based on the pre-engineered metal building (PEMB) vendor design and loads required for the Nashville, TN area.

- Provide engineering soils evaluation and recommendation report to support the foundations design. Report shall be for the area affected by the tornados and need not be specific to a single building.

- Excavate and construct foundations as required to meet foundation's design and PEMB documents. All concrete and reinforcing shall meet the foundations documents, the documents shall be signed and sealed by a registered professional engineer registered in the state of TN. Foundations to be complete including anchor bolts and piers as required. Estimated foundations are 2'6 by 2'6 by 1'0 each; with 2 each ½" A-307 anchor bolts. All concrete to be 4000 psi and 50 grade steel. Epoxy anchors are acceptable and are to be installed per vendor's instructions.

- Contractor to procure and erect a new PEMB to match existing building **4320**, including framing, roof purlins, wall and partition girts, X bracing and door track system in like kind to existing. All steel to be primed only. Roof and wall cladding to be fasten through 26 gage sheet metal panels attached to the girts or purlins including a base angle as required; all panels to be galvanized or aluminized, one side painted. The track doors are to be push/pull manual segmental system, each door to be supported by a wheel and guide system or track

system as provided by the PEMB vendor. Include segmental doors interlocking mechanism and hardware sets to complete the enclosures for each stall.

- Provide translucent roof panels and ridge ventilators; ridge ventilators to be 4'0 long and gravity type, fixed open with quantity as defined under item iii above.

- Provide one exterior roof mounted, single flood light 60 watts wall LED centered at each door; provide 2 each, interior 2'0 x 4'0, 50 watts LED lights and 2 each interior outlets on a 15 amp rated circuit for each stall. Provide a meter and distribution panel for the building as a whole and serve each stall from individual circuits. Include all wiring, anchoring and miscellaneous to complete the minimal electrical service to each stall.

- Complete the work by including a 1/2" spray on foam insulation under the roof panels.

- Clean site and legally dispose of all construction debris as required.

11. Building **No. 4330** – Is a nested (10,000 s.f.) T-hangar with 10 stalls, nominally 50'0 wide by 200'0 long and 14'0 eave, ridge building with a 1:12 roof slope. Hangar doors are segmental track supported push/pull doors nominally 40'0 x 14'0 each. **Rev.(1)**

   i. **Building was severely damaged** and will require **demolition** and **rebuild** in kind.

   ii. Scope of replacement to include new foundations and anchors required to meet present day code.

   iii. Building is 26 gage fasten-through sheet metal panels on the roof, partitions, doors and walls with 20 translucent roof panels per each slope, 40 total. 10 ridge gravity ventilators and Z inset end walls both ends.

   iv. Replace structural and electrical as defined under "general conditions".

Scope to rebuild building 4330:

- General Contractor bids to include all labor, materials and tools to provide a complete hangar building. The contractor will follow restricted access procedures and follow owner's safety protocols; but at a minimum it shall follow OSHA construction site safety and provide safety PPE as required.

- Contractor shall include engineering design and drawings for foundations based on the pre-engineered metal building (PEMB) vendor design and loads required for the Nashville, TN area.

- Provide engineering soils evaluation and recommendation report to support the foundations design. Report shall be for the area affected by the tornados and need not be specific to a single building.

- Excavate and construct foundations as required to meet design and PEMB documents. All concrete and reinforcing shall meet the foundations documents, the documents shall be signed and sealed by a registered professional engineer registered in the state of TN. Foundations to be complete including anchor bolts and piers as required. Estimated foundations are 2'6 by 2'6 by 1'0 each; with 2 each ½" A-307 anchor bolts. All concrete to

be 4000 psi and 50 grade steel. Epoxy anchors are acceptable and are to be installed per vendor's instructions.

- Contractor to procure and erect a new PEMB to match existing building **4330,** including framing, roof purlins, wall and partition girts, X bracing and door track system in like kind to existing. All steel to be primed only. Roof and wall cladding to be fasten through 26 gage sheet metal panels attached to the girts or purlins including a base angle as required; all panels to be galvanized or aluminized, one side painted. The track doors are to be push/pull manual segmental system, each door to be supported by a wheel and guide system or track system as provided by the PEMB vendor. Include segmental doors interlocking mechanism and hardware sets to complete the enclosures for each stall.

- Provide translucent roof panels and ridge ventilators; ridge ventilators to be 4'0 long and gravity type, fixed open with quantity as defined under item iii above.

- Provide one exterior roof mounted, single flood light 60 watts wall LED centered at each door; provide 2 each, interior 2'0 x 4'0, 50 watts LED lights and 2 each interior outlets on a 15 amp rated circuit for each stall. Provide a meter and distribution panel for the building as a whole and serve each stall from individual circuits. Include all wiring, anchoring and miscellaneous to complete the minimal electrical service to each stall.

- Complete the work by including a 1/2" spray on foam insulation under the roof panels.

- Clean site and legally dispose of all construction debris as required.

12. Building **No. 4340** – Is a nested (11,400 s.f.) T-hangar with 8 stalls, nominally 60'0 wide by 200'0 long and 14'0 eave, a ridge building with a 1:12 roof slope. Hangar doors are bi-fold type motorized nominally 50'0 x 14'0 each. Building has a square eastern end-wall and Z inset western wall.

    i. Building was **not damaged** structurally, minimal cosmetic damages.

    ii. Two north facing doors (# 344 and # 341) show some separation during our inspection. Doors to be inspected by certified bi-fold technician and maintain/repair if required.

    iii. Minimal debris strikes to wall panels, repair by replacing affected panels.

13. Building **No. 4350** – Is a nested (10,280 s.f.) T-hangar with 8 stalls, nominally 52'0 wide by 208'0 long and 14'0 eave, a ridge building with a 1:12 roof slope. Hangar doors are bi-fold type motorized nominally 42'0 x 14'0 each. Building has a square eastern end-wall and Z inset western end wall.

    i. Building was **not damaged** structurally, minimal cosmetic damages.

    ii. Two north facing doors (# 344 and # 341) show some separation during our inspection. Doors to be inspected by certified bi-fold technician and maintain/repair if required.

    iii. Minimal debris strikes to wall panels, repair by replacing affected panels.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 97 of 133 PageID #: 100

14. Building **No. 4360** -- Is a nested (12,600 s.f.) T-hangar with 8 stalls, nominally 60'0 wide by 210'0 long and 14'0 eave, a ridge building with a 1:12 roof slope. Hangar doors are bi-fold type motorized nominally 50'0 x 14'0 each. Building has a square both end-walls.

      i. Building was **not damaged** structurally, no debris damages, no door damages noted.

15. Building **No. 4410** -- Is a nested (8,680 s.f.) T-hangar with 6 stalls, nominally 62'0 wide by 140'0 long and 14'0 eave, ridge building with a 1:12 roof slope. Hangar doors are segmental track supported push/pull doors nominally 45'0 x 14'0 each.

      i. **Building was completely destroyed** and will require rebuild in kind.

      ii. Scope of replacement to include new foundations and anchors required to meet present day code.

      iii. Building is 26 gage fasten-through sheet metal panels on the roof, partitions, doors and walls with 9 translucent roof panels per each slope, 18 total. 6 ridge gravity ventilators and Z inset end walls both ends.

      iv. Replace minimal electrical as defined under "general conditions".

Scope to rebuild building **4410**:

- General Contractor bids to include all labor, materials and tools to provide a complete hangar building. The contractor will follow restricted access procedures and follow owner's safety protocols; but at a minimum it shall follow OSHA construction site safety and provide safety PPE as required.

- Contractor shall include engineering design and drawings for foundations based on the pre-engineered metal building (PEMB) vendor design and loads required for the Nashville, TN area.

- Provide engineering soils evaluation and recommendation report to support the foundations design. Report shall be for the area affected by the tornados and need not be specific to a single building.

- Excavate and construct foundations as required to meet foundation's design and PEMB documents. All concrete and reinforcing shall meet the foundations documents, the documents shall be signed and sealed by a registered professional engineer registered in the state of TN. Foundations to be complete including anchor bolts and piers as required. Estimated foundations are 2'6 by 2'6 by 1'0 each; with 2 each ½" A-307 anchor bolts. All concrete to be 4000 psi and 50 grade steel. Epoxy anchors are acceptable and are to be installed per vendor's instructions.

- Contractor to procure and erect a new PEMB to match existing building **4410**, including framing, roof purlins, wall and partition girts, X bracing and door track system in like kind to existing. All steel to be primed only. Roof and wall cladding to be fasten through 26 gage sheet metal panels attached to the girts or purlins including a base angle as required; all panels to be galvanized or aluminized, one side painted. The track doors are to be push/pull manual segmental system, each door to be supported by a wheel and guide system or track system as provided by the PEMB vendor. Include segmental doors interlocking mechanism and hardware sets to complete the enclosures for each stall.

- 16 -

- Provide translucent roof panels and ridge ventilators; ridge ventilators to be 4'0 long and gravity type, fixed open with quantity as defined under item iii above.

- Provide one exterior roof mounted, single flood light 60 watts wall LED centered at each door; provide 2 each, interior 2'0 x 4'0, 50 watts LED lights and 2 each interior outlets on a 15 amp rated circuit for each stall. Provide a meter and distribution panel for the building as a whole and serve each stall from individual circuits. Include all wiring, anchoring and miscellaneous to complete the minimal electrical service to each stall.

- Complete the work by including a 1/2" spray on foam insulation under the roof panels.

- Clean site and legally dispose of all construction debris as required.

16. Building **No. 4420** – Is a nested (8,100 s.f.) T-hangar with 7 stalls. 4 bays face north and 3 bays face south, nominally 54'0 wide by 150'0 long and 14'0 eave, ridge building with a 1:12 roof slope. Hangar doors are segmental track supported push/pull doors nominally 40'0 x 14'0 each.

     i. **Building was completely destroyed** and will require rebuild in kind.

     ii. Scope of replacement to include new foundations and anchors required to meet present day code.

     iii. Building is 26 gage fasten-through sheet metal panels on the roof, partitions, doors and walls with translucent roof panels, 21 total. 7 ridge gravity ventilators and Z inset end walls both ends.

     iv. Replace minimal electrical as defined under "general conditions".

Scope to rebuild building **4420**:

- General Contractor bids to include all labor, materials and tools to provide a complete hangar building. The contractor will follow restricted access procedures and follow owner's safety protocols; but at a minimum it shall follow OSHA construction site safety and provide safety PPE as required.

- Contractor shall include engineering design and drawings for foundations based on the pre-engineered metal building (PEMB) vendor design and loads required for the Nashville, TN area.

- Provide engineering soils evaluation and recommendation report to support the foundations design. Report shall be for the area affected by the tornados and need not be specific to a single building.

- Excavate and construct foundations as required to meet design and PEMB documents. All concrete and reinforcing shall meet the foundations documents, the documents shall be signed and sealed by a registered professional engineer registered in the state of TN. Foundations to be complete including anchor bolts and piers as required. Estimated foundations are 2'6 by 2'6 by 1'0 each; with 2 each ½" A-307 anchor bolts. All concrete to be 4000 psi and 50 grade steel. Epoxy anchors are acceptable and are to be installed per vendor's instructions.

- Contractor to procure and erect a new PEMB to match existing building **4420**, including framing, roof purlins, wall and partition girts, X bracing and door track system in like kind to existing. All steel to be primed only. Roof and wall cladding to be fasten through 26 gage

- 17 -

sheet metal panels attached to the girts or purlins including a base angle as required; all panels to be galvanized or aluminized, one side painted. The track doors are to be push/pull manual segmental system, each door to be supported by a wheel and guide system or track system as provided by the PEMB vendor. Include segmental doors interlocking mechanism and hardware sets to complete the enclosures for each stall.

- Provide translucent roof panels and ridge ventilators; ridge ventilators to be 4'0 long and gravity type, fixed open with quantity as defined under item iii above.

- Provide one exterior roof mounted, single flood light 60 watts wall LED centered at each door; provide 2 each, interior 2'0 x 4'0, 50 watts LED lights and 2 each interior outlets on a 15 amp rated circuit for each stall. Provide a meter and distribution panel for the building as a whole and serve each stall from individual circuits. Include all wiring, anchoring and miscellaneous to complete the minimal electrical service to each stall.

- Complete the work by including a 1/2" spray on foam insulation under the roof panels.

- Clean site and legally dispose of all construction debris as required.


17. Building **No. 4430** – Is a nested (8,000 s.f.) T-hangar with 7 stalls. 4 stalls face north and 3 stalls face south, nominally 54'0 wide by 148'0 long and 14'0 eave, ridge building with a 1:12 roof slope. Hangar doors are segmental track supported push/pull doors nominally 40'0 x 14'0 each.

      i. **Building was completely destroyed** and will require rebuild in kind.

      ii. Scope of replacement to include new foundations and anchors required to meet present day code.

      iii. Building is 26 gage fasten-through sheet metal panels on the roof, partitions, doors and walls with translucent roof panels, 21 total. 7 ridge gravity ventilators and Z inset end walls both ends.

      iv. Replace minimal electrical as defined under "general conditions".

Scope to rebuild building **4430**:

- General Contractor bids to include all labor, materials and tools to provide a complete hangar building. The contractor will follow restricted access procedures and follow owner's safety protocols; but at a minimum it shall follow OSHA construction site safety and provide safety PPE as required.

- Contractor shall include engineering design and drawings for foundations based on the pre-engineered metal building (PEMB) vendor design and loads required for the Nashville, TN area.

- Provide engineering soils evaluation and recommendation report to support the foundations design. Report shall be for the area affected by the tornados and need not be specific to a single building.

- Excavate and construct foundations as required to meet design and PEMB documents. All concrete and reinforcing shall meet the foundations documents, the documents shall be signed and sealed by a registered professional engineer registered in the state of TN. Foundations to be complete including anchor bolts and piers as required. Estimated

- 18 -

foundations are 2'6 by 2'6 by 1'0 each; with 2 each ½" A-307 anchor bolts. All concrete to be 4000 psi and 50 grade steel. Epoxy anchors are acceptable and are to be installed per vendor's instructions.

- Contractor to procure and erect a new PEMB to match existing building **4430**, including framing, roof purlins, wall and partition girts, X bracing and door track system in like kind to existing. All steel to be primed only. Roof and wall cladding to be fasten through 26 gage sheet metal panels attached to the girts or purlins including a base angle as required; all panels to be galvanized or aluminized, one side painted. The track doors are to be push/pull manual segmental system, each door to be supported by a wheel and guide system or track system as provided by the PEMB vendor. Include segmental doors interlocking mechanism and hardware sets to complete the enclosures for each stall.

- Provide translucent roof panels and ridge ventilators; ridge ventilators to be 4'0 long and gravity type, fixed open with quantity as defined under item iii above.

- Provide one exterior roof mounted, single flood light 60 watts wall LED centered at each door; provide 2 each, interior 2'0 x 4'0, 50 watts LED lights and 2 each interior outlets on a 15 amp rated circuit for each stall. Provide a meter and distribution panel for the building as a whole and serve each stall from individual circuits. Include all wiring, anchoring and miscellaneous to complete the minimal electrical service to each stall.

- Complete the work by including a 1/2" spray on foam insulation under the roof panels.

- Clean site and legally dispose of all construction debris as required.

18. **Building No. 4440** – Is a nested (8,220 s.f.) T-hangar with 7 bays, nominally 52'0 wide by 158'0 long and 14'0 eave, a ridge building with a 1:12 roof slope. Hangar doors are bi-fold type motorized nominally 42'0 x 14'0 each. Building has a square western end-wall and Z inset east end wall.

    i. Building has southwest corner panels **damaged**, and cosmetic damages; repair as noted.

    ii. All north facing doors (# 444 to # 441) show some separation during our inspection. Doors to be inspected by certified bi-fold technician and maintain/repair as required.

    iii. Three doors are facing south (# 445 - #447), door # 445 was observed separated from frame and will need repairs or replacement.

    iv. Along the south building face the southwest corner served as grounds equipment storage/warehouse, this end module has the west end wall damaged panels and roof about 30'0 x 20'0 roof area; remove damaged panels (roof, partition and wall) and replace with 26 gage metal panels. Repair girts and purlins in this area if affected.

    v. A roll-up door nominally 10'0 x12'0 facing south and serving as access to the grounds equipment storage was damaged, replace in kind.

    vi. Debris strikes to wall panels, repair as required.

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 101 of 133 PageID #: 104

19. Building **No. 4450** – Is a nested (8,220 s.f.) T-hangar with 7 bays, nominally 52'0 wide by 158'0 long and 14'0 eave, a ridge building with a 1:12 roof slope. Hangar doors are bi-fold type motorized nominally 42'0 x 14'0 each. Building has a square western end-wall and Z inset east end wall.

    i. Building has some southwest interior partition panels **damaged**, and cosmetic damages; repair by replacing panels with new.

    ii. One north facing door (# 454) show some separation during our inspection. Door is to be inspected by certified bi-fold technician and maintain/repair as required.

    iii. Hangar doors facing south are undamaged. One 10' x 12' roll up door facing south is damaged and will need replacement in kind.

    iv. Inspect roof panels for debris strikes, repair by replacing individual panels as required.



**6 – North facing Door Separation.**　　　　　**7 – Western wall and roof portion damage**

20. Building **No. 4460** – Is a nested (10,080 s.f.) T-hangar with 6 stalls, nominally 60'0 wide by 168'0 long and 14'0 eave, a ridge building with a 1:12 roof slope. Hangar doors are bi-fold type motorized nominally 50'0 x 14'0 each. Building has a square both end-walls.

    i. Building was **not damaged** structurally,

    ii. One north facing door (# 463) show some separation during our inspection. Door is to be inspected by certified bi-fold technician and maintain/repair as required.

    iii. Hangar doors facing south are undamaged. One 10' x 12' roll up door facing south has panels damaged and will need repairs.

21. **Other:** Chain link fence around the perimeter consisting of a 6'0 tall with barb wire strands. Repair in like kind.

- 20 -

COST ESTIMATES:

22. Building "A" -

    i. **Building was completely destroyed** and will require rebuild in kind.

    ii. **Estimated COST to replace = $ 305,000.00**

23. Building "B" —

    i. **Building was completely destroyed** and will require rebuild in kind.

    ii. **Estimated COST to replace = $ 615,000.00**

24. Building "C" —

    i. **Building was completely destroyed** and will require rebuild in kind.

    ii. **Estimated COST to replace = $ 410,000.00**

25. Building "D" -

    i. **Building was completely destroyed** and will require rebuild in kind.

    ii. **Estimated COST to replace = $ 340,000.00**

26. Building "E" -

    i. **Building was completely destroyed** and will require rebuild in kind.

    ii. **Estimated COST to replace = $ 300,000.00**

27. Building No. 4250 —

    i. Damages consists of strikes by debris to wall panels, no structural damages noted.

    ii. **Estimated COST to repair = $ 35,000.00**

28. Building No. 4260 —

    i. **Building was damaged** but can be **repaired in place.**

    ii. **Estimated COST to repair = $ 110,000.00**

29. Building No. 4300 —

    i. **Building was completely destroyed** and will require rebuild in kind.

    ii. **Estimated COST to replace = $340,000.00**

30. Building No. 4310 —

    i. **Building was completely destroyed** and will require rebuild in kind.

    ii. **Estimated COST to replace = $360,000.00**

31. Building No. 4320 –

    i. **Building was severely damaged** and will require **demolition** and **rebuild** in kind.

    ii. **Estimated COST to replace = $340,000.00**

32. Building No. 4330 –

    i. **Building was damaged** but can be **repaired** in like kind.

    ii. **Estimated COST to repair = $ 70,000.00**

33. Building No. 4340 –

    i. **Estimated COST to repair = $ 30,000.00**

34. Building No. 4350 –

    i. Building **was not damaged** structurally, cosmetic damages.

    ii. **Estimated COST to repair = $ 20,000.00**

35. Building No. 4360 –

    i. Building was **not damaged** structurally, no debris damages, no door damages noted.

    ii. **Estimated COST to repair = $ 10,000.00**

36. Building No. 4410 –

    i. **Building was completely destroyed** and will require rebuild in kind.

    ii. **Estimated COST to replace = $306,000.00**

37. Building No. 4420 –

    i. **Building was completely destroyed** and will require rebuild in kind.

    ii. **Estimated COST to replace = $300,000.00.**

38. Building No. 4430 –

    i. **Building was completely destroyed** and will require rebuild in kind.

    ii. **Estimated COST to replace = $300,000.00**

39. Building No. 4440 –

    i. Building has southwest corner panels **damaged**, and cosmetic damages; repair as noted.

    ii. **Estimated COST to repair = $ 80,000.00**

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 104 of 133 PageID #: 107

40. Building No. **4450** –

    i.  **Estimated COST to repair = $ 60,000.00**

41. Building No. **4460** –

    i.  **Building was not damaged structurally,**

    ii.  **Estimated COST to repair = $ 14,000.00**

42. **Other**: Chain link fence around the perimeter consisting of a 6'0 tall with barb wire strands. Repair in like kind.

    i.  **Estimated COST to replace = $ 80,000.00**

 

**TOTAL Estimated COST to repair and replace = $ 4,425,000.00**

This report does not include ancillary damages to airport runway lights or buildings leased to other parties as defined by the airport representatives.

Should you have any questions feel free to call on me, and thanks for the opportunity to serve you.

Regards,

*Emilio J. Solis, P.E.*

Emilio J. Solis, P.E.
Registered Engineer State of Tennessee
No. 101439



# Exhibit 3

# waller

Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
P.O. Box 198966
Nashville, TN 37219-8966

615.244.6380   main
615.244.6804   fax
wallerlaw.com

Mark M. Bell
615.850.8850   direct
mark.bell@wallerlaw.com

May 5, 2021

2022 FEB 28 PH 2: 22
DAVIDSON CO. CHANCERY CT.
CLERK & MASTER
D.C.&M.
FILED

**VIA EMAIL AND FIRST CLASS U.S. MAIL**

Joshua Martinez
Assistant Vice President
Senior General Adjuster
FM Global Insurance Company
3460 Preston Ridge Road
Alpharetta, GA 30005
Joshua.martinez@fmglobal.com

Deanna Gajdik
Claims Adjuster
FM Global Insurance Company
3460 Preston Ridge Road
Alpharetta, GA 30005
Deanna.gajdik@fmglobal.com

Re:    Insured:      John C. Tune Airport
        Policy No.:    IA038
        Claim No.:    500245 – Tune Tornado Loss
        Date of Loss:    March 3, 2020

Dear Mr. Martinez and Ms. Gajdik:

     We represent John C. Tune Airport ("Tune") in various matters including with respect to its claim for insurance coverage under Policy Number IA038 ("Policy") issued by Affiliated FM Insurance Company ("FM"). I write specifically concerning the dispute involving the damaged and destroyed hangars at Tune that were the result of the March 3, 2020 tornado.

     The Policy provides coverage "against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded." There is no dispute in this case that tornado damage is a covered cause of loss. I appreciate that FM has agreed that there is coverage under the Policy and has agreed to reimburse Tune for certain expenses, including business income loss.

     The primary dispute concerns the replacement valuation of various damaged and destroyed hangars, i.e., the amount that FM must pay Tune for the destruction of its property. While Tune is being redesigned, Tune is not asking that FM pay for the costs of the full redesign, and the redesign should not affect the amount that FM must pay—the amount that would have been paid had the buildings been rebuilt as they existed immediately before the loss. We do appreciate also that FM has agreed that the redesign constitutes a "rebuilding" for replacement cost valuation purposes such that the depreciation will be paid to Tune at the appropriate time. If that is not the case, however, please let me know immediately.

4837-7725-8982

# waller

Under the Policy, "[a]djustment of the physical loss amount(s) under this Policy will be as of the date of loss at the place of loss, and for no more than the interest of the Insured." Loss Adjustment and Settlement L (Valuation). Additionally:

> 1. Adjustment of physical loss to property will be determined based on the lesser of the following unless stated otherwise below or elsewhere in this Policy:
> a) The cost to repair.
> b) The cost to rebuild or replace on the same site with new materials of like size, kind and quality.
> c) The cost to rebuild, repair or replace on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.
> d) On real property or machinery and equipment, other than stock, offered for sale on the date of the loss, the selling price.

*Id.*

Tune has obtained two independent replacement cost estimates from reputable general contractors in the area for an exact rebuild of the buildings (again, without including any improvements or enhancements). Faithful Gould ("FG") estimated that the total cost of construction for the scope of the project would be $10,458,421, and Connico estimated the construction cost to be $9,315,000. Additionally, FEMA provided a cost estimate for replacement based on the pre-approved scope, and FEMA's updated estimate is $10,182,116. FEMA, however, has taken the position that Tune does not qualify for any FEMA assistance as the proceeds should all be recoverable from FM.

FM, however, has obtained an estimate from ServiceMaster Recovery Management ("SRM") stating that the replacement cost for Tune's hangers is $6,829,625.66—much less than any of the above independent estimates. SRM clearly states that its work product is merely an estimate on the first page of its document.

We also believe the SRM estimate is flawed and prepared solely for the benefit of FM Global. This is demonstrated by the fact that when Tune invited SRM to provide a cost estimate, SRM declined to do so because it was engaged to act on FM's behalf. This demonstrates a clear conflict of interest between SRM and Tune. Second, the SRM quote lacks "soft costs" (for insurance charges, bonding, inevitable rebuilding contingencies, and similar costs) and estimates for the build-out of office space and restrooms that existed prior to the loss (with the requisite plumbing for restrooms and HVAC for offices). Third, SRM's estimates of square footage for the various buildings differed from that provided by Tune and used by FG, Connico, and FEMA. Finally, SRM's bid states that the scope of work was provided by Solis & Parker Associates report dated 8/3/2020, but the SRM estimate ignored the report's statement: "Scope of replacement to include new foundations and anchors required to meet present day code." In other words, the SRM quote does not include new foundations, but proposes to reuse the existing, damaged, and structurally unsound building pads that do not meet the modern Building Codes--directly in contravention to the scope prepared by Solis Parker for FM. According to SRM, it would use the existing pads, cut out the former post and anchor bolts, and reattach new with epoxy and concrete adhesives. We have opinions from two different Tennessee engineering firms that state this approach is unacceptable and both agree that the footings and concrete slabs must be replaced.

**waller**

FM's insistence that the SRM bid be used is not reasonable in light of all of the evidence and opinions to the contrary. In Tennessee, an insurer has a duty to deal with its insured "fairly and in good faith" in settling a claim. *MFA Mutual Insur. Co. v. Flint*, 574 S.W.2d 718, (Tenn. 1978). "[T]he insurer's duty is to exercis(e) good faith and diligence in protecting the interest of its insured which is to indemnify the insured against loss." *Brown v. St. Paul Fire & Marine Ins. Co.*, 604 S.W.2d 863, 865 (Tenn. Ct. App. 1980) (internal quotations omitted).

Tune hopes to be able to amicably resolve this dispute with FM without having to go through the formal appraisal or litigation process. Accordingly, Tune proposes that a reasonable valuation for the losses it sustained is to average the Connico, FG, and FEMA estimates, for a total amount payable to Tune of $9,985,179. Please respond within 10 days to let me know whether that amount is agreeable to FM or if it has a reasonable estimate of the replacement costs provided by a contractor licensed to construct the work here in Tennessee. Please also confirm that FM does not intend to rely on its flawed bid from SRM. I look forward to hearing from you soon.

Very truly yours,

Mark M. Bell

MMB:qdk

# Exhibit 4



May 24, 2021

Mr. Mark Bell
Waller Lansden Dortch & Davis, LLP
Email: mark.bell@wallerlaw.com

2022 FEB 28 PM 2:22 FILED
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.
D.C.&M.

Reference:

| | |
|---|---|
| Client: | Metropolitan Nashville Airport Authority |
| Location of Loss: | John C. Tune Airport, Nashville, TN |
| Date of Loss: | 3-Mar-20 |
| Policy No.: | IA038 |
| Peril: | Wind |
| Adjustment File No.: | 500245 |

Dear Mr. Bell:

This confirms our receipt and review of your letter dated May 5, 2021, requesting AFM Insurance Company to agree to value the repair costs for the hangars located at John C. Tune Airport that were damaged by wind and flying debris as a result of the March 3, 2020 tornado at $9,985,179 versus our current repair cost measure of $6,892,293.84.

Prior to addressing the request for our agreement on your purposed valuation we would like to address some inaccuracies on the history of the loss contained in the correspondence as well as to expand on the description of other events and/or decisions that were discussed and enacted.

In the third paragraph of your letter, you state "While Tune is being redesigned, Tune is not asking that FM pay for the costs of the full redesign, and the redesign should not affect the amount that FM must pay—the amount that would have been paid had the buildings been rebuilt as they existed immediately before the loss. We do appreciate also that FM has agreed that the redesign constitutes a "rebuilding" for replacement cost valuation purposes such that the depreciation will be paid to Tune at the appropriate time.

Under the Policy, "[a]djustment of the physical loss amount(s) under this Policy will be as of the date of loss at the place of loss, and for no more than the interest of the Insured." Loss Adjustment and Settlement L (Valuation). Additionally:

1. Adjustment of physical loss to property will be determined based on the lesser of the following unless stated otherwise below or elsewhere in this Policy:
   a) The cost to repair.
   b) The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

Mr. Mark Bell
Metropolitan Nashville Airport Authority
Nashville, TN | Tornado Damage
File No.: 500245

May 24, 2021
Page 2

    c) The cost to rebuild, repair or replace on the same or another site, but not to
       exceed the size and operating capacity that existed on the date of loss.
    d) On real property or machinery and equipment, other than stock, offered for sale
       on the date of the loss, the selling price."

Please be advised that AFM was not aware of the fact that John C. Tune Airport was being redesigned as we have participated in many conversations with the Airport Authority's previous Risk Manager, Mr. Ed McDonald; the current Risk Manager, Mr. Bob Davidson; Ms. Traci Holton, Assistant VP of Development & Engineering; Marsh's Ms. Catherine Brown, Lindsay Grimes, and Robert Gall, when we have asked if the airport was being redesigned, we have been advised that it was not being redesigned; however, they did not know what they were going to do, which was first brought to our attention by Mr. McDonald in October of 2020. After this was brought to our attention, we advised Mr. McDonald and the Marsh representatives that the recoverable cost for the damages to hangars would be based on the lesser of the cost to repair, or the cost to rebuild or replace on the same or another site with new materials of like size, kind and quality and reflect the cost of such materials on the date of loss. We further advised that if the Airport Authority elected not to repair or replace the damaged hangars, that they may elect to make a claim for the actual cash value (ACV) for property not repaired, replaced, or rebuilt on the same or another site within two years from the date of loss or they could make a claim for an unplanned capital expenditure related to their operations within two years from the date of loss. We further advised that in an effort of good faith, AFM would engage building consultant/contractor, SRM, to prepare a replacement cost estimate based on the August 3, 2020 Solis Parker Engineering Report, with the direction that in the event the Airport Authority accepted the repair estimate and would like to engage them to make the repairs, AFM would release them, and they would be obligated to honor the estimate.

In the fifth and sixth paragraphs of your letter you advise, "Tune has obtained two independent replacement cost estimates from reputable general contractors in the area for an exact rebuild of the buildings (again, without including any improvements or enhancements). Faithful Gould ("FG") estimated that the total cost of construction for the scope of the project would be $10,458,421, and Connico estimated the construction cost to be $9,315,000. Additionally, FEMA provided a cost estimate for replacement based on the pre-approved scope, and FEMA's updated estimate is $10,182,116. FEMA, however, has taken the position that Tune does not qualify for any FEMA assistance as the proceeds should all be recoverable from FM."

With regards to the three estimates you reference from FEMA, Faithful Gould, and Connico, we can advise that we were not provided with any information from FEMA; however, we were provided with copies of the estimates from Faithful Gould and Connico, by Mr. Davidson, who advised the documents were competitive bids versus estimates. For this reason we will focus our response to the Connico bid/estimate, as Mr. Davidson and Ms. Holton have advised that the Airport Authority is required to develop a bid document that identifies the scope of repair, in this instance the August 2020 Solis Parker Engineering report (see attachment) was used, the document is then provided to multiple contractors who have an interest in the project and they are required to submit their bids within the designated time outlined in the bid document. After the time to submit the bids have expired the bids are reviewed and the contract is awarded to

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 112 of 133 PageID #: 115

Mr. Mark Bell
Metropolitan Nashville Airport Authority
Nashville, TN | Tornado Damage
File No.: 500245

May 24, 2021
Page 3

the lowest bidder. We would ask that some clarification be provided if the explanation provided for the bid process is inaccurate, as the current loss measure includes additional time in the period of liability to allow for the described process and if this is not required, we will need to revise the period of liability as it regards to loss of rents and fuel sales.

In your letter you advise the Connico bid is for $9,315,000; however, the estimate/bid document we received (see attachment) identifies the repair estimate/bid amount of $8,002,000.

The letter then states that "FM, however, has obtained an estimate from ServiceMaster Recovery Management ("SRM") stating that the replacement cost for Tune's hangers is $6,829,625.66—much less than any of the above independent estimates. SRM clearly states that its work product is merely an estimate on the first page of its document."

For clarification, the current SRM estimate as of April 23, 2021 is $6,829,293.84 as it was increased following a conversation with Mr. Davidson and Mr. Gall, who advised the sales tax at the date of loss was not 8.5% but rather 9.25%.

Your letter also advises that the SRM estimate is merely an estimate, which we do not disagree; however, as previously stated they have confirmed to AFM, the Airport Authority, and Marsh they were willing to honor the estimate for the scope of work outlined in the document at the time it was produced. We would also like to advise that the cover of the Connico estimate/bid identifies the work product as a "Rough Order of Magnitude Estimate."

In your seventh paragraph you state, "We also believe the SRM estimate is flawed and prepared solely for the benefit of FM Global. This is demonstrated by the fact that when Tune invited SRM to provide a cost estimate, SRM declined to do so because it was engaged to act on FM's behalf. This demonstrates a clear conflict of interest between SRM and Tune."

We disagree with the assertion that the SRM estimate is flawed or prepared solely for the benefit of FM Global. As previously stated, SRM was engaged to assist in identifying a value to return the damaged hangars to a pre-loss condition using like, kind, and quality materials. As we have explained to the Airport Authority and Marsh on multiple occasions, SRM has provided a competitive bid, which includes the engagement of Fulfab, Inc. (the manufacturer of the damaged hangars) to provide materials and to erect the hangars (see attached quote dated October 22, 2020). When you review the SRM estimate versus the Fulfab, Inc. quote (using Building A as an example), you will note that SRM marks the quote up by 31% then adds $9,627.72 in sales tax, then a 20% mark-up for overhead and profit is added. In comparison Fulfab, Inc. is charging $193,500 to provide materials and erect Hangar A and the SRM estimate for the same materials and labor are $316,187.66,

We are unclear to the intent of the statement that "this demonstrates a clear conflict of interest between SRM and Tune", as SRM was engaged as a consultant by AFM and at no time has Tune requested that SRM be released as a consultant so they could be engaged to perform

Mr. Mark Bell
Metropolitan Nashville Airport Authority
Nashville, TN | Tornado Damage
File No.: 500245

May 24, 2021
Page 4

the quoted repairs. The correspondence you are referring to is attached for your review. The January 8th email from Ms. Holton to SRM states,

" Mr. Wilson,

I'd like to request your services in providing an estimate to build t-hangars at John C. Tune Airport. I just need an hourly rate and a not-to-exceed amount. Once we have that agreed upon, I will provide you a Purchase Order to proceed with the work. Below is information related to the scope.

Attached you will find a PDF document that contains the following:
 - Scope of work document
 - Attachment A - Exhibit identifying hangar dimensions/size
 - Attachment B - Scope of work prepared by Solis Parker for FM Global (our insurance provider) - gives a little more detail

Pictures of the existing slabs and foundations can be found at the following link:"

As you can see from the request, the Airport Authority was not requesting that SRM bid on a project or to perform repairs, but rather to engage them as a consultant to develop an estimate, which had already been prepared for AFM at their expense and shared with the Airport Authority.

The letter then states, "Second, the SRM quote lacks "soft costs" (for insurance charges, bonding, inevitable rebuilding contingencies, and similar costs) and estimates for the build-out of office space and restrooms that existed prior to the loss (with the requisite plumbing for restrooms and HVAC for offices)."

Again, we disagree with the accuracy of this statement. While the SRM estimate does not specifically address all of the "soft costs" you reference it does have line items such as construction management, staff for oversight, and offices space. The estimate also includes $574,357.94 for overhead, which would address normal project costs like insurance. You are correct that the estimate does not allow for bonding as this is not a requirement, nor is it a recoverable cost per the terms and conditions of the policy. The estimate also does not include a contingency as the estimate/bid reflects the scope of work identified in the Solis Parker Engineering Report. As with most construction projects the contractors submit a bid based on the scope document and if additional damages are identified during the course of repairs, change orders are submitted for review and approval. The policy responds to the actual costs incurred for covered damages; however, no coverage is afforded for costs that may be incurred if damages may be identified. The following costs will not be considered in the recoverable loss measure:

• 10% for Estimating Design Evolution: As discussed, the description is for potential costs to be incurred for changes in design during the repair process.
• 1% for Performance Bond: This is not a cost the policy will respond to.

3460 PRESTON RIDGE ROAD | SUITE 400 | ALPHARETTA, GA 30005 USA | T: 770 777 3600 | F: 770 777 0414 | FMGLOBAL.COM

Mr. Mark Bell
Metropolitan Nashville Airport Authority
Nashville, TN | Tornado Damage
File No.: 500245

May 24, 2021
Page 5

- 8% for Architectural/Engineering Design: When the metal building is purchased from Fulfab, Inc. they come with a stamped set of engineered drawings and no design is required as this is addressed by the manufacturer based on requested dimensions. A 1% allowance will be considered for the cost to have an engineer calculate the additional weight to be added to the footings in order to meet any current code requirements.
- 2% for Architectural/Engineering Design Construction Admin: As previously refenced the Engineered Stamped drawings are provided by the building manufacturer.
- 2.5% Materials Testing/Inspection/commissioning: The materials testing, and inspection sheets will be provided by the manufacturer.

In addition to the 22.5% (allows for 1% in engineering fees) of additional charges that should not be included in the claim submission we also advise that February 16, 2021 Steel Market Update identifies a price increase on steel between August of 2020 through February 9, 2021 of 168%. As stated above the policy responds to the cost repair, or the cost to rebuild or replace on the same or another site with new materials of like size, kind and quality and reflect the cost of such materials on the date of loss. We have previously discussed this issue with the Airport Authority, as we have confirmed the SRM estimate relied on material costs from October 2020, immediately following their engagement and the Airport Authority have been unable to confirm the dates when the material pricing and erection costs were provided from the metal building manufacturers to their contractor; therefore, we cannot advise if we are agreeable with the costs included in the Connico estimate as it relates to the material and erecting costs.

Regarding the estimates for the build-out of office space and restrooms, the statement that they were not included is inaccurate. We would request that you please review the attached SRM estimate, which has previously been provided to the Airport Authority and includes both items. They were not identified in the initial estimate, as they could not be observed during SRM's initial inspection; however, when Ms. Holston brought this to our attention the items were addressed, and the estimate was revised and reissued to include these additional costs.

The seventh paragraph ends with, "Third, SRM's estimates of square footage for the various buildings differed from that provided by Tune and used by FG, Connico, and FEMA. Finally, SRM's bid states that the scope of work was provided by Solis & Parker Associates report dated 8/3/2020, but the SRM estimate ignored the report's statement: "Scope of replacement to include new foundations and anchors required to meet present day code." In other words, the SRM quote does not include new foundations, but proposes to reuse the existing, damaged, and structurally unsound building pads that do not meet the modern Building Codes--directly in contravention to the scope prepared by Solis Parker for FM. According to SRM, it would use the existing pads, cut out the former post and anchor bolts, and reattach new with epoxy and concrete adhesives. We have opinions from two different Tennessee engineering firms that state this approach is unacceptable and both agree that the footings and concrete slabs must be replaced."

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 115 of 133 PageID #: 118

Mr. Mark Bell
Metropolitan Nashville Airport Authority
Nashville, TN | Tornado Damage
File No.: 500245

May 24, 2021
Page 6

Again, this is an inaccurate statement. SRM provided the information from the Solis Parker Report to the metal building manufacturer as these are standard prefab hangars that were previously purchased from the same vendors and it is those vendors who have provided quotes.

Regarding the statement on foundations, it appears that some confusion as to what the Solis Parker report stated, for consistency we again will use Building A for reference. Building A's scope of work states "Excavate and construct foundations as required to meet foundation's design and PEMB documents. All concrete and reinforcing shall meet the foundations documents, the documents shall be signed and sealed by a registered professional engineer registered in the state of TN. Foundations to be complete including anchor bolts and piers as required. Estimated foundations are 2'6 by 2'6 by 1'0 each; with 2 each ½" A-307 anchor bolts. All concrete to be 4000 psi and 50 grade steel. Epoxy anchors are acceptable and are to be installed per vendor's instructions."

The SRM estimate states they are replacing the piers, concrete cutting the slab, installing new rebar, replacing anchor bolts, and repairing the concrete that is to be removed. This is exactly what is outlined in the Solis Parker report; however, the Connico estimate/bid includes the removal of all piers and slabs at a cost of $1,435,246.67, which is not representative of the scope of work outlined in the Solis Parker report and should be revised to reflect the scope of work accurately.

You also state "the SRM quote does not include new foundations, but proposes to reuse the existing, damaged, and structurally unsound building pads that do not meet the modern Building Codes." Again, this statement is not accurate as the building pads or slabs are not structural elements. During our multiple conversations with Mr. Davidson and Mr. Gall we have advised the footings/piers are the structural elements, as they are the load bearing elements that the columns are connected to, not the building pad or slab. Based on the estimates/bids provided, it appears as if the contractor did not understand what elements the Solis Parker report was referring to nor did anyone contact Mr. Solis. For clarification we asked Mr. Solis to provide a letter clarifying the terms used by professional structural engineers (see attached). Mr. Solis' letter states, "For buildings designated to be demolish and rebuilt or a total loss; the work does include foundation replacement as indicated on our report dated August 3, 2020. This includes the buildings designated as A, B, C, D, E; and the buildings 4300, 4310, 4320, 4330, 4410, 4420 and 4430 inclusive. To clarify, for this report; "foundation" is the load bearing points on each slab per an anchor bolt plan. The metal building vendor will provide the anchor bolt plan with the building reactions to facilitate the foundations design. For buildings where foundation replacement is indicated, the foundation work shall not include the replacement of the slab on grade areas as a whole, but only the areas needed for local saw cut of the slabs (either asphalt paving or concrete slab, depending on the building) and the installation of the new foundations. The remaining buildings; including 4250, 4260, 4340, 4350, 4360, 4440, 4450 and 4460 inclusive have been inspected and deemed to be repairable and as per ICC-Existing Building Code. For these buildings, the level of damage is less than "substantial structural damage." For these buildings, the foundations and the slab on grade was not

Mr. Mark Bell
Metropolitan Nashville Airport Authority
Nashville, TN | Tornado Damage
File No.: 500245

May 24, 2021
Page 7

affected and either do not require repairs, or the repairs are limited to replacing any affected anchor bolt with new epoxy or wedge type anchors."

Lastly, you advise "We have opinions from two different Tennessee engineering firms that state this approach is unacceptable and both agree that the footings and concrete slabs must be replaced." We have only been provided with copies of the letter from Logan Patri Engineering, Inc., whom Mr. Solis met with and discussed the damages with prior to issuing his report. As the Airport Authority requested, they worked together as to not have conflicting reports. In the February 10, 2021 report Logan Patri Engineering, Inc. states:

"OBSERVATIONS of Existing Slabs (of Demolished T hangar buildings)

The existing slabs for demolished T hangars 4330, 4320, 4310, 4300 were uneven, had widespread cracks and were in some cases just a topping slab. Moreover, the slabs were at differential heights between the various pods further restricting its use. It is our understanding new T - Hangar structures would be built at these locations. The new structures would require new footings under columns and the existing slabs will have to saw cut to accommodate new foundations. In addition, at the perimeter of the new T – Hangars, a new turn down slab will be required. This will require further saw cut of the existing slab. Having large amount of saw cuts on an existing distressed slab would further make the slab unusable.

Given the requirements of new foundations and the condition of the existing slabs and keeping the design requirements for a new T-hangar building in terms of usability and performance it is our opinion that it will be cost prohibitive to try and salvage the existing slabs and it should be demolished. A new slab/foundation system with proper subgrade compaction should be designed for the new T hangar building.

LPE performed the site survey of the existing conditions of the structure in an attempt to gather adequate information to form professional opinions concerning the issues. We have relied upon the information gathered to develop our findings, opinions, and recommendations. A detailed evaluation and analysis of every structural member, even where visible, is beyond the scope of services for this report."

Based on our review of Mr. Patri's letter it appears he does not indicate the scope of the repair identified in the Solis Parker cannot be performed but believes it to be cost prohibited, which we disagree with. Mr. Patri's letter also refers to differential heights and various cracks in the slabs. The policy will only respond to actual damages resulting from the tornado and will not respond to correcting pre-existing conditions. Lastly, Mr. Patri's report states "A detailed evaluation and analysis of every structural member, even where visible, is beyond the scope of services for this report." However, the Solis Parker report addresses each building in detail as each building was examined.

In your eighth paragraph you advise, "FM's insistence that the SRM bid be used is not reasonable in light of all of the evidence and opinions to the contrary. In Tennessee, an insurer has a duty to deal with its insured "fairly and in good faith" in settling a claim."

Mr. Mark Bell
Metropolitan Nashville Airport Authority
Nashville, TN | Tornado Damage
File No.: 500245

May 24, 2021
Page 8

As with many of the statements included in your letter we disagree with your opinion. It is our belief that AFM has acted and continues to act in good faith, while honoring the terms and conditions of the policy. AFM also believes that if the information referenced in the letter and the attachments are reviewed, the reviewer will be able to determine the SRM estimate was not only reasonable, but it would not have been the lowest bid if the scope of work in the Solis Parker report was competitively bid as required.

In the final paragraph you advise that "Tune, purposes that a reasonable valuation for the losses it sustained is to average the Connico, FG, and FEMA estimates, for a total amount payable to Tune of $9,985,179," and "also confirm that FM does not intend to rely on its flawed bid from SRM."

As stated multiple times and supported through the various attached documents, the SRM estimate is not flawed and it will continue to be the basis for our measurement of the recoverable loss from this event. Furthermore, AFM is not agreeable to the $9,985,179 demand nor do we agree that Tune should violate their own bid process as explained by Ms. Holton and Mr. Davidson.

AFM stands behind our current hangar repair estimate of $6,892,293.84 of which $5,457,983.29 has been paid as an actual cash value measure in good faith and the balance will be recoverable in the event the repairs are completed or the funds are spent on an unplanned capital expenditure prior to March 3, 2022.

We would ask that you please contact us with any questions.

Neither this letter nor our investigation is an admission or denial of liability and does not waive any rights or duties of either party under any Affiliated FM Insurance Company Policy No. IA038. Anything done or to be done by Affiliated FM Insurance Company, or on its behalf, in connection with the above-described matter, including, but not limited to, any investigation into the cause or amount of loss or other matter relative thereto, shall not waive, invalidate, forfeit, or modify any of its rights under the policies issued by it.

Sincerely,

Deanna Gajdik, Staff Adjuster
Atlanta Operations | Claims

# Exhibit 5

# waller

Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
P.O. Box 198966
Nashville, TN 37219-8966

615.244.6380   main
615.244.6804   fax
wallerlaw.com

Mark M. Bell
615.850.8850   direct
mark.bell@wallerlaw.com

January 24, 2022

**VIA EMAIL AND FIRST CLASS U.S. MAIL**

Joshua Martinez
Assistant Vice President
Senior General Adjuster
FM Global Insurance Company
3460 Preston Ridge Road
Alpharetta, GA 30005
Joshua.martinez@fmglobal.com

Deanna Gajdik
Claims Adjuster
FM Global Insurance Company
3460 Preston Ridge Road
Alpharetta, GA 30005
Deanna.gajdik@fmglobal.com

Re: Insured:        John C. Tune Airport
    Policy No.:     IA038
    Claim No.:      500245 - Tune Tornado Loss
    Date of Loss:   March 3, 2020

Dear Mr. Martinez and Ms. Gajdik:

As you know, we represent the Metropolitan Nashville Airport Authority ("MNAA") and the John C. Tune Airport ("Tune") in connection with the claim for damages to Tune. We have been very disappointed with FM Global's failure to pay additional amounts due and owing and merely requesting additional information instead. The requests also deviate from the previously stated goals of FM Global ascertaining additional information concerning FAA regulations and code requirements.

As you will recall during our in-person meeting, there were two primary areas of "new information" that were discussed for which FM Global asserted that it needed additional information: (1) FAA requirements for relocating slabs and necessitating certain redesign elements and (2) code requirements. MNAA provided all information requested by FM Global in the in-person meeting.

Instead of responding to any of the FAA or code items, Envista requested a litany of additional information, including multiple interviews, none of which relates to FAA or code requirements. The requested information merely seems to be an additional attempt to delay the claim and to avoid paying MNAA what it is owed under the Policy.

4841-1207-0143

# waller

At this point, MNAA does not believe it has any other option but to invoke the Appraisal Clause in the Policy and hereby formally demands an appraisal. Please confirm your receipt of this demand for appraisal, and confirm whether FM Global contends that MNAA needs to take any further action to effectuate its demand for appraisal. Assuming there is none, MNAA will notify FM Global of its selected appraiser within 20 days of this letter.

Additionally, please see attached a copy of a draft Tolling Agreement that we have prepared. MNAA believes it is necessary for the parties to enter into a tolling agreement while the parties attempt to resolve this dispute through the appraisal process without having to file a formal complaint and to protect MNAA's right to sue in the event this process is drawn out. If the terms are agreeable to you, please sign the Tolling Agreement and return a signed copy to us.

I look forward to hearing from you soon.

Very truly yours,

Mark M. Bell

MMB:qdk

## TOLLING AGREEMENT

This Tolling Agreement (the "Agreement") is made and entered into on January 24, 2022, by and between Metropolitan Nashville Airport Authority ("MNAA") and Affiliated FM Insurance Company ("Insurer"). MNAA and Insurer are sometimes referred to herein individually as a "Party" and are collectively referred to herein as the "Parties."

### RECITALS

**WHEREAS,** Insurer issued a policy of insurance, Policy No. IA038 for the policy period March 1, 2019, through March 1, 2020, which was extended to July 1, 2020, for MNAA's various properties ("Policy"), including MNAA's John C. Tune Airport;

**WHEREAS,** on or around March 3, 2020, a tornado damaged and destroyed hangars at MNAA's John C. Tune Airport ("Loss"), which is undisputedly covered by the Policy, resulting in MNAA's notification to Insurer of the loss ("Claim");

**WHEREAS,** certain disputes between MNAA and Insurer have arisen concerning the amount of coverage available to MNAA under the Policy and for the Claim;

**WHEREAS,** the Policy contains a provision that states, in relevant part, "[n]o suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless . . . [l]egal action is started within two years after inception of the loss" (the "Limitation Provision");

**WHEREAS,** the Parties desire additional time to evaluate the Claim and Loss under the Policy;

**WHEREAS,** the Parties desire, intend, and agree to toll the applicable periods of limitations arising from or relating to the Claim and the Policy, as more specifically described below, and to preserve all legal rights, claims, defenses, and causes of action which may exist relating to the Claim and the Policy, including but not limited to the Limitation Provision, statutes of limitation, and statutes of repose, as of the date of this Tolling Agreement.

### AGREEMENT

NOW THEREFORE, in consideration of the promises, benefits, covenants, and conditions set forth herein, the sufficiency of which are hereby acknowledged, the Parties covenant and agree as follows:

1.      The running of any statute of limitations, statute of repose, laches as well as any other time-related defense applicable to the Loss against Insurers authorized, instituted, or brought by or on behalf of Airport Authority, is tolled and suspended for the period beginning on January 24, 2022, through January 24, 2024 (the "Tolling Period" or "Tolled Period").

2.      Neither Insurer nor any of its agents or attorneys shall include the Tolling Period in the calculation of the running of any statute of limitations, statute of repose, Limitation Provision, laches or other time-related defense applicable to the Policy or Claim, including any relief that may be imposed therein, in asserting or relying upon any such time-related defense.

3.      Nothing in this Agreement shall affect any applicable statute of limitations, statute of repose, laches or other time-related defense that may be available to Insurers before the commencement of the Tolling Period.

4. It is the intent of the Parties to this Agreement to extend the time for the filing of any claims arising out of or relating to the Policy or Loss, and no party is waiving its right to assert any claim, right, defense, or cause of action it might hold during the Tolling Period, nor shall this Agreement constitute a waiver by any Party of any claim, right, defend or cause of action which may exist during the Tolled Period.

5. The running of any statute of limitations, statute of repose, laches or other time-related defense applicable to the Policy or Claim shall commence again after the end of the Tolling Period, unless there is an extension of the Tolling Period executed in writing by and on behalf of the Parties hereto.

6. The application and interpretation of this Agreement shall be governed exclusively by the laws of the State of Tennessee.

7. Each of the undersigned individuals warrant and represent that they have the power and authority to enter into this Agreement on behalf of the entity for which they are signing, and that this Agreement is a valid and binding obligation, enforceable against each Party.

8. This Tolling Agreement shall be binding on and shall inure to the benefit of the Parties hereto, and their respective affiliates, parent companies, subsidiaries, successors, heirs, transferees and assigns.

9. If the tolling of any claim is determined to be contrary to any applicable law or public policy, such tolling shall be effective to the extent permitted by law or public policy.

10. This instrument contains the entire agreement of the Parties and may not be changed orally, but only by an agreement in writing.


**Metropolitan Nashville Airport Authority**

By: _____          Date: _____

Name: _____          Title: _____


**Affiliated FM Insurance Company**

By: _____          Date: _____

Name: _____          Title: _____


4884-5758-4395

# Exhibit 6



Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700      615.244.6380   main
P.O. Box 198966                   615.244.6804   fax
Nashville, TN 37219-8966          wallerlaw.com

Mark M. Bell
615.850.8850   direct
mark.bell@wallerlaw.com

February 2, 2022

**VIA EMAIL AND FIRST CLASS U.S. MAIL**

Joshua Martinez
Assistant Vice President
Senior General Adjuster
FM Global Insurance Company
3460 Preston Ridge Road
Alpharetta, GA 30005
Joshua.martinez@fmglobal.com

Deanna Gajdik
Claims Adjuster
FM Global Insurance Company
3460 Preston Ridge Road
Alpharetta, GA 30005
Deanna.gajdik@fmglobal.com

Re:   Insured:        John C. Tune Airport
      Policy No.:     IA038 ("Policy")
      Claim No.:      500245 - Tune Tornado Loss
      Date of Loss:   March 3, 2020

Dear Mr. Martinez and Ms. Gajdik:

As you know, we represent the Metropolitan Nashville Airport Authority ("MNAA") and the John C. Tune Airport ("Tune") in connection with the claim for damages to Tune. We recently sent you an appraisal demand on January 24, 2022 ("Appraisal Demand"). As required under the Subsection B (Appraisal) of the Loss Adjustment and Settlement Section of the Policy, MNAA hereby gives notice that MNAA has selected Toby Johnson from Omega Insurance Appraisals as its competent and disinterested appraiser.

Please notify us of your selected competent and disinterested appraiser by February 13, 2022 (within 20 days of the Appraisal Demand), as required under the Policy. Please confirm whether you will sign the Tolling Agreement that we attached to the Appraisal Demand. I look forward to hearing from you soon.

Very truly yours,

Mark M. Bell

MMB:qdk

4880-5262-7212

# Exhibit 7



**AFM**®

Member of the FM Global Group

2022 FEB 28 PM 2:22

FILED

CLERK & MASTER
DAVIDSON CO. CHANCERY CT.
D.C.&M.

February 4, 2022

Mr. Mark Bell
Waller Lansden Dortch & Davis, LLP
Email: mark.bell@wallerlaw.com

Reference:

| | |
|---|---|
| Client: | Metropolitan Nashville Airport Authority |
| Location of Loss: | John C. Tune Airport, Nashville, TN |
| Date of Loss: | 3-Mar-2020 |
| Policy No.: | IA038 |
| Peril: | Wind |
| Adjustment File No.: | 500245 |

Dear Mr. Bell:

This confirms our receipt and review of your letter dated January 24, 2022, in which your client purported a written demand for an Appraisal proceeding.

The Policy states the following regarding Appraisal:

> **"B.   _APPRAISAL_**
>
> *If the Insured and this Company fail to agree on the amount of loss, each will, on the written demand of either, select a competent and disinterested appraiser after:*
>
> *1. The Insured has fully complied with all provisions of this Policy.*
>
> *2. This Company has received a signed and sworn Proof of Loss from the Insured.*
>
> *Each will notify the other of the appraiser selected within 20 days of such demand.*
>
> *The appraisers will first select a competent and disinterested umpire. If the appraisers fail to agree upon an umpire within 30 days then, on the request of the Insured or this Company, the umpire will be selected by a judge of a court of record in the jurisdiction in which the appraisal is pending. The appraisers will then appraise the amount of loss, stating separately the **actual cash value** and replacement cost value as of the date of loss and the amount of loss, for each item of physical loss or damage or if, for Business Interruption loss, the amount of loss for each Business Interruption coverage of this Policy.*

AFFILIATED FM INSURANCE COMPANY
3460 PRESTON RIDGE ROAD | SUITE 400 ALPHARETTA, GA 30005 USA | T: +1 (1)770 777 3613 | AFFILIATEDFM.COM

*If the appraisers fail to agree, they will submit their differences to the umpire. An award agreed to in writing by any two will determine the amount of loss.*

*The Insured and this Company will each:*

*1. Pay its chosen appraiser; and*

*2. Bear equally the other expenses of the appraisal and umpire.*

*A demand for Appraisal shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this Policy, including as provided under Requirements in Case of Loss.*

*This Company will not be held to have waived any of its rights by any act relating to appraisal."*

Based on the terms and conditions stated above, Appraisal is premature at this time and AFM objects to moving forward with an Appraisal proceeding. AFM reserves all rights under the Policy and at law regarding your client's purported demand.

Appraisal is premature at this time because Metropolitan Nashville Airport Authority has not complied with its obligations under the Policy, particularly the Requirements in Case of Loss, which details the steps that Metropolitan Nashville Airport Authority must take prior to proceeding with an Appraisal. The Requirements in Case of Loss provision states the following:

*"I.*   ***REQUIREMENTS IN CASE OF LOSS***

*The Insured will:*

*1. Give immediate written notice to this Company of any loss.*

*2. Protect the property from further loss or damage.*

*3. Promptly separate the damaged and undamaged property; put it in the best possible order; and furnish a complete inventory of the lost, destroyed, damaged and undamaged property showing in detail the quantities, costs, **actual cash value**, replacement value and amount of loss claimed.*

*4. Give a signed and sworn proof of loss to the Company within 90 days after the loss, unless that time is extended in writing by this Company. The proof of loss must state the knowledge and belief of the Insured as to:*

*a) The time and origin of the loss.*

*b) The Insured's interest and that of all others in the property.*

*c) The **actual cash value** and replacement value of each item and the amount of loss to each item; all encumbrances; and all other contracts of insurance, whether valid or not, covering any of the property.*

*d) Any changes in the title, use, occupation, location, possession or exposures of the property since the effective date of this Policy.*

*e) By whom and for what purpose any **location** insured by this Policy was occupied on the date of loss, and whether or not it then stood on leased ground.*

*5. Include a copy of all the descriptions and schedules in all policies and, if required, provide verified plans and specifications of any buildings, fixtures, machinery or equipment destroyed or damaged.*

*6. Further, the Insured, will as often as may be reasonably required:*

*a) Exhibit to any person designated by the Company all that remains of any property;*

*b) Submit to examination under oath by any person designated by the Company and sign the written records of examinations; and*

*c) Produce for examination at the request of the Company:*

*i) All books of accounts, business records, bills, invoices and other vouchers; or*

*ii) Certified copies if originals are lost,*

*At such reasonable times and places that may be designated by the Company or its representative and permit extracts and machine copies to be made."*

AFFILIATED FM INSURANCE COMPANY
3460 PRESTON RIDDE ROAD | SUITE 400 ALPHARETTA, GA 30005 USA | T: +1 (1)770 777 3613 | AFFILIATEDFM.COM

Additionally, Settlement of Claims provides the following:

> **"J. *SETTLEMENT OF CLAIMS***
>
> *The amount of loss for which this Company may be liable will be paid within 30 days after:*
>
> *1. Proof of loss as described in this Policy is received by this Company; and*
>
> *2. When a resolution of the amount of loss is made either by:*
>
> > *a) Written agreement between the Insured and this Company; or*
> >
> > *b) The filing with this Company of an award as provided in the Appraisal clause of this section.*
>
> *In the event of insured physical loss or damage determined by this Company's representatives to be in excess of the applicable policy deductible, this Company will advance mutually agreed-upon partial payment(s), subject to the Policy's provisions. To obtain such partial payments, the Insured will submit a signed and sworn proof of loss as described in this Policy, with adequate supporting documentation."*

We note that Metropolitan Nashville Airport Authority has not provided a signed, sworn proof of loss to AFM. Therefore, there has not been, nor can there be, a failure of AFM "to pay additional amounts due and owing", which is a necessary prerequisite to an Appraisal proceeding under the Policy. Thus, unless and until Metropolitan Nashville Airport Authority provides a signed and sworn proof of loss in accordance with the Policy, Appraisal is premature.

Although the Policy requirements state that the signed and sworn proof of loss must be received within 90 days from the date of loss, AFM will agree to issue a 90-day extension from the date of this letter for the Insured to provide a copy of their proof of loss. The signed and sworn proof of loss must be accompanied by all supporting documentation used to calculate and total the proof of loss along with all supporting documentation that identifies both the costs to restore the property with like kind and quality and associated with any upgrades or deviation from the existing types of construction or location of structures and copies of all codes that were enforced at the time of the loss by a governing agency associated with such.

Please let us know if you would like to discuss any aspect of this letter.

Regards,

*Deanna Gajdik*

Deanna Gajdik, Staff Adjuster
Atlanta Operations | Claims

AFFILIATED FM INSURANCE COMPANY
3460 PRESTON RIDDE ROAD | SUITE 400 ALPHARETTA, GA 30005 USA | T: +1 (1)770 777 3613 | AFFILIATEDFM.COM

Case 3:22-cv-00212   Document 1-1   Filed 03/28/22   Page 131 of 133 PageID #: 134

# ORIGINAL

| STATE OF TENNESSEE<br>20TH JUDICIAL DISTRICT<br>CHANCERY COURT | **SUMMONS** | CASE FILE NUMBER<br>22-0304-II |
|---|---|---|

| PLAINTIFF<br>Metropolitan Nashville Airport Authority | DEFENDANT<br>Affiliated FM Insurance Company |
|---|---|

**TO:** (NAME AND ADDRESS OF DEFENDANT)

Affiliated FM Insurance Company
270 Central Avenue
Johnston, Rhode Island 02919-4949

NAIC CoCode: 10014

**Method of Service:**

- ☐ Certified Mail
- ☐ Davidson Co. Sheriff
- ☑ *Comm. Of Insurance
- ☐ *Secretary of State
- ☐ *Out of County Sheriff
- ☐ Private Process Server
- ☐ Other

   *Attach Required Fees

List each defendant on a separate summons.

**YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CHANCERY COURT, DAVIDSON COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.**

| Attorney for plaintiff or plaintiff if filing Pro Se:<br>(Name, address & telephone number)<br><br>Mark M. Bell<br>Quynh-Anh D. Kibler<br>Waller Lansden Dortch & Davis, LLP<br>511 Union Street, Suite 2700<br>Nashville, Tennessee 37219<br>(615) 244-6380 | FILED, ISSUED & ATTESTED<br>**FOR CLERK USE ONLY**   3/1/22<br><br>MARIA M. SALAS, Clerk and Master<br>By:      1 Public Square<br>       Suite 308<br>       Nashville, TN 37201<br><br>Deputy Clerk & Master |
|---|---|

## NOTICE OF DISPOSITION DATE

  The disposition date of this case is twelve months from date of filing. The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02 and Local Rule 18.

  If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Clerk and Master at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

| TO THE SHERIFF: | DATE RECEIVED<br><br><br>Sheriff |
|---|---|

***Submit one original plus one copy for each defendant to be served.

ADA Coordinator, Maria M. Salas (862-5710)

## RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows: (Name of Party Served) *On behalf of Affiliate/FM Insurance Company*

☑ Served     *Return Serve on Comm of Ins*
☐ Not
   Served

☐ Not Found
☐ Other _____

Date of Return: *3/9/22*

Agency Address:

By: *Special Officer _____*

Sheriff/or other authorized person to serve process

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____ 20___, I sent, postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case to the defendant _____. On the ___ day of _____, 20___, I received the return receipt, which had been signed by _____ on the _____ day of _____ 20

The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

Sworn to and subscribed before me on this _____ day of _____, 20___.

Signature of ____ Notary Public or ____ Deputy Clerk

My Commission Expires:

Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process.

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S):

Tennessee law provides a ten thousand dollar ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

Mail list to:  Clerk & Master
              1 Public Square
              Suite 308
              Nashville TN 37201

Please state file number on list.

ATTACH
RETURN
RECEIPT
HERE
(IF APPLICABLE)

## CERTIFICATION (IF APPLICABLE)

I, Maria M. Salas, Clerk & Master of the Chancery Court in the State of Tennessee, Davidson County, do certify this to be a true and correct copy of the original summons issued in this case.

MARIA M. SALAS, Clerk & Master

By: _____

D.C. & M.